2008 WY 97

**Dale Wayne EATON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**Nos. 04–180, 06–255.**

Supreme Court of Wyoming.

Aug. 18, 2008.

Rehearing Denied Sept. 15, 2008.

40 

Representing Appellant: Kenneth M. Koski, Public Defender; Tina N. Kerin, Senior Assistant Appellate Counsel; Marion Yoder, Senior Assistant Public Defender; Ryan R. Roden, Senior Assistant Appellate Counsel; and Donna D. Domonkos, Appellate Counsel. Argument by Tina N. Kerin.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling; David L. Delicath; and Melissa M. Swearingen, Senior Assistant Attorneys General. No. 04–180 argued by D. Michael Pauling; No. 06–255 argued by David L. Delicath.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ¶1

Issues ................................................................. ¶ 2

Facts and Proceedings ............................................. ¶¶ 3-10

Discussion ......................................................... ¶¶ 11-12

PART I. Guilt/Innocence Phase

A. Was Eaton Incompetent During Trial and the Proceedings in this Court
 (i) Competency as a medical/mental issue. ......................... ¶¶ 13-23
 (ii) Competency as suggested by events at trial. .................... ¶¶ 24-30

B. Voir Dire as Predisposing Jury to Find Eaton Guilty ............... ¶¶ 31-32

C. Ineffective Assistance of Counsel ................................ ¶¶ 33-37
 (i) Did the theory-of-the-case defense chosen by defense counsel meet the ABA Guide-
 lines for the Appointment and Performance of Defense Counsel in Death Penalty
 Cases (February 2003). ...................................... ¶¶ 38-47
 (ii) No challenge to DNA. ......................................... ¶¶ 48-50
 (iii) Failure to know the applicable law. ........................... ¶¶ 51-54
 (iv) Concession of guilt without Eaton's consent. ................... ¶¶ 55-61
 (v) Defense counsel's election to allow the trial to proceed when Eaton was not
 competent to stand trial constitutes ineffective assistance of counsel. ................. ¶ 62
 (vi) Waiver of venue. .............................................. ¶¶ 63-65
 (vii) Failure to object to instructions. ............................. ¶¶ 66-73
 (viii) The foregoing arguments, in combination, demonstrate that Eaton was abandoned by
 defense counsel. .............................................. ¶¶ 74-76

D. Hostility/Prejudice/Bias Toward Eaton at Guilt/Innocence Phase; Additional Remand ..... ¶¶ 77-79
 (i) Guilt/innocence phase prejudice/bias/hostility. .................. ¶¶ 80-81
 (ii) Need for additional remand. .................................... ¶ 82

E. Juror Misconduct ................................................ ¶¶ 83-91

F. Admission of Evidence ............................................ ¶ 92
 (i) Testimony of Joe Dax. .......................................... ¶¶ 93-96
 (ii) Dr. Thorpen in the jury box. ................................... ¶¶ 97-98
 (iii) Mary Follette. ............................................... ¶¶ 99-100

G. Record Incomplete ............................................... ¶¶ 101-102

H. Prosecutorial Misconduct ........................................ ¶¶ 103-104

I. Cumulative Error ................................................ ¶ 105

CONCLUSION ...................................................... ¶ 106

PART II: Sentencing Phase ......................................... ¶ 107

A. Voir Dire ....................................................... ¶¶ 108-114

B. Application of the 2003 Statute to this Case ...................... ¶¶ 115-125

C. Ineffective Assistance of Counsel ................................ ¶ 126
 (i) 2003 statute. ................................................. ¶ 127
 (ii) Whether Trial Counsel Provided Ineffective Assistance in the Investigation and
 Presentation in the Sentencing Phase of Mitigating Evidence. .................... ¶¶ 128-185
 (iii) Instructions. ................................................ ¶¶ 186-188
 (iv) Sentencing form inadequate. ................................... ¶ 189

D. Hostility of Judge ............................................... ¶ 190

E. Prosecutorial Misconduct ........................................ ¶ 191
 (i) In closing argument. ........................................... ¶¶ 192-200
 (ii) During examination of witnesses. ............................... ¶¶ 201-205
 (iii) Destruction of evidence. ...................................... ¶ 206

F. Allowing Dr. Ash to Testify ................................................... ¶¶ 207-210

G. Instructions Improper ....................................................... ¶¶ 211-213

H. Record Incomplete ........................................................... ¶ 214
 (i) Instructions conference/other discussions. ...................................... ¶¶ 215-216
 (ii) Remand hearing too limited...................................................... ¶ 217

I. Error in Admission of Too Much Evidence About 1998 Conviction ......................... ¶ 218

Conclusion ........................................................................ ¶ 219

Part III: Motion for New Trial ....................................................... ¶ 220

Discussion ........................................................................ ¶¶ 221-227

Conclusion ........................................................................ ¶¶ 228-230

HILL, Justice.

## INTRODUCTION

[¶ 1] Appellant, Dale Wayne Eaton (Eaton), seeks review of his conviction for the crime of first-degree murder, as well as for other crimes,[1] and the sentence of death which was imposed on June 3, 2004. We will affirm the Judgment as to all convictions. We will affirm both the convictions and the death sentence.

## ISSUES

[¶ 2] Eaton raises these issues:

I. The trial court committed reversible error and violated the *Ex Post Facto* Clause by applying post–1989 amendments to Wyo. Stat. Ann. § 6–2–102 (1982) to Eaton's case.

II. Eaton received ineffective assistance of counsel.

 A. Eaton's counsel were ineffective for stipulating to the use of the entire 2001 amended version of Wyo. Stat. Ann. § 6–2–102 (1982), excluding "future dangerousness." Amended portions were more disadvantageous to Eaton and violated the *Ex Post Facto* Clause of the United States and Wyoming constitutions.

 B. Defense counsel were ineffective by failing to comply in substantive ways with the ABA Guidelines which establish specific standards for both experience and performance in trying death penalty cases.

C. Failure to know the law.

D. Concession of Eaton's guilt without valid consent from him.

E. Eaton was unable to assist in his defense and thus not competent to be tried. Counsel's failure to address this fundamental problem and election to allow the case to proceed under these circumstances rendered trial patently unfair.

F. Trial counsel were ineffective for waiving objection to venue.

G. The oversights, errors and decisions to forego (i.e., the sorts of things set out above) amounted to an abandonment of Eaton's defense by his own counsel.

H. Defense counsel were ineffective in failing to adequately investigate potential mitigation evidence, failing to offer appropriate mitigation evidence, and failing to provide necessary information to mitigation experts.

I. Counsel's failure to object to the given instructions which were substantively different than those proposed by the defense constituted substandard performance and substantially prejudiced Eaton.

J. Counsel did not assure that Eaton's jury was given a constitutionally adequate sentencing form.

III. The jury was not properly instructed on the law as intended by Wyoming's death penalty statute.

---

1. Eaton was convicted of one count of first-degree premeditated murder, three counts of fel- ony murder, aggravated kidnapping, aggravated robbery, and first-degree sexual assault.

IV. An unconstitutional and fatally defective voir dire deprived Eaton of a fair and impartial jury to determine his guilt or innocence and to decide on life or death.

V. The trial court was biased at trial and in limiting the remand, showing such hostility to his claims that Eaton was deprived of due process and prejudiced as a result.

VI. Prosecutorial misconduct occurred, violating Eaton's due process rights and warranting reversal.

VII. Eaton was unable to assist in his own defense and thus was not competent to be tried.

VIII. The trial court erred in denying defense counsel's motion for mistrial, where a juror conducted his own investigation and discussed his investigation during deliberations.

IX. The trial court erred in the admission and presentation of evidence.

X. The trial court erred in permitting the testimony of Dr. Ash without Eaton's express waiver of privilege, and without insuring the protection of Eaton's Fifth Amendment right against self-incrimination.

XI. Is the record below reversibly incomplete?

XII. Cumulative error occurred, warranting reversal of Eaton's convictions and death sentence.

The State phrases its issues as follows:

I. The trial court did not abuse its discretion when it applied the 2001 version of Wyo. Stat. Ann. § 6–2–102 rather than the 1983 version.

II. [Eaton] received effective assistance of counsel from his defense attorneys.

A. [Eaton's] trial counsel were not ineffective for stipulating to the 2001 version of Wyo. Stat. Ann. § 6–2–102.

B. Trial counsel provided effective assistance in substantial compliance with the ABA Guidelines.

C. Trial counsel provided effective assistance through their demonstrated knowledge, citation and application of the law relevant to the case.

D. Trial counsel provided effective assistance by employing a defense strategy that allowed counsel, with [Eaton's] express consent, to present a single, cohesive defense theory both at the guilt phase and the punishment phase.

E. Trial counsel provided effective assistance by having [Eaton] evaluated for competency prior to and during trial; the parameters for evaluating competency are much more specific than a client's unwillingness to assist or cooperate with his own defense.

F. Trial counsel [were] not ineffective for waiving [their] objection to venue.

G. Trial counsel provided effective assistance through tactical and strategic decisions which were reasonably calculated to assist in [Eaton's] defense.

H. Trial counsel provided effective assistance in the investigation and presentation of mitigating evidence.

I. Trial counsel provided effective assistance in proposing, evaluating and stipulating to jury instructions.

J. Counsel were not ineffective in approving the sentencing phase verdict form.

III. [Eaton] has failed to establish that any portion of the jury instructions constituted plain error.

IV. Trial counsel's voir dire ensured that none of the seated jurors held views that would prevent or substantially impair the performance of their duties as jurors.

V. The trial judge was not biased against [Eaton], nor did [it] abuse its discretion in voir dire, jury selection, or evidentiary rulings.

VI. No reversible prosecutorial misconduct occurred in this case.

VII. [Eaton] was capable of assisting in his own defense and competent to stand trial.

VIII. The trial court did not abuse its discretion when it denied [Eaton's] motion for a mistrial after finding that [Eaton] was not prejudiced by a juror's admittedly improper conduct.

IX. The trial court did not abuse its discretion when it allowed testimony from Joe Dax, Dr. Thorpen, Mary Follette, Shannon Breeden, and Richard Haskell, and allowed the admission of State's Exhibit 1000 during the sentencing phase.

X. The trial court did not err by allowing [Eaton's] trial counsel to question his own expert witness about information provided to the witness by [Eaton].

XI. The record on appeal contains a complete and accurate record of all trial proceedings as required by law.

XII. Cumulative error does not exist in this case.

### FACTS AND PROCEEDINGS

[¶ 3] At about noon on April 2, 1988, a fisherman found the murdered corpse of eighteen-year-old Lisa Marie Kimmell in the North Platte River southwest of Casper, near what is called Government Bridge. The victim had last been seen alive at 9:08 p.m., on March 25, 1988, in Douglas when she was stopped for a traffic violation. The crime was not solved until 2002, when a DNA match linked Eaton, who was incarcerated in Colorado on a felony conviction,[2] to her murder. On April 17, 2003, an information was filed charging Eaton with the crimes enumerated above, and on June 3, 2003, the State gave notice that it would seek the death penalty.

[¶ 4] Ms. Kimmell was last seen alive at approximately 9:08 p.m., on March 25, 1988, just east of Douglas, Wyoming, when she was issued a speeding ticket by a Wyoming State Trooper. That event occurred when she was en route from Denver, Colorado, to Billings, Montana, with a planned intermediate stop in Cody. When she did not arrive in Cody or Billings as scheduled, her mother reported her missing and a search for her began on March 26, 1988.

[¶ 5] An autopsy was performed shortly after her body was found. It revealed that Ms. Kimmell had been dead for 36 hours or more, although it was conceded that death may have occurred as much as three to seven days earlier. Because Kimmell's body was in the cold water of the North Platte River, the time of death was difficult to estimate accurately. Ms. Kimmell died of sanguination (internal bleeding) and exsanguination (external bleeding), secondary to multiple stab wounds to her chest and abdomen. In addition, a lethal blow was delivered to Kimmell's head shortly before she was stabbed. That blow would have proved fatal had she not first bled to death.

[¶ 6] Semen was found in her vagina and on the panties she was wearing, which was the only clothing she had on when her body was found. Samples were taken and preserved. DNA extracted from the semen found on her panties eventually led the authorities to Eaton. Eaton had once lived near Moneta, Wyoming, and a search of that property uncovered various parts from Ms. Kimmell's automobile, as well as the remainder of the automobile itself, buried in the ground.

[¶ 7] At trial, two theories emerged as to how Eaton and his victim came to be together. One, reported by a fellow inmate of Eaton's at the Natrona County Jail, was that Ms. Kimmell gave Eaton a ride to help him out. Eaton made sexual advances toward her and Kimmell slammed on the brakes and was going to make him get out of the car "in the middle of nowhere." Things spun out of control and Eaton ended up subduing her, raping her, killing her, etc. This theory was presented to the jury during the guilt/innocence phase of the trial.

[¶ 8] The second theory was presented by Eaton during the sentencing phase. It came into evidence through a physician who had examined Eaton for the purpose of preparing a mental evaluation. Eaton reported that he returned to his home late on March 25, 1988 and observed Ms. Kimmell's car parked on his land. He thought there were two people there and that he was being robbed. Eaton was in an angry state of mind to begin with, and upon finding her there, he got even more angry. He approached her with a gun and

---

**2.** Wyoming and many other states now require DNA testing of all convicted felons, and it was this process that led to Eaton's arrest and conviction. Wyo. Stat. Ann. § 7–19–401, *et seq.* (LexisNexis 2007) (enacted in 1997).

took her to his makeshift home. The further details of this version suggested that circumstances then spun out of control, and Eaton ended up raping and killing her after keeping her on his property for several days so that he would not be alone at Easter.

[¶ 9] The guilt/innocence phase of this case was tried to a jury on February 23, 2004 through March 15, 2004. The penalty phase lasted from March 18, 2004 until March 20, 2004. A sentencing hearing was held on May 20, 2004, and a warrant of execution was entered of record on that date. The judgment and sentence were entered of record on June 3, 2004. The death sentence has been stayed since June 22, 2004.

[¶ 10] This Court ordered a partial remand to the district court on April 5, 2005. The purpose of that hearing was to conduct an inquiry into whether or not Eaton's defense counsel rendered ineffective assistance of counsel during his trial. That hearing was held June 6–10, 2005. After briefing, the case was argued to this Court and taken under advisement on September 14, 2006.

## DISCUSSION

### *Introduction*

[¶ 11] This brief introduction will serve to explain how and why we divided our opinion into three parts. Our first task was to put the issues raised in this appeal into a logical order. This was necessary because some of the issues pose threshold questions which would necessarily obviate the need for exhaustive and/or dispositive consideration of some of the other issues that follow, if those threshold issues were resolved in Eaton's favor. Part I will deal with those asserted errors that occurred in the guilt/innocence phase of the trial that would require reversal of Eaton's conviction(s). Part II will deal with whether or not there were errors in the sentencing phase of trial that would require reversal of the sentence of death. Part III of the opinion deals with the issues raised in Eaton's appeal of the district court's denial of his motion for a new trial.

[¶ 12] We also take note here that in all of our modern cases dealing with the death penalty, we have acknowledged the now venerated proposition that "death is different," and we give due deference to that concept in our opinion. See *Hopkinson v. State*, 632 P.2d 79, 190 (Wyo.1981); *Hopkinson v. State*, 798 P.2d 1186, 1189 (Wyo.1990); *Olsen v. State*, 2003 WY 46, ¶ 3, 67 P.3d 536, 547 (Wyo.2003); *Harlow v. State*, 2003 WY 47, ¶ 6, 70 P.3d 179, 184 (Wyo.2003).

## PART I. Guilt/Innocence Phase

### A. *Was Eaton Incompetent During Trial and the Proceedings in this Court*

#### (i) **Competency as a medical/mental issue.**

[¶ 13] The discussion of this issue ranges far and wide in the briefs, but at this juncture we intend only to address the initial premise, i.e., that Eaton was not competent to stand trial. Our discussion of this issue pertains to both the guilt/innocence phase and the sentencing phase of the trial. Other aspects of this subject will be discussed in the other matters that involve the status of Eaton's mental health, such as mitigation of penalty. Although the facts relating to Eaton's mental state must be reviewed in light of the applicable law, not unlike the question of whether or not a search is unreasonable, whether or not a set of facts demonstrate that a defendant is or is not competent to stand trial is a question of law that we review *de novo*. *deShazer v. State*, 2003 WY 98, ¶¶ 12–13, 74 P.3d 1240, 1244–45 (Wyo.2003).

[¶ 14] The test of trial competence is whether or not a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether or not he has a rational as well as a factual understanding of the proceedings against him. Wyo. Stat. Ann. § 7–11–302 (LexisNexis 2007) provides:

(a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity, to:

(i) Comprehend his position;

(ii) Understand the nature and object of the proceedings against him;

(iii) Conduct his defense in a rational manner; and

(iv) Cooperate with his counsel to the end that any available defense may be interposed.

[¶ 15] This statutory directive captures a constitutional imperative established by the United States Supreme Court and adopted, as well, by this Court. *Hayes v. State*, 599 P.2d 558, 563 (Wyo.1979). Eaton contends that he has been incompetent throughout the proceedings to date, including this appeal. Indeed, we considered this issue as raised in a motion by Eaton pending argument of this appeal. By order entered on July 11, 2006, we denied Eaton's motion that this appeal be stayed because he was not competent to assist in the appeal. However, our more immediate concern is whether or not Eaton was competent during the time he actually stood trial. If he was not, then we would be compelled to reverse and remand and direct that proceedings could only commence anew once Eaton was declared competent.

[¶ 16] Wyo. Stat. Ann. § 7–11–303 (LexisNexis 2007) provides:

(a) If it appears at any stage of a criminal proceeding, by motion or upon the court's own motion, that there is reasonable cause to believe that the accused has a mental illness or deficiency making him unfit to proceed, all further proceedings shall be suspended.

(b) The court shall order an examination of the accused by a designated examiner. The order may include, but is not limited to, an examination of the accused at the Wyoming state hospital on an inpatient or outpatient basis, at a local mental health center on an inpatient or outpatient basis, or at his place of detention. In selecting the examination site, the court may consider proximity to the court, availability of an examiner, and the necessity for security precautions. If the order provides for commitment of the accused to a designated facility, the commitment shall continue no longer than a thirty (30) day period for the study of the mental condition of the accused.

(c) Written reports of the pretrial examination shall be filed with the clerk of court. The report shall include:

(i) Detailed findings;

(ii) An opinion as to whether the accused has a mental illness or deficiency, and its probable duration;

(iii) An opinion as to whether the accused, as a result of mental illness or deficiency, lacks capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed;

(iv) An opinion as to whether at the time of the alleged criminal conduct the accused, as a result of mental illness or deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law;

(v) A recommendation as to whether the accused should be held in a designated facility for treatment pending determination by the court of the issue of mental fitness to proceed; and

(vi) A recommendation as to whether the accused, if found by the court to be mentally fit to proceed, should be detained in a designated facility pending further proceedings.

(d) The clerk of court shall deliver copies of the report to the district attorney and to the accused or his counsel. The report is not a public record or open to the public. After receiving a copy of the report, both the accused and the state may, upon written request and for good cause shown, obtain an order granting them an examination of the accused by a designated examiner of their own choosing. For each examination ordered, a report conforming to the requirements of subsection (c) of this section shall be furnished to the court and the opposing party.

(e) If the initial report contains the recommendation that the accused should be held in a designated facility pending determination of the issue of mental fitness to proceed, the court may order that the accused be committed to or held in a designated facility pending determination of mental fitness to proceed.

(f) If neither the state, nor the accused or his counsel contests the opinion referred to in paragraph (c)(iii) of this section relative to fitness to proceed, the court may make a determination and finding of record on this issue on the basis of the report filed or the court may hold a hearing on its own motion. If the opinion relative to fitness to proceed is contested the court shall hold a hearing on the issue. The report or reports may be received in evidence at any hearing on the issue. The party contesting any opinion relative to fitness to proceed has the right to summon and cross-examine the persons who rendered the opinion and to offer evidence upon the issue.

(g) If the court determines that the accused is mentally fit to proceed, the court may order that the accused be held in confinement, be committed to a designated facility pending further proceedings, or be released on bail or other conditions. If the court determines that the accused lacks mental fitness to proceed, the proceedings against him shall be suspended and the court shall commit him to a designated facility for such period as the court may order but not to exceed the time reasonably necessary to determine whether there is substantial probability that the accused will regain his fitness to proceed:

(i) If it is determined that there is no substantial probability that the accused will regain his fitness to proceed, the accused shall not be retained in a designated facility unless proper civil commitment proceedings have been instituted and held as provided in title 25 of the Wyoming statutes. The continued retention, hospitalization and discharge of the accused shall be the same as for other patients. However, if the accused is discharged, the criminal proceedings shall be resumed, unless the court determines that so much time has elapsed since the commitment of the accused that it would not be appropriate to resume the criminal proceeding;

(ii) If it is determined that there is substantial probability that the accused will regain his fitness to proceed, the commitment of the accused at a designated facility shall continue until the head of the facility reports to the court that in his opinion the accused is fit to proceed as provided in paragraph (iii) of subsection (c) of this section. If this opinion is not contested by the state, the accused or his counsel the criminal proceeding shall be resumed. If the opinion is contested, the court shall hold a hearing as provided in subsection (f) of this section. While the accused remains at a designated facility under this subsection, the head of the facility shall report at least once every three (3) months on the progress the accused is making towards regaining his fitness to proceed.

(h) A finding by the court that the accused is mentally fit to proceed shall not prejudice the accused in a defense to the crime charged on the ground that at the time of the act he was afflicted with a mental illness or deficiency excluding responsibility. Nor shall the finding be introduced in evidence on that issue or otherwise brought to the notice of the jury. No statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any person in the course of the examination or treatment shall be admitted in evidence in any criminal proceeding then or thereafter pending on any issue other than that of the mental condition of the accused.

(j) Notwithstanding any provision of this section, counsel for the accused may make any and all legal objections which are susceptible of a fair determination prior to trial without the personal participation of the accused.

W.R.Cr.P. 12(c) embraces this statute: "If it appears at any stage of a criminal proceeding by motion or upon the court's own motion, that there is reasonable cause to believe that the defendant has a mental illness or deficiency making the defendant unfit to proceed, all further proceedings shall be suspended and an examination ordered as required by W.S. 7–11–301 *et. seq.*"

[¶ 17] At his arraignment on June 6, 2003, Eaton was asked if he suffered from any "mental disability or learning disorder." His attorney answered on his behalf, stating:

I'll respond to that particular question, Your Honor. We—as of this particular point we do believe that he understands sufficiently enough to be arraigned. We are having him examined by mental health professionals. We've not got the results of those examinations yet. And so we're not able to totally answer that particular question. But we do desire to go forward with the arraignment at least today, reserving the right, of course, to change the plea later on.

In all other respects, the record on appeal most strongly suggests that Eaton understood the arraignment proceedings and responded appropriately to all of the questions asked of him.

[¶ 18] At a motions conference on October 2, 2003, this exchange occurred:

THE COURT: All right. Mr. Skaggs, one last point. There was a discussion that Mr. Eaton, for lack of a better word, was being interviewed for possible consideration of a not guilty by reason of mental illness or deficiency. Is there any—are you still evaluating that prospect?

[DEFENSE COUNSEL]: Well, Your Honor, the question that you asked is improper. We didn't—we didn't necessarily have him interviewed for purposes of not guilty by reason of mental deficiency or illness. We did have him interviewed for a number of different reasons, competency being number one, of course; and second thing, to develop possible mitigating circumstances in the penalty phase. At this particular point, we have no—we have no inclination to enter a plea of not guilty by reason of mental illness or deficiency; and at this particular point, we have no interest in continuing the case by doing that sort of thing.

[¶ 19] At trial, Eaton did not contend that he was incompetent to stand trial nor did he enter a plea asserting a defense of "mental illness or deficiency at the time of the alleged offense." W.R.Cr.P. 12.2(a); and see Wyo. Stat. Ann. §§ 7–11–304 and 7–11–305 (Lexis-Nexis 2007). It was defense counsel's view that the mental health professional who examined Eaton determined that he was competent and did not suffer from a mental illness or deficiency at the time of the offense. Moreover, as a part of the defense strategy, defense counsel did not want Eaton sent to a state-appointed examiner because he felt certain that would produce expert testimony that was contrary to Eaton's defense posture in this case. However, both the statute and the rule mandate that the district court be attentive to this matter, even if counsel are not. In this case, the district court was first to broach this matter:

THE COURT: All right. I have one other comment, then, one other concern that's come up that I was not aware of. And I don't think it has been raised before in that it's troubling, and it arises because of the case out of Gillette where the Supreme Court ruled that the judge should have ordered an evaluation of the ... client.

[PROSECUTOR]: I recall the case, Your Honor.

THE COURT: Now, there's testimony that Mr. Eaton has troubles with his memory. So I guess I want the counsel—both of you just to inquire of him to his memory problems. He's indicated he has some memory concerns.

[DEFENSE COUNSEL]: He indicated that he remembered this incident quite well.

THE COURT: Okay. You know, I—I'm concerned that that's going to come back to haunt us at some later date. So I guess—I'm not asking for submittals at this time, but I want the parties to be prepared to address that, whether the Court now has an obligation to order an evaluation of Mr. Eaton, given those difficulties that have surfaced.

[PROSECUTOR]: Your Honor, I don't believe they do. Even if he had a complete lack of memory, that would not be a lack of competency under the case law.

THE COURT: Might be inability to assist his defense.

[PROSECUTOR]: The courts have ruled on this specifically, Your Honor. In fact, Mr. Short had a client on vehicular homicide some years ago that complained—and probably appropriately so—that because of the accident, he couldn't remember anything that had happened. And Mr. Short raised exactly that issue. And it was litigated—our research at that time indicated that that does not qualify as the competency that the courts refer to. So I think even a claim of complete lack of memory would not make him incompetent, much less a claim of some memory difficulty. And that's my review of that case law. And I have had occasion to look at that.

. . . .

[DEFENSE COUNSEL]: Absolutely. I totally agree. I totally oppose any attempt to have his competency looked at, because I can assure the Court I've done that.

THE COURT: Yeah. And I do not mean to suggest that. But that case is troublesome, because they place the onus on the Court, even though [defense counsel] indicated he had no intention of seeking an evaluation. My recollection is that the Supreme Court said that the District Court nonetheless had that obligation. So I guess I would like the parties to submit any case law in advance and be prepared to discuss that more fully at the December hearing.

[¶ 20] The district court concluded that hearing with the admonition that he wanted to make a "complete record on this issue." The case discussed in the above exchange is *deShazer*. It is important that it be very clear in any discussion of this issue that it is not this Court that mandates the district court's role in competency matters, it is the statute and the rule, as well as the underlying constitutional case law which generated that statute and accompanying rule, that mandates the district court's role in that arena. It is also important to carefully read *deShazer*, because its reach is considerably narrower than that assumed by many who have cited it to us since its publication, and that was most certainly true here.

[¶ 21] In *deShazer*, the defendant was evaluated for dangerousness to himself or others, and both counsel and the trial court appeared to consider that as satisfying the need for examination with respect to competence. Moreover, in *deShazer* there were a number of warning signs suggesting that deShazer was incompetent, even before the time came that deShazer was about to testify:

As the prosecution was about to rest on the last day of trial, the defense attorney asked for an in-chambers conference. As that proceeding got underway, the defense attorney told the district court that based upon his observations, deShazer had "continued to improve" during the pretrial process. Defense counsel iterated that he had had mental examinations done and the examinations established that deShazer knew right from wrong and "that a competency defense was not appropriate." As defense counsel began to prepare deShazer for trial, he observed that deShazer was "extremely depressed," and was unable to concentrate or do the things necessary to get ready for trial. Through contacts the deShazer family had with a psychiatrist in Casper, an arrangement was made during the weekend break in the trial for deShazer to be evaluated by psychiatrist Bruce Kahn, M.D. Both defense counsel and the district court noted that deShazer had appeared to do well on the first day of trial, both in the courtroom and in chambers. Defense counsel's concern was that deShazer was not "capable" of assisting counsel in his defense nor was he "capable" of testifying in his own defense if he chose to do so. Defense counsel's indication was that, in any event, he did not intend to have deShazer testify. Defense counsel indicated that deShazer's testimony would not be material and that after consultation with counsel, as well as with his family, a decision was made to go ahead with the proceedings. Defense counsel also conceded that he "never had a case like this, and I don't have experience with mental health people—or mentally ill people that has provided me any kind of background to do this. I'm prepared to proceed, but I thought the court needed to

be aware." The district court then asked that deShazer be brought into chambers because it needed to "make some advisements and inquiry." The following advisement/inquiry was made:

THE COURT: I am informed that the State is close to the end of their case. So you and Mr. Goddard will be given an opportunity to put on a case of your own if you want to. Mr. Goddard has explained to me that there's a couple of witnesses that he thinks that you all will probably want to call, and that's fine.

The critical thing, though, that I want to be sure of is that you understand your personal right to either testify or to remain silent. The Court has absolutely no preference over which choice you make; it just wants to be sure that you understand the choice and that whatever choice you make along those lines is done of your own free will.

So you understand that as a matter of law you're not required to testify, correct?

THE DEFENDANT: Correct. But—

THE COURT: Also, at this stage of the game you absolutely have the right to testify if you want to. The choice that you make may be very important to you. And I suggest that you not make any choice like that without consulting with your counsel. But I need to know kind of ahead of time what you think you personally want to do. Not what somebody else thinks you ought to do, but what you want to do.

THE DEFENDANT: I want to, but I'm wrestling with whether or not I'm prepared for it (indicating) mentally. And I've been talking with Greg about that.

THE COURT: So you haven't made up your mind yet what you want to do?

THE DEFENDANT: Correct. I was hoping to talk to Greg here over this lunch break.

When defense counsel called Dr. Kahn as a witness, a conference was held out of the hearing of the jury. The purpose of that hearing, as articulated by the district court, was, "[i]n this case the Defendant has not entered a plea of not guilty by reason of mental illness or deficiency and has represented to the Court that he will not tender any evidence regarding that type of defense." At the outset it was agreed that Dr. Kahn would not offer an opinion that deShazer met the statutory definition for incompetency due to mental illness or deficiency. Dr. Kahn was asked, and he responded to, a question regarding deShazer's mental state at the time of the crime. He opined:

DR. KAHN: Yes, I do have an opinion, in that he was psychotically depressed at the time of the offense and I think that his illness contributed substantially and materially to the commission of acts of which he's accused. I think that the mental illness contributed substantially and materially to loss of impulse control.

And it would be my further opinion, if I were asked, Your Honor, and allowed the opportunity to answer, that it meets the threshold criteria of the volitional prong of the mental illness statute, 7–11–301, et se[q]. as the lack of substantial capacity to refrain from conduct which doesn't conform to the requirements of [the] law.

When the district court asked about deShazer's competency to stand trial, Dr. Kahn responded:

DR. KAHN: With all due respect, Your Honor, I think that he lacks [the] mental capacity to assist in some respects with his defense; but I think it would be your decision, Your Honor, if he did not—if he was not competent by virtue of the means—or, rather, the way in which he did not have mental capacity.

Let me explain it. I'm not being very clear, and I'm aware of that.

Capacity is a function of his mental wherewithal. Competency is a judicial construct, and it's not for me to tell the Court how relevant or significant his ability to testify might be. I do not

think he has the mental capacity to testify in his own behalf. But if the Court were to decide that that's a relatively insignificant issue, for example, because counsel says we don't want him to testify regardless of how healthy he is mentally, then he probably is competent.

And regardless of how incapacitated he is mentally in that respect, in all other respects I think he has mental capacity to understand the nature of the proceedings and to assist counsel. The narrow exception is I don't think he can testify on his own behalf in his current frame of mind.

After considerable further discussion, the district court determined that Dr. Kahn would be allowed to testify, so long as his testimony was precisely limited to "the Defendant's state of mind, some of the processes that go on with people if they do get involved in what we commonly refer to as an obsession, perhaps, arguably, the Defendant, you know, would have the right to offer that sort of explanation to the jury, since the contra inferences will obviously be made." Following Dr. Kahn's testimony, a very brief conference was held wherein deShazer stated that he had decided not to testify.

Thus, we are confronted with determining whether, in light of all the information available to the district court, it should have sua sponte suspended the proceedings, declared a mistrial, excused the jury, and ordered a mental examination of deShazer before a new trial could be held. Wyo. Stat. Ann. § 7–11–303 does not make it entirely clear what procedure should be followed in an instance such as this where the problem does not come fully to light until the middle of a jury trial. However, in this regard, the statute plainly contemplates that it might arise "at any stage of a criminal proceeding." As future events bear out, it took several months for a mental examination to be completed at the Wyoming State Hospital for purposes of sentencing and a motion for new trial, and many more months yet for a second examination to be completed at the request of the prosecution. As a practical matter, the jury could not be held in waiting for a period of over one year. In such a circumstance, we conclude that the only practical solution was to declare a mistrial and re-initiate proceedings, if that was the appropriate thing to do in light of the mental examination(s). As a predicate to that, we must also conclude that the district court was obligated to suspend the proceedings given the information that slowly accumulated before it, from the date of the crime until the ultimate bridge had to be crossed in the midst of trial.

*deShazer,* ¶¶ 21–25, 74 P.3d at 1249–51.

[¶ 22] In short, the *deShazer* case has no apparent application to the circumstances of Eaton's case. Likewise, Eaton's reliance on *Keats v. State,* 2005 WY 81, 115 P.3d 1110 (Wyo.2005), is misplaced. Although it may have some tangential pertinence to the effective assistance of counsel issue we will discuss later, it has no pertinence in the context of whether or not Eaton was competent to stand trial.

[¶ 23] The issue of Eaton's competence is addressed in a memorandum submitted by defense counsel (under seal) on January 13, 2004. In that memo, the defense submitted authority to the effect that Eaton's memory problems did not constitute incompetence to stand trial. Expert witness Kenneth H. Ash, M.D., a psychiatrist, testified that his conclusion was that Eaton was competent to stand trial and that he had no mental illness or deficiency that rose to the level of a defense. Based upon that evaluation and the other evaluations subsumed into Dr. Ash's opinion, as well as the observations made by defense counsel, the matter of Eaton's competency was not further pursued by the defense.

**(ii) Competency as suggested by events at trial.**

■ [¶ 24] Although the record does not suggest that Eaton was incompetent based upon medical examinations, Eaton also contends that several incidents/outbursts by him, during trial, evidenced the fact that he was incompetent and, therefore, called into play the district court's responsibility to inquire further into Eaton's competence, as identified by the *deShazer* case. As back-

ground for these outbursts, Eaton contends that: (1) There was a profound lack of communication between him and his lead defense attorney and the mitigation specialist; (2) that his principal defense counsel and mitigation specialist were afraid of him; and (3) that counsel did not sufficiently consult with him concerning the defense mustered on his behalf. Against this background, Eaton claims that he became so frustrated and so unable to refrain from making audible and visible outbursts at the defense table (making layman's "objections"), that he irreparably prejudiced his own case in the eyes of the jury with his "unseemly" behavior.

[¶ 25] The first such outburst occurred during the testimony of Joseph Francis Dax, a man who was in the Natrona County Jail for a few days with Eaton and who claimed to have had conversations with Eaton in which Eaton admitted to having killed a woman. Dax's testimony served as the primary basis for the prosecution's theory that Ms. Kimmell had picked up Eaton alongside the road and given him a ride. Dax was relating some of the conversations he had with Eaton and, in the course of that testimony, identified (pointing at) Eaton as the man he talked with in the Natrona County Jail. Eaton exclaimed, "You don't me [sic]. Why in the hell are you talking and pointing to me [!]"[3]

[¶ 26] The examination of Dax continued after this incident and nothing was said about it at the time. However, later that same day, the district court did have an in-chambers meeting with Eaton and his defense team because the trial judge was able to hear Eaton's "grumblings," in addition to the more overt outburst immediately at issue. The trial court inquired about Eaton's apparent dissatisfaction with his attorneys. Eaton replied:

THE DEFENDANT: I was mad because of the fact that this morning, the guy I didn't even know, I'm supposed to have talked to; then everybody that has come in so far sat there and lied about me. And they haven't done nothing about it. It's—I mean, my own son come in; and you can

tell someone taught—led him along about it, because all of a sudden he knows what is all in a CRX. And the only Honda that he had, I had after he had done left and went back. I had a Honda back there three or four years ago. Pardon me. Before I got in trouble, I had a Honda in that Moneta.

And I—they keep telling me to write stuff down. I write—as I remember something, I write it down. And they never use any of it.

In later discussion, Eaton added that he was upset over a witness who claimed to have bought a chainsaw from him at a garage sale he supposedly had at his Moneta residence.

[¶ 27] The district court explained in detail what the limitations are for examination and cross-examination of witnesses, and Eaton expressed his understanding of that and conceded that his attorneys had explained "some of it" to him. Eaton was asked if he wanted a different attorney and he declined, although he qualified it with the statement, "Let's just go on with it." The principal defense attorney then made a further explanation of his representation to Eaton, as well as to the trial court, emphasizing that he controlled the cross-examination to the end that it would only serve to benefit Eaton, and not so as to benefit the prosecution. Furthermore, defense counsel explained that he did not want to get into a problem with Eaton at the counsel table because that was not a good thing to do in front of the jury. At the conclusion of this session, Eaton indicated that he was ready to go back into the courtroom.

[¶ 28] The final such episode occurred when a witness, Jim Broz, was testifying about a note that was found on the headstone of Ms. Kimmell's gravesite. The note said: "Lisa, there aren't words to say how much you're missed. The pain never leaves. It's so hard without you. You'll always be alive in me. Your death is my painful loss but heaven's sweet gain. Love always, Stringfellow Hawke." Broz analyzed the handwriting on the note in the light of writ-

---

3. In the transcript the punctuation is a question mark. However, it is our sense that an exclama-

tion point better captures the apparent tone of Eaton's rhetorical question.

ing samples given by Eaton. In Broz's opinion, Eaton was the likely writer of the note. Eaton vehemently denied that he wrote the note, but defense counsel declined to cross-examine Broz. Eaton then made this outburst in front of the jury: "I can prove where the fuck I was that day, and you guys won't do nothing." It was decided that a recess would be in order and during that recess, defense counsel explained to the trial court and to Eaton why he chose not to challenge the testimony. Defense counsel related that he was not able to get an expert handwriting analyst to state that it was not Eaton's handwriting. Eaton did not want to testify and try to explain where he was that day because that opened a door the defense did not want opened. The record suggests that exactly what day the note was left on the tombstone was not known (exact only within a week or more length of time). Moreover, in defense counsel's opinion the note connoted remorse for the crime at issue, and that was positive for the defense's overall trial strategy.

[¶ 29] We will note at this juncture that defense counsel frequently took breaks in the proceedings to ask the trial court to allow him to explain his trial strategy on the record. It is apparent that this was done in part to protect the record for appeal and post-conviction relief, but also for the apparent reason of ensuring that Eaton knew what was going on and reassuring him that counsel knew what he was doing.

[¶ 30] We have carefully examined the record with respect to Eaton's apparent understanding of the trial strategy adopted by his defense team, the outbursts Eaton made during his trial in front of the jury, and the fact that the record demonstrates that Eaton was, in general, an uncooperative client. We conclude that those materials do not suggest that Eaton was incompetent as contemplated by § 7–11–302, *supra,* at ¶ 14. This conclusion applies to both the guilt/innocence phase and to the sentencing phase.

**B.** *Voir Dire as Predisposing Jury to Find Eaton Guilty*

[¶ 31] This argument was not clearly raised below and is not well developed in Eaton's brief. However, because the argument presented appears to posit this issue for our consideration, we are duty bound to consider it. Since the advent of modern death penalty litigation, one perennial issue is the assertion that "death-qualified" juries are biased toward conviction and, hence, unconstitutional. See 2 Elissa Krauss, General Editor, *Jury Work®, Systematic Techniques* § 23:1 at 23–2 and § 23:3 at 23–4 through – 10 (National Jury Project), (Thomson–West 2d ed.2006). However, the status of the law is still that articulated by the United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1764–70, 90 L.Ed.2d 137 (1986). Although that decision accepted for the sake of discussion that "death qualification" produces juries that are somewhat more "conviction-prone" than "non-death-qualified" juries, it nonetheless held that the Constitution does not prohibit the states from "death qualifying" juries in capital cases. Continuing, it held that excluding jurors from the guilt phase, who could not apply the law in the penalty phase of capital case trials, serves a legitimate state interest. *Id.* at 1764, 1768–70; also see *Witherspoon v. Illinois,* 391 U.S. 510, 517, 88 S.Ct. 1770, 1774, 20 L.Ed.2d 776 (1968) ("The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt.").

[¶ 32] Based on the record on appeal in these proceedings, we conclude that Eaton has not demonstrated anything new or different about his case that would cause us to reconsider the established law in this area.

**C.** *Ineffective Assistance of Counsel*

[¶ 33] Eaton was represented in these proceedings by the Capital Case Attorney of the Wyoming Public Defender System, as well as by a second attorney from the Public Defender's staff in the Second Judicial District. They were assisted by an experienced legal investigator, who served several functions on the team but was primarily charged with putting together the mitigation evidence for the penalty phase. The principal defense attorney had considerable experience in han-

dling death penalty cases, as well as murder cases in general, and the investigator had some experience doing mitigation investigations in death penalty cases. The second-chair defense attorney did not have experience in death penalty cases or, for that matter, major felony trials. Eaton contends that his defense team was ineffective on several bases. Some of those assertions pertain only to the guilt/innocence phase and some pertain only to the sentencing phase. We separate them out accordingly and will discuss each of those that pertain to the guilt/innocence phase in this section of the opinion. Of course, we will aggregate them in our final analysis.

[¶ 34] This matter was remanded to the district court for the purpose of conducting a hearing, in accordance with our decision in *Calene v. State*, 846 P.2d 679 (Wyo.1993), so as to develop a record on the issue of ineffective assistance of counsel. See W.R.A.P. 21. That hearing was conducted over the course of five days, June 6–10, 2005, producing a transcript of 1,178 pages. On July 1, 2005, the district court issued a 47–page decision letter discussing the evidence developed during that hearing and concluding that counsel had not been ineffective.

[¶ 35] We apply this standard of review in these circumstances. Where the trial court has heard and decided the issue, we will not disturb that court's findings of fact unless they are clearly erroneous or against the great weight of the evidence. We will, on the other hand, conduct a *de novo* review of the trial court's conclusions of law, which include the question of whether or not counsel's conduct was deficient and the question of whether or not the appellant was prejudiced by that deficient conduct. *Barker v. State*, 2005 WY 20, ¶ 9, 106 P.3d 297, 299 (Wyo.2005) (citing *Robinson v. State*, 2003 WY 32, ¶¶ 16, 64 P.3d 743, 748 (Wyo.2003)).

[¶ 36] We have espoused this analytical framework for addressing ineffective assistance of counsel issues:

[O]ur paramount consideration is whether, in light of all the circumstances, trial counsels' acts or omissions were outside the wide range of professionally competent assistance. *Gleason v. State*, 2002 WY 161, ¶ 44, 57 P.3d 332, ¶ 44 (Wyo.2002). An appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Ordinarily, he must also demonstrate that prejudice resulted. Under this test, the inquiry is whether or not counsel rendered the assistance a reasonably competent attorney would have offered and, if not, whether his failure to do so prejudiced the defense of the case. *Id.* This two-part test, the *Strickland* test, is the test we normally apply in reviewing ineffectiveness claims....

We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Gleason*, 2002 WY 161, 57 P.3d 332. We do not evaluate the efforts of counsel from a perspective of hindsight but endeavor to reconstruct the circumstances surrounding the challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. *Dickeson*, 843 P.2d at 609. We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. *Id.* The burden is on the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy. *Id.*

*Harlow v. State*, 2005 WY 12, ¶ 45, 105 P.3d 1049, 1069 (Wyo.2005) (quoting *Sincock v. State*, 2003 WY 115, ¶¶ 34–35, 76 P.3d 323, 336 (Wyo.2003)).

[¶ 37] Also of pertinence in this matter is the following:

Before we address Harlow's separate allegations of trial counsel ineffectiveness, we must first address his contention that, in capital cases, the Strickland test has been substantially modified by *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in that the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are now the benchmark for determining the objective reasonableness of counsel's performance. We have read *Wiggins* and we do not see that it represents any significant amendment of the *Strickland* standard. In *Wiggins,* the United States Supreme Court reviewed the conduct of two trial attorneys in a death penalty case. In the process of finding counsel's performance both deficient and prejudicial, the United States Supreme Court reiterated the applicable standard of review. First, the United States Supreme Court repeated that ineffectiveness claims are tested under the two-part *Strickland* test, with "objective reasonableness" defined in terms of prevailing professional norms. *Id.* at 521, 123 S.Ct. 2527. Next, the United States Supreme Court defined those "prevailing professional norms" as the professional standards prevailing in Maryland in 1989. *Id.* at 524, 123 S.Ct. 2527. After concluding that counsels' performance fell short of those standards, the United States Supreme Court stated that "[c]ounsels' conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'" *Id.* (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). Clearly, these passages do not indicate any substantive departure from the test. Furthermore, the inexperience of counsel in handling death penalty cases, standing alone, does not establish ineffectiveness (citations omitted).

*Harlow,* ¶ 46, 105 P.3d at 1069–70. We will include references to the *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (February 2003) in our analysis of the ineffective assistance of counsel issues raised in this appeal because, while they do not set black-letter rules, they are guidelines of significance that we consider in our review of this case.

**(i) Did the theory-of-the-case defense chosen by defense counsel meet the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003).**

[¶ 38] We approach the arguments, and many of those that follow, with this observation derived from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation ... applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066; *Sanchez v. State,* 2002 WY 31, ¶¶ 11–16, 41 P.3d 531, 534–35 (Wyo.2002).

[¶ 39] In this case, defense counsel chose a strategy that included the admission that Eaton bore some responsibility for Ms. Kimmell's homicide. Eaton was charged with murder in the first-degree based upon the theory of premeditation. However, he was also charged with three counts of first-degree murder based on felony murder, i.e., that the homicide was committed in the perpetration of (1) kidnapping, (2) robbery, and (3) sexual assault. This, of course, made that strategy very tenuous, at best. The express goal of the defense team was to save Eaton's life, and the first step in that process was to avoid a verdict of first-degree murder. The path to that goal included Eaton's admission of some guilt, so as to avoid the "I didn't do it, but if I did I am very sorry I did it" defense. Having admitted some guilt, the defense anticipated that it would next present mitigating evidence persuasive enough to convince at least one juror to spare his life. We

describe this part of strategy at Part II(C)(ii) (¶¶ 128–133, *infra* ).

[¶ 40] In an argument that comprehends much of the defense team's performance in the guilt/innocence phase, Eaton contends that the public defender did not have a plan to provide high quality service in death penalty cases. Guideline 2.1 provides:

A. Each jurisdiction should adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to be provided in accordance with these Guidelines (the "Legal Representation Plan").

B. The Legal Representation Plan should set forth how the jurisdiction will conform to each of these Guidelines.

C. All elements of the Legal Representation Plan should be structured to ensure that counsel defending death penalty cases are able to do so free from political influence and under conditions that enable them to provide zealous advocacy in accordance with professional standards.

ABA Guidelines, *supra*, at 18.

[¶ 41] The commentary to the guidelines recommends that the plan be embodied in a statute and that it be funded on a jurisdiction-wide basis. Wyoming does not have such a statute. The attorney who represented Eaton is *the* death penalty defense unit in Wyoming, and he conceded that he had not adopted such a formalized plan. What the budgetary provisions are for the death penalty unit is not revealed by the record. The lead defense attorney conceded that there was no such formalized plan, but that there is "a plan." We will not dwell on this issue too long because we conclude that it does not have a dispositive effect on this case. It would be better to have a written plan that conforms to the ABA Guidelines and, of course, it would be better yet if the plan were fully funded and staffed.

[¶ 42] Guideline 10.5 advises on the subject of counsel maintaining an appropriate relationship with the client:

A. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

B. 1. Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

2. Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to the preservation of the attorney-client privilege and similar safeguards.

3. Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

C. Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

2. current or potential legal issues;

3. the development of a defense theory;

4. presentation of the defense case;

5. potential agreed-upon dispositions of the case;

6. litigation deadlines and the projected schedule of case-related events; and

7. relevant aspects of the client's relationship with correctional, parole, or other governmental agents (e.g., prison medical providers or state psychiatrists).

ABA Guidelines, *supra*, at 68.

[¶ 43] Eaton's principal defense attorney conceded that he was unable to develop a working relationship with Eaton, and that was also true of the mitigation specialist. Indeed, the mitigation specialist (a woman) was afraid of Eaton and after her initial contact with him (at which time he frightened her), she thereafter declined to see him in person. The assistant defense attorney eventually developed a working relationship with Eaton. All three testified at the re-

mand hearing to the difficulties they had with Eaton and that he was extremely uncooperative (characterized by them as ineffective assistance of client). The Guidelines have this to say about that subject in the commentary:

*Counsel's Duties Respecting Uncooperative Clients*

Some clients will initially insist that they want to be executed—as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence, should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence and securing a life sentence may bar the state from seeking the death penalty in the event of a new trial.

Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision—fully documented, for the benefit of actors at later stages of the case—whether to assert the position that the client is not competent to waive further proceedings.

ABA Guidelines, *supra,* at 71–72.

[¶ 44] Eaton is especially critical of the theory of defense that was chosen. The record reveals that Eaton agreed to this defense theory:

I, Dale Wayne Eaton, do hereby give permission for my counsel to pursue, as a trial strategy, the lesser included offense of second degree murder in the Lisa Marie Kimmell case. I understand that by doing so, my counsel will admit to the jury that I face some criminal responsibility in this case, but not for first-degree murder.

This strategy required the defense to fit Eaton's actions into the elements found in Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2007): "Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree[.]"

[¶ 45] In this regard, ABA Guideline 10.10.1 provides: "A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *Id.* at 99. Defense counsel decided that the second degree murder theory would segue into the mitigation theory that Eaton acted without premeditation and in the face of acute mental and emotional disturbance, as well as that he was remorseful about what he had done. The successful pursuit of this theory also required defense counsel to convince the jury that the kidnapping, sexual assault, and robbery of Ms. Kimmell were so attenuated from the killing so as to not implicate the felony murder doctrine.

[¶ 46] In this appeal, it is contended that this theory was unrealistic, and that it really conceded guilt to first-degree murder, and most especially felony murder, hence virtually eliminating any realistic chance of success. Eaton contends that this is compounded by Dr. Ash's testimony (which we will discuss in more detail, *infra,* at ¶¶ 207–210) that indicated that he did premeditate the killing. The flaw in that reasoning is that the jury did not hear that evidence during the guilt/innocence phase and so did not take it into account in determining guilt. Moreover, to the extent it then became an inconsistency

in the penalty phase, that testimony was tempered by Dr. Ash's additional testimony that Eaton acted in a state of extreme emotional disturbance. We think it evident that defense counsel could not have established a plausible episode of extreme mental disturbance without at least as much detail as Dr. Ash did provide. Our experience tells us that juries have minds of their own, and a theory such as that propounded by the defense team was as good as anything we can think of, given the circumstances of this case. Appellate counsel offer no more compelling theory that might have been pursued. As required by the ABA Guidelines, the theory did provide consistency between the guilt/innocence and penalty phases. That is, Eaton conceded that he had committed the homicide but did not premeditate it or commit it in the perpetration of the kidnapping, robbery, or sexual assault. In the penalty phase, he could then point to his admission of wrongdoing, in conjunction with his remorse and severe emotional distress, as mitigating factors that suggested either life, or life without parole, would be appropriate punishments.

[¶ 47] We have carefully examined the record in this regard, and we conclude that the defense team's choice of a trial strategy does not constitute ineffective assistance of counsel during the trial phase. E.g., *Olsen*, ¶¶ 70–76, 67 P.3d at 563–66.

#### (ii) No challenge to DNA.

[¶ 48] In analyzing this issue, as well as several others that appear later in this opinion, Eaton looks to the ABA Guidelines with respect to the investigation of the case in order to bolster his contentions. Guideline 10.7 provides:

> A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> 1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that

evidence bearing upon guilt is not to be collected or presented.

> 2. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.
>
> B. 1. Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.
>
> 2. Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

ABA Guidelines, *supra*, at 76.

[¶ 49] Eaton contends that defense counsel erred in failing to more meaningfully challenge the DNA evidence during the guilt/innocence phase, in particular in failing to hire an independent expert to testify on behalf of the defense. See ABA Guidelines, *supra*, at 80 (Physical Evidence: Assistance of appropriate experts to re-examine forensic evidence). Defense counsel did make some challenge to the DNA evidence, in the sense that he brought to the fore that it is not infallible, and that, perhaps, could have left the jury with some residual doubt at least about imposing death as the penalty. However, that effort was tempered by the reality that the DNA was checked and double-checked and it pointed only to Eaton as the individual who deposited semen on Ms. Kimmell's clothing. In this appeal, it is postulated that it could have been Eaton's son or his brother and, with the assistance of DNA experts, additional inroads could have been made in rebutting the DNA juggernaut.

[¶ 50] Once again, we have carefully examined the record with respect to the presentation of the DNA evidence to the jury, and we conclude that defense counsel were not ineffective in handling that aspect of the case. It was established that the evidence had been handled carefully and in conformance with the applicable chain-of-custody standard. Moreover, the record on appeal,

including the record of the remand hearing, contains no information that suggests the DNA evidence was not reliable or that Eaton was not accurately identified as the perpetrator of the crimes at issue here.

### (iii) Failure to know the applicable law.

[¶ 51] For purposes of the guilt/innocence phase, this issue asserts that the defense team did not sufficiently know the law applicable to death penalty cases and, furthermore, did not understand the applicable law to the extent that they were aware of it. However, the precedents pertinent to this argument are overstated in Eaton's brief. While counsel may be unaware of certain aspects of the "law," that circumstance does not necessarily equate with deficient performance. Indeed, counsel may be unaware of applicable law and his performance can still meet the *Strickland* standard. *Bullock v. Carver,* 297 F.3d 1036, 1048–50 (10th Cir.2002).

[¶ 52] Eaton contends that the defense team's lack of knowledge of the law is demonstrated by its agreement to the application of a "hybrid" statute to govern this case. We discuss that issue in Part II (B) of this opinion. He also claims that lacking is demonstrated by: (1) Defense counsel's failure to adhere to or meet the ABA Guidelines applicable to death penalty cases (¶¶ 40–49, *supra*); conceding Eaton's guilt without his valid consent (¶¶ 55–61, *infra*); and the failure of defense counsel to object to the trial court's failure to give the instructions that it initially offered (¶¶ 66–73, *infra*).

[¶ 53] In addition, Eaton contends that defense counsel demonstrated a lack of knowledge of the law because it solicited testimony from Kenneth Ash, M.D., about the details of Eaton's admission to Dr. Ash about his commission of the actual crime. Appellate counsel flesh out this contention by reasoning that the lead defense attorney elicited that testimony for the purpose of furthering his theory that extreme emotional disturbance mitigated the enormity of Eaton's crime. Continuing, this theory relies on some of the lead defense attorney's testimony at the remand hearing that suggested he believed the law required the mitigation evidence to be related to the circumstances of the crime. We have carefully reviewed that testimony, and defense counsel's answers only suggest that his understanding of the law was that the extreme emotional disturbance had to be in place at the time the crime was committed. That appears to be correct.

[¶ 54] In summary, we have thoroughly examined this general area of argument and conclude that the record on appeal will not support a conclusion that the defense team had such an inadequate knowledge of the pertinent law, so as to render their representation of Eaton ineffective.

### (iv) Concession of guilt without Eaton's consent.

[¶ 55] Eaton signed a very brief statement entitled, "Consent to Trial Strategy." Although it previously was set out herein, we repeat it here for the sake of convenience:

I, Dale Wayne Eaton, do hereby give permission for my counsel to pursue, as a trial strategy, the lesser included offense of second degree murder in the Lisa Marie Kimmell case. I understand that by doing so, my counsel will admit to the jury that I face some criminal responsibility in this case, but not for first-degree murder.

[¶ 56] Eaton contends that defense counsel went well beyond the reach of the consent he signed. In the process of presenting his case to the jury, defense counsel also conceded that Eaton committed kidnapping, robbery, and sexual assault. This contention is supported by a reference to defense counsel's closing argument during the penalty phase, during which Eaton's admissions from the guilt/innocence phase were iterated. In opening statements during the guilt/innocence phase, defense counsel also made certain "admissions" about Eaton's conduct, but stressed that Eaton had been greatly overcharged. The admissions there were limited to these: (1) Eaton committed one homicide (not four as charged), and that was either second-degree murder or voluntary manslaughter; (2) that homicide was not committed during a larceny (of Ms. Kimmell's car and other property) because the theft was an

afterthought and not within the contemplation of the felony murder doctrine; (3) the homicide did not occur during a kidnapping, because the kidnapping occurred long before Ms. Kimmell's death and, therefore, not within the contemplation of the felony murder doctrine; and, (4) defense counsel theorized that the homicide did not occur in the commission of a sexual assault because that was "somewhere in the middle of the black hole of the State's circumstantial evidence."

[¶ 57] Defense counsel's strategy was to bring Eaton's conduct within this Court's jurisprudence governing felony murder which we have described in considerable detail in some of our recent decisions:

The court gave the following instruction:

### INSTRUCTION 15

For the purposes of establishing the crime of felony murder, a killing which occurred in the perpetration of a robbery, the sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration.

Bouwkamp argues that this instruction should not have been given and should no longer be the rule of law in Wyoming. He reasons it does not further the felony murder rationale, it led to an incorrect verdict against Bouwkamp, and its effect is to impose punishment disproportionate to a defendant's culpability. We disagree. The instruction as given accurately states the law, and Bouwkamp has not demonstrated the dire consequences that he alleges flowed from its use.

Felony-murder is an unusual offense in that the death arising out of the robbery is purely an incident of the basic offense. It makes no difference whether or not there was intent to kill. The statutory law implies all of the malevolence found and necessary in the crime of first degree murder alone.

*Richmond v. State*, 554 P.2d 1217, 1232 (Wyo.1976). Consequently, a defendant convicted under this language faces the same penalties as one convicted of premeditated, that is, coolly calculated murder.

The element of deliberation is established by the defendant's presumed consideration of the high degree of risk of causing death involved in the commission of one of the inherently dangerous felonies expressly incorporated into our first degree statute. *Richmond*, 554 P.2d at 1232.

In its brief the state acknowledges there may be merit in Bouwkamp's claim that the felony murder rule should not be applied in the instance where the felony arises as an afterthought and is committed subsequent to the murder. The rationale underlying this claim is that the purpose of the rule is to deter homicides in the course of felonies, including those resulting from negligence or accident, by holding the perpetrators strictly responsible. *Richmond*, 554 P.2d at 1232. This purpose does not logically reach the circumstance where the felony is conceived of and executed after the killing has occurred. However, the state then argues that the issue of misapplication of the felony murder rule does not arise from the trial court's giving of Instruction 15 in this case. We agree with both contentions.

The key phrase in the instruction, "in the perpetration of," relied on by the state is found in *Cloman v. State*, 574 P.2d 410, 418–21 (Wyo.1978). "Perpetration," as used here, is the act or process of commission of a specified crime. *Webster's Third New International Dictionary* 1684 (1971). To occur in the perpetration of a felony the killing must occur in the unbroken chain of events comprising the felony. *See Cloman*, 574 P.2d at 419–22. In *Cloman* we framed the concept in this way: "the time sequence is not important as long as the evidence, including the inferences, point to one continuous transaction." *Cloman*, at 420. This means that, for a finding of felony murder, the killing must occur as part of the res gestae or "things done to commit" the felony. If the felony was not conceived of before the victim's death but occurs after the murder, the chain is broken, and the murder is a separate act which cannot have occurred "in the perpetration of" the underlying felony. *See United States v. Mack*, 466 F.2d 333, 338 (D.C.Cir.1972) *cert. denied sub nom.*

*Johnson v. United States,* 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223; *see also Grigsby v. State,* 260 Ark. 499, 542 S.W.2d 275, 280 (1976).

While the sequence of events is not significant, their interrelationship is. A specific connection is required: the murder must occur in the performance of the felony for conviction of felony murder under Wyo. Stat. § 6–2–101 (June 1988).

Instruction 15 requires that, before Bouwkamp could be found guilty of felony murder, the murder must be proved to have occurred in the perpetration of, or during transaction of, the robbery of Millox. Consequently, it does not dictate application of the felony murder rule where both the intent to commit the felony and the act itself follow the murder as a separate transaction, as Bouwkamp contended happened here.

Whether the killing and the felony were part and parcel of one transaction is a jury question. Annotation, *What Constitutes Termination of Felony for Purpose of Felony-Murder Rule,* 58 A.L.R.3d 851 § 5 (1974). Without doubt it may be difficult to persuade a jury on facts such as these that there were two separate criminal transactions. The jury is not bound to accept a defendant's version of events, *Grigsby,* 260 Ark. at 508, 542 S.W.2d at 280. This jury chose not to believe Bouwkamp's story. We note that the evidence and inferences satisfy the one continuous transaction test imposed by the directive that the murder occur "in the perpetration of" the felony.

We expressly reject the suggestion that *Cloman* may be read to permit a conviction for felony murder where intent to commit the felony cannot be inferred before the murder and the chain of events is apparently broken. When a reasonable doubt remains as to whether the felony may have occurred as an afterthought that followed the killing, the killing cannot have been "in the perpetration of the felony," and the homicide may not be elevated to murder in the first degree by application of the felony murder rule. This is our understanding of the legislature's intent.

Although the proposition of law may perhaps be stated more plainly, Instruction 15 presents a correct statement of the law, and the trial court did not err in giving it.

*Bouwkamp v. State,* 833 P.2d 486, 491–92 (Wyo.1992).

[¶ 58] The theory espoused by the defense in this case was a plausible defense to both first-degree murder and felony murder. If there were better theories, they have not been called to our attention nor have any occurred to us.

[¶ 59] In *Olsen,* ¶¶ 74–76, 67 P.3d at 565–66, we addressed this same subject:

Our independent review requires that we examine whether trial counsel's admission of guilt to the shootings violates the rule that "the admission by counsel of his client's guilt to the jury[ ] represents a paradigmatic example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice." *United States v. Williamson,* 53 F.3d 1500, 1511 (10th Cir.1995). Wyoming recognizes that there are cases of deficient performances where prejudice is presumed. *Herdt v. State,* 816 P.2d 1299, 1301–02 (Wyo.1991). *Williamson's* holding is based on the following rationale:

The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall ... have the assistance of counsel for his defense." U.S. Const. amend. VI. While a defendant must ordinarily prove deficient performance by counsel coupled with a showing of prejudice in order to prevail on an ineffective assistance of counsel claim, *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), there is a narrow class of cases where the particular circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984) (footnote omitted). If a defendant can prove such circumstances actually existed, prejudice will be presumed. *Id.* at 659–62, 104 S.Ct. at 2047–49.

There is no question but that the sort of conduct alleged here, i.e., the admission by counsel of his client's guilt to the jury, represents a paradigmatic example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice. *See, e.g., United States v. Swanson,* 943 F.2d 1070, 1074 (9th Cir.1991); *Jones v. State,* 110 Nev. 730, 877 P.2d 1052, 1056–57 (1994) (quoting *Brown v. Rice,* 693 F.Supp. 381, 396 (W.D.N.C.1988), cert. denied, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990)). Whether such an admission actually occurred is necessarily fact-intensive. The focus must be on whether, in light of the entire record, the attorney remained a legal advocate of the defendant who acted with " 'undivided allegiance and faithful, devoted service' " to the defendant. *See Osborn v. Shillinger,* 861 F.2d 612, 624 (10th Cir.1988) (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948)).

*Williamson,* 53 F.3d at 1510–11. Usually, concession of guilt issues involves a failure of defense counsel to secure the client's consent to employ this particular strategy because:

When counsel concedes a client's guilt during the guilt-innocence phase of trial in spite of the client's earlier plea of not guilty and without the defendant's consent, counsel provides ineffective assistance of counsel regardless of the weight of evidence against the defendant or the wisdom of counsel's "honest approach" strategy. *Francis v. Spraggins,* 720 F.2d 1190 (11th Cir.1983); *Wiley v. Sowders,* 647 F.2d 642 (6th Cir.1981); *State v. Harbison,* 315 N.C. 175, 337 S.E.2d 504 (N.C.1985). The gravity of the consequences of a decision to plead guilty or to admit one's guilt demands that the decision remain in the defendant's hand. An attorney cannot deprive his or her client of the right to have the issue of guilt or innocence presented to the jury as an adversarial issue on which the state bears the burden of proof without committing ineffective assistance of counsel. "The adversarial process pro-tected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate'. The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *U.S. v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). A lawyer may make a tactical determination of how to run a trial, but the due process clause does not permit the attorney to enter a guilty plea or admit facts that amount to a guilty plea without the client's consent.

*Jones v. State,* 110 Nev. 730, 877 P.2d 1052, 1056 (1994) (quoting *Brown v. Rice,* 693 F.Supp. 381, 396 (W.D.N.C.1988), rev'd on other grounds, *Brown v. Dixon,* 891 F.2d 490 (4th Cir.1989)) (some citations omitted). *See Grainey v. State,* 997 P.2d 1035, 1040 (Wyo.2000).

The Eighth Circuit has considered similar facts and concluded that admitting the act but denying the requisite mental state by an intoxication defense to first degree murder charges is not the functional equivalent of a guilty plea. *Nielsen v. Hopkins,* 58 F.3d 1331, 1335 (8th Cir.1995); *Parker v. Lockhart,* 907 F.2d 859, 861 (8th Cir. 1990).

Also see *Sincock v. State,* 2003 WY 115, ¶¶ 45–59, 76 P.3d 323, 339–42 (Wyo.2003); *Sanchez v. State,* 2002 WY 31, ¶¶ 10–16, 41 P.3d 531, 533–35 (Wyo.2002).

[¶ 60] Although the circumstances here are different from those in *Olsen,* defense counsel did obtain Eaton's consent to an admission of the homicide. Moreover, the United States Supreme Court recently held that defense counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt at the guilt phase of a capital case does not automatically render counsel's performance deficient. *Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 560–63, 160 L.Ed.2d 565 (2004).

[¶ 61] In light of that decision, as well as our holding in *Olsen,* we conclude that defense counsel's use of that consent did not encompass admissions to the crimes of kid-

napping, sexual assault, or theft. Defense counsel's strategy was not such a leap beyond what was contemplated by the concession of some guilt, so as to make defense counsel's strategy the functional equivalent of a guilty plea and to render counsel's assistance ineffective.

### (v) Defense counsel's election to allow the trial to proceed when Eaton was not competent to stand trial constitutes ineffective assistance of counsel.

[¶ 62] We considered this issue as a substantive matter in Part I (A), above (¶¶ 13–30, *supra* ). We have concluded that the record on appeal does not indicate that Eaton was not competent to be tried. Hence, we also conclude that defense counsel were not ineffective for permitting the trial to go forward.

### (vi) Waiver of venue.

[¶ 63] Defense counsel initially sought a change of venue. It was the defense's goal to have venue changed to Albany County. Albany County was home to the lead defense counsel and the mitigation expert, providing a sort of home court advantage as well as the comfort level in working out of one's own office, etc. Moreover, we take notice that Laramie is perceived in many quarters as a unique venue in Wyoming, in terms of the demographics of its population and because it is the home of the University of Wyoming. That certainly was the view of the defense. It was also the view of the defense that, although Natrona County was not a favorable venue because of the enormous amount of pretrial publicity generated by Wyoming's only newspaper of statewide distribution, the *Casper Star–Tribune,* there were no other venues in the state that were particularly more favorable, or if there were venues somewhat more favorable, no courtroom was available for a trial in the applicable time frame. The effort to obtain a change of venue was abandoned when it became clear that a courtroom would not be available in Albany County.

[¶ 64] Two factors to be considered in whether or not to grant a change of venue

are the nature and extent of the publicity surrounding the case and the difficulty or ease in selecting a jury. As was the case in *Olsen,* here we do not perceive that publicity made the selection of an unbiased or "untainted" jury especially difficult. *Olsen,* ¶ 84, 67 P.3d at 568; also see *Barnes v. State,* 2004 WY 146, ¶¶ 7–12, 100 P.3d 1256, 1258–60 (Wyo.2004).

[¶ 65] It is conceded that no scientific studies of any sort were done by the defense to verify its view that Natrona County was as good a venue as any other, under the circumstances of this case (including that this case had a high profile in Wyoming and Montana, as well as a considerable profile nationally). However, we are cited no authority that the defense is required to make such studies, or that the failure to do such studies is reversible error, at least insofar as the guilt/innocence phase of trial is concerned. Likewise, we take note that the argument presented by Eaton in support of this issue was not especially persuasive. Appellate counsel go so far as to say that defense counsel simply "abandoned" Eaton with respect to this matter, as well as several others. We find no support for such a view in the record on appeal. Perhaps we too often tend to look at Wyoming as a "unique" place, or at least an "out of the ordinary" state. It is said that Wyoming's highways make up Wyoming's "Main Street." There is at least a kernel of truth in that supposition, and we conclude that, based upon the record on appeal extant, defense counsel were not ineffective for not more vigorously seeking an alternative venue for Eaton's trial.

### (vii) Failure to object to instructions.

[¶ 66] Defense counsel offered a comprehensive set of instructions for the trial court's consideration. The essence of this contention is that although good instructions were offered by the defense team, many of them were not used by the district court, and defense counsel failed to defend them or to object to the fact that they were not used. Ultimately, defense counsel accepted all the instructions used in the guilt/innocence phase after they were agreed to in an unreported instructions conference.

[¶ 67] Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts. Instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct. A failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction, and the test of whether or not a jury has been properly instructed on the necessary elements of a crime is whether or not the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed. We analyze jury instructions as a whole and do not single out individual instructions or parts thereof. We give trial courts great latitude in instructing juries and will not find reversible error in the jury instructions as long as the instructions correctly state the law and the entire set of instructions sufficiently covers the issues which were presented at the trial. *Harlow,* ¶ 31, 105 P.3d at 1065–66.

[¶ 68] In addition, we have said this about the presentation of a defendant's theory of the case or defense in an instruction:

Our analysis at this level looks to the reasoning behind the refusal of the requested instruction by the trial judge. We begin by looking to ensure that the requested instruction "contain[s] a proper enunciation of the law in Wyoming" as it relates to the theory of the case or defense advanced by the defendant. *Phillips,* 760 P.2d at 391. *See United States v. Coin,* 753 F.2d 1510 (9th Cir.1985). It is critical that instructions correctly articulate Wyoming law because it is from the instructions that a jury decides if someone is to be found guilty or not guilty. "If part of an instruction is erroneous, a trial court may properly reject the entire instruction." *Griffin,* 749 P.2d at 256. Although the trial court has "no duty to excise objectionable portions of an instruction and rephrase it to properly state the law of the case," the defense counsel is not foreclosed from doing so. *Evans v. State,* 655 P.2d 1214, 1218 (Wyo.1982). An instruction can also be refused without offending the defendant's due process guarantee if it is patently argumentative or unduly emphasizes one aspect of the case. *Thomas,* 784 P.2d at 240. *See State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987). The form of the instruction remains within the discretion of the trial court provided the substance of the requested theory of defense is otherwise given. *United States v. Meyer,* 808 F.2d 1304 (8th Cir.1987).

It is also possible for an instruction to articulate Wyoming law properly and yet be incomplete such that the instruction "may be properly refused." *Stapleman v. State,* 680 P.2d 73, 76 (Wyo.1984). If this does occur, it becomes "incumbent upon the court to either give the instruction or to otherwise properly instruct upon the accused's theory of the case," *id.* at 76, even "if the instruction, although not entirely correct, is at least sufficient to apprise the court of the theory of defense" advanced by the person accused. *Id.* at 76. *See People v. Moya,* 182 Colo. 290, 512 P.2d 1155 (1973).

We next look to see if the refusal of the requested instruction was based upon the perception by the trial judge that the principle embodied in the requested instruction was equally presented to the jury through another instruction. "A trial court may refuse a proposed instruction if the principle embodied in the requested instruction is covered by other instructions." *Griffin,* 749 P.2d at 256 (*accord Summers v. State,* 725 P.2d 1033, 1044 (Wyo.1986) and *Britton v. State,* 643 P.2d 935, 938 (Wyo.1982)). The given instruction must affirmatively present the defendant's theory of the case or defense before such substitution satisfies due process. Once the defendant requests an instruction be given which correctly articulates Wyoming law after an offering of substantial evidence to underpin that request, the "court's failure to cause [defendant's] main defense to be affirmatively presented to the jury [constitutes] a denial of due process." *Blakely,* 474 P.2d at 130 (emphasis added) (*accord*

*State v. Hickenbottom,* 63 Wyo. 41, 178 P.2d 119, 131 (1947)).

*Oien v. State,* 797 P.2d 544, 548 (Wyo.1990).

[¶ 69] With respect to the guilt/innocence phase, Eaton contends that Instruction No. 6 amounted to a comment on Eaton's right to remain silent:

### INSTRUCTION NO. 6

YOU ARE INSTRUCTED that a defendant in a criminal trial has a constitutional right not to testify. The reason the defendant need not testify is that he must be presumed innocent. The State carries the burden of proving the defendant's guilt beyond a reasonable doubt. You must not draw any inference from the fact that the defendant has chosen not to testify in this case. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

[¶ 70] This instruction was given exactly as requested by Eaton. In this appeal it is contended that it was error for counsel to request it and it was error for the district court to give it. This contention is simply not supported by cogent argument or pertinent authority. We have given the assertion a full measure of consideration and conclude that it is not an error under any standard that we can ascertain.

[¶ 71] Instruction No. 11 set out the eight counts contained in the criminal information filed in Eaton's case. Eaton contends that this unduly emphasized the crimes charged, misled and prejudiced the jury, and that reversal is required. The contention is not supported by cogent argument or pertinent authority and, while we have given it a full measure of consideration as well, we conclude that no error occurred in this regard.

[¶ 72] Finally, Eaton contends that defense counsel were deficient in their performance by offering Instruction No. 27 (in conjunction with No. 26), and the trial court erred by giving it:

### INSTRUCTION NO. 27

YOU ARE INSTRUCTED that to occur "in the perpetration of" a felony the killing must occur in the unbroken chain of events comprising the felony. The time sequence is not important as long as the evidence, including the inferences, point to one continuous transaction. This means that, for a finding of felony murder, the killing must occur as part of the "things done to commit" the felony. While the sequence of events is not significant, their interrelationship is. A specific connection is required; the murder must occur in the performance of the felony for conviction of felony murder.

In order for the defendant to be found guilty of felony murder, something more than a mere coincidence of time and place between the wrongful act and the death is necessary. It must appear that there was such actual relation between the killing and the crime committed or attempted that the killing can be said to have occurred as a part of the perpetration of the crime.

This instruction comprehends the instructions offered by the defense in a more compact form, i.e., in one comprehensive instruction rather than in four separate instructions. In combination with defense counsel's argument, this instruction fully presented Eaton's theory of his defense to the jury and we do not perceive any error in it.

[¶ 73] Defense counsel were not ineffective with respect to the instructions used in the guilt/innocence phase.

### (viii) The foregoing arguments, in combination, demonstrate that Eaton was abandoned by defense counsel.

[¶ 74] We made brief mention of this issue earlier. Eaton contends that because he was depressed, uncooperative, and a difficult client to manage, defense counsel simply abandoned him to his fate rather than employing alternative methods or alternative counsel to overcome those obstacles. We view this contention as akin to a cumulative error argument. We have held that an accumulation of errors, although none may be reversible individually, may operate so as to deprive a defendant in a criminal case of a

fair trial. *Wilde v. State*, 2003 WY 93, ¶ 31, 74 P.3d 699, 711–12 (Wyo.2003) (citing *Schmunk v. State*, 714 P.2d 724, 745 (Wyo. 1986)).

[¶ 75] In addition to the contention associated with (1) the motion for a change of venue, Eaton enumerates these matters in constructing his abandonment contention: (2) That he was not competent to stand trial and defense counsel failed to recognize that; (3) an insufficient effort was made to seat a qualified jury; (4) defense counsel failed to develop a unified theory of defense; (5) failed to challenge the DNA evidence with a counter-expert; (6) conceded the client's guilt to first-degree murder; (7) failed to learn the applicable law for death penalty cases; (8) failed to object to instructions offered but refused; and (9) failed to act as his client's loyal advocate.

[¶ 76] As set out more fully above, we conclude that these matters were not errors at all, thus their cumulative effect could not have deprived Eaton of a fair trial, nor do they constitute an abandonment of Eaton by the defense team.

### D. *Hostility/Prejudice/Bias Toward Eaton at Guilt/Innocence Phase; Additional Remand*

[¶ 77] The bulk of this issue addresses hostility that Eaton contends evidenced itself during the penalty phase and the remand hearing. To the extent this assertion is directed to the guilt/innocence phase, we will address that here. We will also address here Eaton's contention that the remand hearing was unnecessarily abbreviated and that a second remand is required to more fully develop Eaton's ineffective assistance of counsel claims. We will address the penalty phase aspects of this issue in Part II of this opinion.

[¶ 78] Only very recently we said this about the subject of judicial bias in a criminal trial:

Marshall next argues he was deprived of a fair trial because the trial judge was biased against him and his trial counsel. As proof of this bias, Marshall alleges that the judge rebuked defense counsel, agreed with the State when it made objections, sustained objections before they were fully stated and interfered with counsel's examination of the witnesses. Marshall claims the judge's actions impeded his ability to present a defense and implied to the jury that the judge thought defense counsel was incompetent, thereby prejudicing the jury against him.

Marshall's argument consists solely of factually and legally unsupported allegations of judicial bias. In construing the word "bias," this Court has stated:

Bias is a leaning of the mind or an inclination toward one person over another. The "bias" . . . must be personal, and it must be such a condition of the mind which sways judgment and renders the judge unable to exercise his functions impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce.

*Pearson v. State*, 866 P.2d 1297, 1300 (Wyo.1994) (citing *Hopkinson v. State*, 679 P.2d 1008, 1031 (Wyo.1984)); *see also TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1211 (Wyo.1990). In condemning the trial judge, Marshall has not pointed to any evidence that the judge was predisposed to rule against him or that the judge's rulings were based on anything other than the law and the facts before him. Nor has Marshall cited to any authority that the alleged judicial improprieties he has identified, in and of themselves, legally constitute judicial bias. Instead, Marshall has merely provided a list of adverse rulings from the trial transcript and a bald assertion that the trial court was biased against him. An appellant must show more than the fact that a trial court ruled against him on any particular matter to demonstrate judicial bias. *Brown v. Avery*, 850 P.2d 612, 616–17 (Wyo.1993). Marshall has failed to carry that burden.

*Marshall v. State*, 2005 WY 164, ¶¶ 6–7, 125 P.3d 269, 273 (Wyo.2005).

[¶ 79] As was the case in *Marshall*, here Eaton failed to carry his burden. In the course of our review, we have comprehen-

sively reviewed the transcripts of the voir dire and the guilt/innocence phase of the trial, and we find no evidence of the trial court being biased against Eaton, or in favor of the State, or that the district court showed favoritism to either party.

### (i) Guilt/innocence phase prejudice/bias/hostility.

[¶ 80] Eaton contends that there were at least twelve instances wherein the district court evidenced a prejudice against him and his case. We enumerate those below. Eaton asserts that during the guilt/innocence phase, the trial court told the jury on several occasions that the penalty phase (1) "may require the jury to determine whether the death penalty must be imposed." On one occasion (2) the district court indicated that the jury would be called upon to determine if the death penalty "should be imposed." No objections were interposed. In addition, it is asserted that the district court instructed the jury that Eaton must prove mitigating factors by a preponderance of the evidence. No objections were interposed. During voir dire (3) the trial court would not allow Eaton to inquire into a juror's understanding of depression. With respect to two jurors, (4) the district court would not allow the defense to further inquire of jurors about their feelings concerning child abuse. With respect to three other jurors, (5) the district court entered into the voir dire to rehabilitate them when they expressed questionable views about the death penalty. The district court (6) excused a juror who indicated that she could not follow the instructions because she knew two of the defense witnesses. The district court (7) refused to excuse a juror for cause when he directly indicated that he considered Eaton to be guilty, but was rehabilitated by the prosecution (it was also evident that this juror was not very anxious to serve because of business matters). When a juror indicated that he had heard about the case for over 16 years (but also stated that he was a "black and white guy," i.e., "I have to be shown things before I lean either way"), and expressed a view that he would impose the death penalty only under some circumstances (but also said he believed in "an eye for an

eye" but agreed that application of the view might make everyone blind), the district court (8) erred in denying Eaton's motion to excuse that juror for cause. When the State persisted in asking a juror what types of cases were appropriate for the death penalty, the district court (9) overruled Eaton's objections to that line of questioning. The district court (10) instructed a potential juror that he did not have to call defense counsel "sir" (after the juror had used "sir" in eight consecutive answers, the district court said, "... I appreciate you're trying to be polite, but it isn't necessary to call him 'sir.'"). The district court (11) stated to one juror that "this trial will have two phases" (but qualified that with a further explanation that that was only so if the defendant was found guilty of first-degree murder). Eaton contends that the district court showed its bias (12) when it told him, in front of the jury, to "calm down" when he had one of his outbursts.

[¶ 81] In summary, Eaton contends that just about every ruling the district court made during voir dire and the guilt/innocence phase that was adverse to him demonstrated a prejudice against Eaton. Likewise, it is contended that just about every ruling that the district court made that was favorable to the State demonstrated a bias in favor of the State. We have examined the transcripts of Eaton's trial with great care and conclude that the district court did not demonstrate prejudice against Eaton, nor did it demonstrate a bias in favor of the State.

### (ii) Need for additional remand.

[¶ 82] Eaton floats a contention that the remand hearing was unnecessarily abbreviated and that an additional remand is required. We do not agree that the district court failed to allow enough time for the remand hearing. This is borne out by our careful examination of the record, as well as by Eaton's failure to describe with some level of precision what could be accomplished by an additional remand.

### E. *Juror Misconduct*

[¶ 83] Eaton contends that a juror's misconduct requires reversal of his con-

victions. The juror in question went to the Government Bridge crime scene to take a look for himself and then relayed his findings during the jury's deliberations. Unquestionably, the juror's conduct was improper and remedial action of some sort was required. Any independent inquiry by a juror about the evidence violates the juror's duty to limit his consideration to the evidence, arguments, and law presented in open court. 89 C.J.S. *Trial*, §§ 775, 776, 780 (2001). However, it also is necessary for a defendant to demonstrate that a juror's misconduct operates in such a manner so as to prejudice his right to a fair trial. Jimmie E. Tinsley, *Jury Misconduct Warranting New Trial*, 24 Am.Jur. POF2d 633, 651–53 (§ 5. Independent investigations, tests, or experiments by jurors) (1980 and Supp.2006); and see, e.g., *Guess v. State*, 264 Ga. 335, 443 S.E.2d 477, 481 (1994) (in murder trial two jurors read newspaper article that related that the defendant had previously been found guilty of the crime; trial court did not abuse its discretion in denying motion for new trial or in denying motion to excuse the two jurors where they said they would not consider that in their deliberations); also see generally *Skinner v. State*, 2001 WY 102, ¶¶ 10–15, 33 P.3d 758, 762–64 (Wyo.2001).

[¶ 84] Here, the juror who conducted the investigation was excused and an alternate was seated in his place. The district court denied the motion for mistrial. The decision to grant a mistrial rests within the sound discretion of the trial court. Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial. E.g., *Allen v. State*, 2002 WY 48, ¶ 75, 43 P.3d 551, 575 (Wyo.2002).

[¶ 85] It is evident that the juror misconduct created a significant crisis in these proceedings. We will give the "death is different" axiom its full measure of importance in this context. However, that axiom is tempered by the equally important concept that, even in a death penalty case, a defendant is entitled to a fair trial, but not a perfect trial. The misconduct did create a crisis, but the district court ably surmounted

that crisis by doing all that could have been done to salvage the hard work that had already been accomplished, while at the same time ensuring Eaton's right to a fair trial.

[¶ 86] The jury began its deliberations in the guilt/innocence phase in the early afternoon on Monday, March 15, 2004. At 9:55 a.m., on Tuesday, March 16, 2004, the district court called all attorneys and parties to the courtroom to consider a question raised by the jury. The question was this: "The jury members have a serious concern about one jury person that openly admitted going out to Government Bridge [where, according to the testimony at trial, Ms. Kimmell's body was thrown into the North Platte River] to investigate and form an opinion about the tire track evidence presented during the case."

[¶ 87] The district court called the juror who created this problem (hereafter referred to as JJC) into the courtroom in order to make a discreet further inquiry. JJC conceded that he had done his own investigation, but that his comments were not a matter of substantial discussion. In order to explore the matter further, the jury foreperson was called into the courtroom. The foreperson related that the matter had been a matter of substantial discussion and that nine out of the eleven other jurors expressed serious concern.

[¶ 88] It was decided that replacing JJC with an alternate was essential, but the lead defense counsel also indicated that he needed time to consider a mistrial motion. The trial court heard argument on the mistrial motion later that morning and decided that further inquiry of the jury was appropriate under these circumstances. Before that inquiry was commenced, the parties agreed to the general time lines leading up to this incident. On March 15, 2004, the jury began its deliberations at 2:05 p.m., and retired for the day at 5:00 p.m. The jury resumed deliberation at 9:00 a.m. on March 16, 2004, and the note came to the trial judge at about 9:45 a.m. that same day. At that time, the trial court told the jury to cease its deliberations. The admonition to cease deliberations was given again when the jury was informed that JJC had been excused from the jury.

[¶ 89] The eleven remaining jurors were then brought into the courtroom for further inquiry. We will summarize their responses to the district court's questions (which the parties agreed to), numbering the jurors (1)-(11) as their responses appear in the record:

(1) Juror (1) said she could put aside JJC's comments and begin deliberations anew, with a new juror, relying only on the evidence presented at trial.

(2) Juror (2) said the same.

(3) Juror (3) was more of a problem. Initially he did not think he would be able to put the errant comments of JJC aside and that it would influence him in further deliberation. Eventually, the district court clarified the crux of the question Juror (3) was being asked, and he changed his mind (i.e., once the juror understood that JJC would no longer be on the jury). Although it took up over six pages of the transcript to straighten this out, the juror eventually agreed that he could start deliberations over from scratch with a clean slate.

(4)(5)(6)(7)(8)(9)(10)(11). The remainder of the jurors said they could put aside JJC's comments and begin deliberations anew, with a new juror, relying only on the evidence presented at trial.

[¶ 90] Defense counsel then renewed his motion for mistrial and, failing that, that Juror (3), discussed above, also be replaced with an alternate juror. The district court denied both motions.

[¶ 91] We conclude that Eaton was not prejudiced by JJC's misconduct and that the district court adequately addressed all of the concerns raised by that misconduct.

## F. *Admission of Evidence*

[¶ 92] Eaton contends that the district court erred in several respects with regard to the admission of evidence. Evidentiary rulings are within the sound discretion of the trial court. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion. We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria. It also means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. In the absence of an abuse of discretion, we will not disturb the trial court's determination. The burden is on the defendant to establish such abuse. *Trevino v. State*, 2006 WY 113, ¶ 10, 142 P.3d 214, 217 (Wyo.2006).

### (i) Testimony of Joe Dax.

[¶ 93] Joe Dax was incarcerated in the Natrona County Detention Center in a cell near that in which Eaton was housed during the time April 3, 2003 through April 8, 2003. Eaton objected to Dax's testimony for many reasons. For one thing, Eaton maintained through his attorneys that he had never spoken with Dax (and Dax's appearance in the courtroom produced one of Eaton's outbursts). In addition, Eaton's attorneys claimed that Dax's proposed testimony was patently false and was being given only in the hope that it would help Dax with mitigating the sentences to be imposed for his pending crimes.

[¶ 94] Of even greater importance, Dax's testimony included an admission on Eaton's part that he had made a pass at Ms. Kimmell, who had helped him out by giving him a ride, and that she became angry and stopped her car and ordered him to get out. Eaton did not get out, but instead grabbed her and sexually assaulted her. It took a considerable amount of leading questioning by the prosecutor to get Dax to state why he knew Eaton had had sexual contact with Ms. Kimmell, but eventually he said that Eaton commented that she was "a lousy lay." The district court overruled the defense attorney's objections, but admonished the jury "Ladies and gentlemen, that statement is offered to you solely for the purpose of Mr. Blonigen's question, which was to indicate whether or not—and again, it's up to you to evaluate this testimony—Mr. Eaton had any sexual contact with Ms. Kimmell." After the admonishment, the prosecutor repeated Dax's comment word for word, and Dax agreed that was what Eaton had said to him.

[¶ 95] The essence of Eaton's contention in this regard is that this evidence was so inflammatory and prejudicial that its admission was error that requires reversal of his conviction. We have said in several contexts that allowing the admission of such testimony will be viewed as reversible error only if the defendant can demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury. E.g., *Dike v. State*, 990 P.2d 1012, 1019–20 (Wyo. 1999); *Law v. State*, 2004 WY 111, ¶¶ 16–29, 98 P.3d 181, 187–91 (Wyo.2004); compare *Perritt v. State*, 2005 WY 121, ¶¶ 26–29, 120 P.3d 181, 193 (Wyo.2005).

[¶ 96] Evidence that points to guilt is, by its very nature, prejudicial. Here, Dax's testimony went to the heart of the crime: that Eaton was with Ms. Kimmell, and that he kidnapped her, sexually assaulted her, and murdered her. However, we agree that the prosecutor used poor judgment in allowing it to be a part of his case, a crucial case for the Kimmell family, for the citizens of this state, and for Eaton. The district court might well have disallowed its admission because all parties knew it was coming and the objections were made well in advance of its telling. However, the district court admonished the jury that it was admissible only as proof of Eaton's having sexually assaulted his victim. Under these circumstances, we conclude that the district court did not abuse its discretion in allowing its admission, and the probative value of the evidence, as limited by the trial court's instruction, was not outweighed by its prejudicial or inflammatory qualities.

#### (ii) Dr. Thorpen in the jury box.

[¶ 97] This issue arose as the jury was being shown Exhibits 632 and 633. These exhibits are quite grisly, as they are color photographs of Ms. Kimmell's chest cavity, essentially looking from the inside out. They are basically blood red in color, and depict the stab wounds as they enter the chest cavity through the ribs from the outside of her body. Defense counsel objected to their admission, but that objection was overruled. The issue raised in this appeal

with respect to those exhibits results, in part, from their admission and, in part, because Dr. Thorpen went into the jury box with them and personally showed them to jurors, pointing out the wounds in more detail because some jurors were not able to make out the details shown by those photographs. The defense made no objection to this incident. Because there was no objection, we consider this under the plain error standard: (1) The record must clearly present the incident alleged to be error; (2) Eaton must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way; and (3) Eaton must demonstrate that he was denied a substantial right resulting in material prejudice to him. *Lopez v. State*, 2006 WY 97, ¶ 18, 139 P.3d 445, 453 (Wyo.2006).

[¶ 98] Eaton's contention is that this caused some jurors to view the evidence in a different light than other jurors, and that it gave undue weight to those photographs. Neither party has cited authority directly in point, and our own research effort did not uncover such a case. While it certainly may be the preferred practice not to allow a witness to mingle in such a manner with the jurors, we are unable to categorize it as plain error meriting reversal of Eaton's convictions.

#### (iii) Mary Follette.

[¶ 99] Mary Follette testified that she had a conversation with Eaton in 1991. In that conversation Eaton advised her: "He said that—he made me promise him that I would not stop at any of the rest areas, because that's where rape—women got raped and killed." Eaton's contention is that the evidence was not relevant and that its relevance, if any, was outweighed by its prejudice to Eaton and because it tended to inflame the jury as well. The district court overruled the objection. The admission of circumstantial evidence is extremely liberal, allowing for the admission of any circumstances that shed light on the matter being investigated. See *Wentworth v. State*, 975 P.2d 22, 27 (Wyo.1999).

[¶ 100] We conclude that the district court committed no errors with respect to

the admission or exclusion of evidence that would require reversal of Eaton's seven convictions.

## G. *Record Incomplete*

[¶ 101] Eaton contends that the record of the proceedings during the guilt/innocence phase is not complete. Under the authority of *Bearpaw v. State*, 803 P.2d 70, 78–79 (Wyo.1990), which requires that the record on appeal be at least sufficient and complete enough for this Court to give the central issues meaningful review, and W.R.A.P. 3.02(a), which requires that transcripts in criminal cases consist of *all proceedings,* he claims his convictions must be reversed. Eaton contends that the record is deficient. The focus of this argument is the instructions conference that preceded the charge to the jury in the guilt/innocence phase, but includes a few other nonspecific instances where the transcripts suggest that court and counsel conferred off the record. However, no effort was made below to augment the record on appeal under the auspices of W.R.A.P. 3.03 or 3.04. Defense counsel's reasons for not insisting that the in-chambers conference on the guilt/innocence phase instructions be recorded by a court reporter was explored during the remand hearing on the ineffective assistance of counsel issues. In this appeal, appellate counsel note that, in the initial proceedings in Eaton's case, defense counsel insisted that the instructions conference be reported, and that defense counsel's testimony at the remand hearing was merely self-serving, after-the-fact justification for the failure to ensure that this portion of the proceedings was properly reported. Appellate counsel also note that a request was made to this Court for a stay of the briefing schedule so that off-the-record discussions could be reconstructed, and this Court denied that request. However, we take note that our order denied the motion, but with the admonition that such a reconstruction could readily take place within the generous briefing schedule and without a stay of the proceedings.

[¶ 102] Whatever efforts may have been made by appellate counsel to augment the record, beyond those found in the transcript of the remand hearing, are not called to our attention. Our perusal of the remand hearing transcripts, as well as the transcripts of the trial itself, leaves us well satisfied that the failure to have a reporter present at the instructions conference, and the instances where court and counsel parleyed off the record (most often over "housekeeping" matters), do not constitute an error that requires the reversal of Eaton's convictions.

## H. *Prosecutorial Misconduct*

[¶ 103] Eaton contends that the prosecutor engaged in misconduct during the guilt/innocence phase of the trial in only one instance. Before we will hold that an error in the nature of prosecutorial misconduct has affected an accused's substantial rights, thus requiring reversal of a conviction, we must conclude that based upon the entire record, a reasonable possibility exists that in the absence of the error the verdict might have been more favorable to the accused. *Harlow,* ¶ 25, 105 P.3d at 1063; *Williams v. State,* 2006 WY 131, ¶ 37, 143 P.3d 924, 934 (Wyo.2006) (and cases cited therein). Moreover, a decision to reverse on such a basis hinges on whether or not a defendant's case has been so prejudiced as to constitute denial of a fair trial. The propriety of any comment within a closing argument is measured in the context of the entire argument. *Dysthe v. State,* 2003 WY 20, ¶ 22, 63 P.3d 875, 884 (Wyo.2003). If there is no objection to instances of alleged misconduct, we review under the plain error rule. *Id.* at ¶ 23.

[¶ 104] Eaton contends that there was no evidence to support the inference argued for by the prosecutor that Ms. Kimmell must have known from the time she was first abducted by Eaton what her fate was going to be. We deem this to be fair argument premised on evidence that Kimmell was held captive for a period that could have been two days, but more probably lasted seven days. Kimmell was handled roughly, bound, and raped during her captivity. Her killing involved a massive skull fracture and methodical, multiple stabbings. The prosecutor's argument was within the bounds set by our precedents on this subject.

## I. *Cumulative Error*

[¶ 105] Eaton contends that if the cumulative effect of the errors outlined above is considered, then Eaton's convictions must be reversed and this matter remanded for a new trial. We have said that the purpose of the cumulative error rule is to address whether or not the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. In that equation, we only consider matters determined to be errors, not matters asserted to be errors but determined *not* to be erroneous. Moreover, a series of harmless or nonprejudicial errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial. *McClelland v. State*, 2007 WY 57, ¶ 27, 155 P.3d 1013, 1022 (Wyo.2007); *Luedtke v. State*, 2005 WY 98, ¶ 36, 117 P.3d 1227, 1234 (Wyo.2005). For the most part, we have found no errors in the guilt/innocence phase. To the extent some harmless error has been identified herein, or to the extent we have opined that a different approach may be preferable to that adopted by the trial court, we are compelled to conclude that cumulative error is not a factor in the guilt/innocence phase of this case, and we will not reverse Eaton's convictions on that basis.

## CONCLUSION

[¶ 106] We have examined the briefs of the parties and the record on appeal with the utmost care, and we hold that no error occurred during the guilt/innocence phase of Eaton's trial that would require reversal of his seven convictions. Therefore, the judgment of the district court is affirmed in all respects.

## PART II: Sentencing Phase

[¶ 107] We begin this part of the opinion with an acknowledgment that some of the errors asserted in Part I of the opinion may have an effect on our analysis of the issues that relate to the penalty imposed in this case. By this we do not suggest cumulative error, because we will deal with that separately. Although the asserted errors that occurred during the guilt/innocence phase did not operate to invalidate Eaton's convictions, the errors we considered and rejected with respect to the guilt/innocence phase may affect our view of the validity of the sentence imposed. Where that is the case, we will be direct in including those matters in the equation.

## A. *Voir Dire*

[¶ 108] Eaton contends that the voir dire of the jury was so poorly done by the defense team that the penalty imposed must be remanded for a new sentencing trial. This issue is presented principally in the context of ineffective assistance of counsel, with a more generalized failure of the voir dire process woven into it. We treat ineffective assistance of counsel in the next section of this part of our opinion, but with respect to voir dire, and especially the death qualifying process, we will dispose of all issues raised here. The trial court has an affirmative duty to ensure that a jury of competent, fair, and impartial persons is impaneled; however, the conduct of voir dire and the impaneling of a jury are functions committed to the discretion of the trial court, and we do not reverse the exercise of that discretion by a trial court absent clear abuse. *Olsen*, ¶ 196, 67 P.3d at 604.

[¶ 109] We set out the standards for a proper, death-qualifying voir dire in *Harlow*, ¶¶ 15–24, 70 P.3d at 187–89:

In presenting this argument, Harlow seeks to tease out of the opinions of the United States Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), and *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), talismanic language for conducting voir dire in a capital case. In *Witt*, the United States Supreme Court adopted as the appropriate standard for excluding a prospective juror from a capital case because of his or her views on capital punishment the proposition of whether the individual's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, 105 S.Ct. at 852. Subse-

quently, the United States Supreme Court clarified the *Witt* opinion in *Morgan*. In the *Morgan* case, the United States Supreme Court reversed a capital sentence because the trial court had refused to ask potential jurors, "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Morgan*, 504 U.S. at 723, 112 S.Ct. at 2226. Instead, the trial court had posed this question to the venire, "Would you follow my instructions on the law even though you may not agree?" The United States Supreme Court held the question asked to be inadequate to reveal potential jurors who had refused to consider mitigating circumstances. The United States Supreme Court explained

A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* at 729, 112 S.Ct. at 2229–30. Subsequently, the United States Supreme Court articulated the goal, saying, "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at 736, 112 S.Ct. at 2233.

In Wyoming, the legislature clearly has adopted the *Witt* proposition in Wyo. Stat. Ann. § 7–11–105(a)(iii) (Michie 1997), which states:

(a) The following is good cause for challenge to any person called as a juror in a criminal case:

* * * *

(iii) In a case in which the death penalty may be imposed, he states that his views on capital punishment would prevent or substantially impair performance of his duties as a juror in accordance with his oath or affirmation and the instructions of the court[.]

The gravamen of Harlow's contentions relative to the voir dire examination of the jury is that the trial court did not ask prospective jurors whether they held views that would "prevent or substantially impair" them from sentencing him to life imprisonment in the event of a conviction. Harlow presented the issue several months before trial in a "Motion for Legal Standard/Definition by Court of Death Qualification." In that motion, Harlow invoked *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which he contended recognized error for the dismissal of veniremen mainly because they do not believe in capital punishment and acknowledged that they have conscientious or religious scruples against the infliction of the death penalty. On the same day, Harlow submitted a motion to remove for cause jurors who will automatically vote for death in which he invoked *Morgan* to support an argument that jurors also should be asked whether they automatically vote for the death penalty in every case. In substance, Harlow was asking for the question that the trial court posed using substantially the language from *Morgan*.

Subsequently, at a pretrial motion hearing, Harlow's counsel contended that the law did not deny to the prosecution the ability to challenge for cause those who say they would never vote to impose the death penalty, but that the prosecution could not dismiss veniremen merely because they did not believe in capital punishment. The response was that Harlow simply was demanding that the State be ordered to comply with § 7–11–105(a)(iii). At the continuation of the hearing, Harlow also requested that the trial court enter an

order stating that anybody who automatically would vote for the death penalty under these particular sets of circumstances is not qualified to serve.

When jury selection for Harlow's trial began, defense counsel repeatedly violated W.R.Cr.P. 24 and also a prior order of the trial court by asking questions that the trial court deemed inappropriate. Counsel persisted despite repeated warnings; and after counsel refused to stop talking while making his presentation despite caution from the trial court to stop, the trial court announced that it would conduct voir dire. The trial court then denied Harlow's motion for a mistrial and noted that the jurors were questioned specifically about attitudes regarding the death penalty and were asked about their inclination to automatically impose the death penalty in accordance with the question approved in *Morgan.* The trial court also pointed out that jurors were asked the *Witt* question ascertaining whether the jury would never vote for the death penalty.

We review the trial court's conduct of jury voir dire under an abuse of discretion standard. *Vit v. State,* 909 P.2d 953, 960 (Wyo.1996). We have said with respect to our examination of judicial discretion that "[w]e perceive the core of our inquiry as reaching the question of reasonableness of the choice made by the trial court." *Vaughn v. State,* 962 P.2d 149, 151 (Wyo. 1998). In *Vaughn,* we reaffirmed our adoption in *Martin v. State,* 720 P.2d 894, 897 (Wyo.1986), of the following standard:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen,* 41 Wash.App. 495, 704 P.2d 1236 (1985).

*Vaughn,* 962 P.2d at 151.

In analyzing Harlow's contentions, we are persuaded that the goal of the voir dire with respect to establishing a challenge for cause as it is articulated in § 7–11–105(a)(iii) is to identify those jurors at both ends of the spectrum. According to the *Witt* standard, those jurors who would never impose a death penalty presumably would insert "yes" to the question captured in the statute. The effort also would be made to eliminate jurors who would always vote for the death penalty in accordance with the *Morgan* standard. Harlow contends that in making the latter endeavor, the trial court should invoke the "prevent or substantially impair" language even though the question is more direct than the statute or *Witt* requires. Harlow contends that *Morgan* demands that his position be adopted, but in our view that claim misses the essential point found in *Morgan.* We prefer a more pragmatic analysis that is articulated in opinions from two United States Courts of Appeal.

In *McQueen v. Scroggy,* 99 F.3d 1302, 1329–30 (6th Cir.1996), the United States Court of Appeals for the Sixth Circuit upheld a capital sentence in an instance in which the appellant claimed he had not been allowed to question potential jurors adequately on whether they would impose the death sentence in every circumstance. *McQueen* determined that error occurred when the trial court refused to ask questions proposed by the trial counsel for his co-defendant: "Would you inflict the death penalty in all murders?"; "In what kinds of cases do you think the death penalty is warranted?"; and "Do you believe the death penalty is a deterrent?" *Id.* at 1329. The trial court instead asked each juror whether the juror could accept and impose any penalty within the statutorily specified range in the event of conviction. The United States Court of Appeals for the Sixth Circuit said:

> A person who answers that he will consider every possible penalty ... is by virtue of that answer disclaiming the intent to impose the death penalty in every case. There are no magic words in these circumstances. Here the questions and answers disclose that the jurors were ready to consider each of the penalties that could be imposed, and that they were not predisposed to give only death or to act with leniency. It would be a game of semantics, not law, to

conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating. *Id.* at 1330.

Subsequently, the United States Court of Appeals for the Tenth Circuit arrived at a similar conclusion in *United States v. McVeigh*, 153 F.3d 1166, 1205–06 (10th Cir.1998). McVeigh argued that the trial court unconstitutionally constrained him in examining the venire and prevented him from learning whether individual jurors automatically would vote for death upon a conviction. The United States Court of, Appeals for the Tenth Circuit held that the trial judge properly excluded this question:

> If the allegations did—if you served on the jury and heard all the evidence in the guilty/innocence part of the trial and the jury voted that Mr. McVeigh was guilty, would you feel in that instance that the death penalty automatically should apply?

The court reasoned that *"Morgan* does not require courts to permit improperly phrased questions, such as questions that misstate the law or confuse the jurors." *Id.* at 1207. The court went on to say:

> Further, the question is susceptible of an interpretation asking the juror how she would vote on the evidence presented at trial. That is a question broader than the scope of inquiry *Morgan* requires. The question approved in *Morgan* was the following: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Morgan*, 504 U.S. at 723, 112 S.Ct. 2222, 119 L.Ed.2d 492 (emphasis added). The Supreme Court felt such a question was necessary to identify jurors who would always impose the death penalty upon conviction of a capital offense "regardless of the facts and circumstances of conviction." *Id.* at 735, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492.

*McVeigh*, 153 F.3d at 1207.

The record in this case demonstrates that the trial court asked prospective jurors whether their views would "always require" them to impose the death penalty following a conviction for murder. The question asked is calculated to elicit the same information as the question required by the United States Supreme Court in *Morgan*, "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" Furthermore, the trial court complied with the requirements of the Wyoming statute that adopts the rule of *Witt.* We hold that the voir dire questions posed by the trial court were sufficiently similar to the question approved in *Morgan* as to be "equally illuminating." We do not perceive that it is necessary to fetter the discretion of the trial court by structuring any further mandatory phrasing of questions of the veniremen. Certainly, in the exercise of its discretion, the trial court is able to form a conclusion as to how effective the communication is between counsel or the court and the potential jurors being questioned, and we perceive no abuse of discretion in what was accomplished in this case.

Also see *Olsen,* ¶¶ 64–69, 67 P.3d at 561–63.

[¶ 110] Eaton makes arguments similar to those propounded by Harlow. He contends that the biases of his jury were neither adequately explored nor objected to, even when obvious. Furthermore, he asserts that his attorney's conduct "was not 'strategic' but instead a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.' " Continuing, Eaton contends that the trial court also had a duty to ensure that the jurors' biases and attitudes were adequately explored, which the trial court failed to do.

[¶ 111] As we begin our analysis of the voir dire as it pertained to the death qualifying process, we note that the district court conducted the voir dire in several large groups (approximately 27–33 to a group). The district court made comments at the opening of each of these sessions as did the prosecutor and the defense attorney. The comments made by the district court and counsel were agreed to prior to beginning of voir dire. Although the comments varied a bit from group to group, they could be most accurately characterized as "scripted." Prior

to the beginning of the first session, counsel for both sides agreed that they had no objections to the district court's planned comments or to the comments of each other.

[¶ 112] In analyzing this case, we have, of course, examined the entire voir dire which consumed six full days, and part of a seventh (February 23–27, 2004, and March 1–2, 2004). We have most carefully examined the transcript regarding the specific jurors to whom Eaton directs our attention. We will not set out the questioning of each of the jurors mentioned by Eaton in detail in this opinion, because to do so would make it unnecessarily long. With respect to the voir dire, we are satisfied to make these observations. The district court did a creditable and evenhanded job of overseeing the process and established clear guidelines prior to the beginning of that difficult process. The parties agreed to the sorts of questions that could be asked under the then-prevailing standards set out in the cases of the United States Supreme Court, the appellate courts of many of our sister states, as well as the guidance provided in opinions within our own jurisprudence. We are satisfied, in particular, that the district court was unerring in its granting excusals for cause where a juror expressed a view that suggested he/she would always or almost always impose the death penalty, and, hence, would be "prevented or substantially impaired" from properly applying the law in that regard. Although the opposite circumstance did not arise quite so often, the district court was likewise unerring in excusing jurors who said they could "never" impose the death penalty. However, such excusals for cause were not granted until the juror had made it clear beyond cavil that he/she could not impose the death penalty under any circumstances and could not put that view aside and follow the law as given to the jury by the court.

[¶ 113] In the lengthy portion of his brief wherein Eaton challenges aspects of the voir dire, his contentions are based primarily on selected passages taken out of ten or twelve pages (per juror) of questioning. Indeed, if those passages had been representative of the jurors' responses to questioning, some serious problems would have existed. However, in each and every instance, when the entirety of the questioning process is considered, it was then revealed that jurors who were fully qualified under the applicable test were passed to the jury, just as when the juror was not so qualified he/she was excused.

[¶ 114] Although this case faced its fair share of problems, the voir dire is one area where we commend all the participants for their commitment to doing the voir dire in accordance with the prevailing standards, and to the very best of their respective abilities. See *Uttecht v. Brown*, — U.S. —, 127 S.Ct. 2218, 2222–2231, 167 L.Ed.2d 1014 (2007).

## B. Application of the 2003 Statute to this Case

[¶ 115] This issue arises under Article 1, § 10 of the United States Constitution which prohibits a state from passing any ex post facto law, as well as Wyo. Const. art. 1, § 35 ("No ex post facto law ... shall ever be made."). "Ex post facto law" is a phrase of art in the law. It is defined as "[a] law that impermissibly applies retroactively, esp. in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed." Black's Law Dictionary, 620 (8th ed.2004). Its more precise contours are given substance by "an accretion of case law." As articulated by this nation's highest court in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)):

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.

Also see *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 1626–31, 146 L.Ed.2d 577 (2000); *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct.

2715, 111 L.Ed.2d 30 (1990) (clarifying "confusions" in the meaning of "ex post facto"); *In re Wright*, 3 Wyo. 478, 480–81, 27 P. 565, 29 L.R.A. 748 (Wyo.1891); *Snyder v. State*, 912 P.2d 1127, 1130–31 (Wyo.1996). The analysis is the same whether considered under the United States Constitution or the Wyoming Constitution.

[¶ 116] Eaton contends that the district court erred in allowing him to stipulate that portions of the 2003 death penalty statute would apply to his case, instead of the statute that was in place at the time the crime was committed in 1988 (not using the 1989, 1999, and 2001 amendments). In essence, he contends that the 2003 version of the death penalty statute made "more burdensome the punishment for a crime after its commission." Defense counsel entered into that stipulation with the prosecutor (and the district court condoned it), because all three agreed that the 2003 version included some advantages for Eaton, but no disadvantages, and Eaton should be entitled to the benefit of those advantages. However, this came after defense counsel had championed strict application of the law, Wyo. Stat. Ann. § 6–2–102 (Michie 1983), in effect at the time of the crime (1988), and opposed application of the 2003 version of § 6–2–102. Initially, the district court agreed that the version of the statute in place in 1988 had to be applied. On appeal, Eaton now contends that some of the amendments were disadvantageous to him.

[¶ 117] In the proceedings below, and in the briefs filed in this Court, there are a variety of references to various years of the statutes at issue. In some cases, only the term "current" is used (in years 2003 and 2004). On remand for the *Calene* hearing, it is not made clear exactly what statutes were applied, or at least what statutes the prosecution and defense agreed to apply. Initially, the district court granted Eaton's motion to apply only the law as it stood in 1988. On January 13, 2004, an order was entered that acknowledged that the district court granted the earlier motion, but went on to say that it is "understood between the parties that the order shall be limited to exclude the aggravator of 'future dangerousness' and it is further stipulated that in all other respects the current statutory scheme shall govern this case including, but not limited to, the penalty option of life without parole." The briefs are not entirely clear in this regard either. However, we are satisfied that the 2001 and 2003 versions are the same, and that by "current," everyone agreed to apply the statutes as they appeared in the 2003 statutes. The analysis set out below will compare the statute as it stood at the time of the crime (1988), and as it appeared in the 2003 version of the Wyoming Statutes.

[¶ 118] Appellate counsel appear to suggest that perhaps trial counsel yielded to pressure from the district court which had apparently changed its mind to apply the then-current version of the first-degree murder statute, in any event. Thus, as a matter of "strategy," defense counsel entered into the stipulation so as to get "future dangerousness" off the table and to appease the district court. This subject is also a part of the "ineffective assistance of counsel" issues which come up later in this part of our opinion.

[¶ 119] At the time Eaton committed these crimes, Wyo. Stat. Ann. § 6–2–102 (Michie 1983) provided:

§ 6–2–102. **Presentence hearing for murder in the first degree; mitigating and aggravating circumstances; effect of error in hearing.**

(a) Upon conviction of a person for murder in the first degree the judge shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted before the judge alone if:

(i) The defendant was convicted by a judge sitting without a jury;

(ii) The defendant has pled guilty; or

(iii) The defendant waives a jury with respect to the sentence.

(b) In all other cases the sentencing hearing shall be conducted before the jury which determined the defendant's guilt or, if the judge for good cause shown discharges that jury, with a new jury impaneled for that purpose.

(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph (ii) of this subsection:

(i) After hearing all the evidence, the jury shall deliberate and render a recommendation of sentence to the judge, based upon the following:

(A) Whether one (1) or more sufficient aggravating circumstances exist as set forth in subsection (h) of this section;

(B) Whether sufficient mitigating circumstances exist as set forth in subsection (j) of this section which outweigh the aggravating circumstances found to exist; and

(C) Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.

(ii) In nonjury cases, the judge shall determine if any aggravating or mitigating circumstances exist and impose sentence within the limits prescribed by law, based upon the considerations enumerated in subparagraphs (A), (B), and (C) of this subsection.

(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foreman of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

(f) Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to death but shall sentence the defendant to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.[4]

(g) If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

(h) Aggravated circumstances are limited to the following:

(i) The murder was committed by a person under sentence of imprisonment;

(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(vi) The murder was committed for pecuniary gain;

---

4. This subsection was repealed in 2001. 2001 Wyo. Sess. Laws ch. 96 § 3.

(vii) **The murder was especially heinous, atrocious or cruel;**

(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney or former county and prosecuting attorney, during or because of the exercise of his official duty.

(j) Mitigating circumstances shall be the following:

(i) The defendant has no significant history of prior criminal activity;

(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(iii) The victim was a participant in the defendant's conduct or consented to the act;

(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

(v) The defendant acted under extreme duress or under the substantial domination of another person;

(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired;

(vii) The age of the defendant at the time of the crime. [Emphasis added.]

[¶ 120] At the time of Eaton's trial, Wyo. Stat. Ann. § 6–2–102 (LexisNexis 2003) provided that (Additional material and reorganized material are indicated by **bold-face** type. Material deleted is shown in strike out, although in a few cases it has merely been moved elsewhere in the statute.):

§ 6–2–102. **Presentence hearing for murder in the first degree; mitigating and aggravating circumstances; effect of error in hearing.** [Bold in both versions.]

(a) Upon conviction of a person for murder in the first degree **in a case in which the state seeks the death penalty,** the judge shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death, **life imprisonment without parole** or life imprisonment. The hearing shall be conducted before the judge alone if:

(i) The defendant was convicted by a judge sitting without a jury;

(ii) The defendant has pled guilty; or

(iii) The defendant waives a jury with respect to the sentence.

(b) In all other cases the sentencing hearing shall be conducted before the jury which determined the defendant's guilt or, if the judge for good cause shown discharges that jury, with a new jury impaneled for that purpose. **The jury shall be instructed that if the jury does not unanimously determine that the defendant should be sentenced to death, then the defendant shall be sentenced to life imprisonment without parole or life imprisonment.**

(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph (iii) of this subsection:

(i) After hearing all the evidence, the jury shall deliberate and render a recommendation of sentence to the judge, based upon the following:

(A) Whether one (1) or more ~~sufficient~~ aggravating circumstances exist

beyond a reasonable doubt as set forth in subsection (h) of this section;

(B) Whether ~~sufficient~~, by a preponderance of the evidence, mitigating circumstances exist as set forth in subsection (j) of this section ~~which outweigh the aggravating circumstances found to exist~~; and

(C) ~~Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.~~ The mere number of aggravating or mitigating circumstances found shall have no independent significance.

(ii) The jury shall consider aggravating and mitigating circumstances unanimously found to exist, and each individual juror may also consider any mitigating circumstances found by that juror to exist. If the jury reports unanimous agreement to impose the sentence of death, the court shall discharge the jury and shall impose the sentence of death. If the jury is unable to reach a unanimous verdict imposing the sentence of death within a reasonable time, the court shall instruct the jury to determine by a unanimous vote whether the penalty of life imprisonment without parole shall be imposed. If the jury is unable to reach a unanimous verdict imposing the penalty of life imprisonment without parole within a reasonable time, the court shall discharge the jury and impose the sentence of life imprisonment;

(iii) In nonjury cases, the judge shall determine if any aggravating or mitigating circumstances exist and impose sentence within the limits prescribed by law, based upon the considerations enumerated in subparagraphs (A), (B), and (C) of paragraph (i) of this subsection.

(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. In nonjury cases the judge shall make such designation. The jury, if its verdict is a sentence ~~recommendation~~ of death, shall designate in writing signed by the foreman of the jury: ~~the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.~~

(i) The aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt;

(ii) The mitigating circumstance or circumstances which it unanimously found by a preponderance of the evidence; and

(iii) The mitigating circumstance or circumstances which any individual juror found by a preponderance of the evidence.

(f) ~~Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to death but shall sentence the defendant to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.~~ Repealed by Laws 2001, ch. 96, § 3.

(g) If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

(h) Aggravated circumstances are limited to the following:

(i) The murder was committed by a person ~~under sentence of imprisonment;~~

(A) Confined in a jail or correctional facility;

(B) On parole or on probation for a felony;

(C) After escaping detention or incarceration; or

(D) Released on bail pending appeal of his conviction.

(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(vi) The murder was committed **for compensation, the collection of insurance benefits or other similar** pecuniary gain;

(vii) The murder was especially heinous atrocious or cruel, being unnecessarily torturous to the victim;

(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney, **defending attorney, peace officer, juror or witness** or former county and prosecuting attorney, during or because of the exercise of his official duty **or because of the victim's former or present official status.**

(ix) **The defendant knew or reasonably should have known the victim was less that seventeen (17) years of age or older than sixty-five (65) years of age;**

(x) **The defendant knew or reasonably should have known the victim was especially vulnerable due to significant mental or physical disability;**

(xi) **The defendant poses a substantial risk and continuing threat of future dangerousness or is likely to commit continued acts of criminal violence;**

(xii) **The defendant killed another human being purposely and with premeditated malice and while engaged in, or as an accomplice in the commission. of, or attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary, kidnapping or abuse of a child under the age of sixteen (16) years.**

(j) Mitigating circumstances shall be **include** the following:

(i) The defendant has no significant history of prior criminal activity;

(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(iii) The victim was a participant in the defendant's conduct or consented to the act;

(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

(v) The defendant acted under extreme duress or under the substantial domination of another person;

(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired;

(vii) The age of the defendant at the time of the crime;

(viii) **Any other fact or circumstance of the defendant's character or prior record or matter surrounding his offense which serves to mitigate his culpability.**

■ [¶ 121] An important feature of this discussion is that, while defense counsel originally insisted that Eaton be tried under the death penalty law in effect at the time the crime was committed, defense counsel eventually stipulated that the then current version of the death penalty statute (with some modifications) be applied instead. In this appeal it is contended that that stipulation had the effect of placing Eaton at a disadvantage because the older statute provided for no burden of proof with respect to mitigating evidence, and the potential issue concerning the unconstitutionality of the "atrocious, heinous, and cruel" aggravator (which was modified in the 2003 version of the statute to eliminate the unconstitutionality argument)

was taken off the table. However, defense counsel believed that he reaped a couple of advantages from the stipulation: (1) The provision for a burden of proof as to aggravators (beyond a reasonable doubt) and mitigators (by a preponderance of the evidence) aided his case; and (2) because the new statute provided a third alternative sentence, "life without parole [LWOP]." To the extent the newer statute could be said to be disadvantageous, it was pretty much agreed that those aspects of it would not be applied ("future dangerousness" could not be used as an aggravator).

[¶ 122] Of course, we must begin our discussion of this issue with a recognition that Eaton did not object to the district court's application of the 2003 version of the statute, and the Ex Post Facto argument that we are called upon to consider here was not considered in the district court. We will assume for purposes of resolving this issue that the district court determined that Ex Post Facto concerns were not present, and now that this issue is laid at our doorstep, we are called upon to review it *de novo.*

[¶ 123] As another threshold matter, we note that Eaton points out that Wyo. Stat. Ann. § 6-1-101 (Michie 1983 and LexisNexis 2003) provides:

§ 6-1-101. **Short title; applicability of provisions; conflicting penalties.**

(a) This act may be cited as the Wyoming Criminal Code of 1982.

(b) This act does not apply to crimes committed prior to the effective date of this act. Prosecutions for a crime shall be governed by the law in effect on the date when the crime occurred. A crime was committed prior to the effective date of this act if any of the elements of the crime occurred prior to the effective date of this act.

(c) In a case pending on or after the effective date of this act, involving a crime committed prior to the effective date, if the penalty under this act for the crime is different from the penalty under prior law, the court shall impose the lesser sentence.

[¶ 124] For the most part, this language is now of no import whatsoever. This was the opening statute in a general revision of the criminal code that became effective on July 1, 1983. It does not govern the question we are called upon to answer here. See *Attletweedt v. State,* 684 P.2d 812, 814–15 (Wyo.1984).

[¶ 125] Where the changes in a death penalty statute are procedural, and on the whole ameliorative, the Ex Post Facto clause is not violated. *Dobbert,* 432 U.S. 282, 97 S.Ct. 2290 at 2298. We have carefully examined the 2003 version of the statute and conclude, as did the district court, that the changes that were applied to Eaton's case did not impose any additional burdens on him and that the procedural changes were, in their totality and as applied, salutary for his case. Hence, the Ex Post Facto Clause was not violated.

### C. *Ineffective Assistance of Counsel*

[¶ 126] We will apply the same standard of review here as we did in Part I. See ¶¶ 35–37, *supra.*

### (i) 2003 statute.

[¶ 127] Because we have determined immediately above that the district court did not err in applying the 2003 version of the statute, we also conclude that the defense's strategy in this respect did not constitute ineffective assistance of counsel.

### (ii) Whether Trial Counsel Provided Ineffective Assistance in the Investigation and Presentation in the Sentencing Phase of Mitigating Evidence.

[¶ 128] Eaton's criticisms of his trial counsels' performance in investigation and presentation of mitigating evidence proceed on two lines. On the first line, he claims that, although trial counsel did investigate and present some "life history" mitigating evidence, trial counsel failed to sufficiently investigate and obtain for presentation more "life history" mitigating evidence from various sources, such as Eaton's father, siblings, children, former wife, other relatives, former employers and coworkers, former teachers and schoolmates, welfare service providers,

health care providers, mental health care providers, school records, birth records, medical records, and so on. Eaton argues that these failures "resulted in a thin, virtually nonexistent mitigation case."

[¶ 129] On the second line of criticism, Eaton claims that his trial counsel's performance in his preparation and presentation of mitigating evidence through two expert witnesses, Dr. Kenneth Ash and Dr. Linda Gummow, was deficient. With regard to trial counsel's preparation and presentation of Dr. Ash's testimony, Eaton asserts that trial counsel's failure to alert Dr. Ash about certain notations in a journal kept by Doris Buchta, one of Eaton's neighbors, which suggested that Eaton may not have been as socially isolated as Dr. Ash believed, exposed Dr. Ash to the prosecutor's damaging cross-examination. With regard to trial counsel's preparation and presentation of Dr. Gummow's testimony, Eaton points to three matters. First, Eaton claims that trial counsel's failure to provide Dr. Gummow with the correct date of the suicide death of Eaton's brother (which Dr. Gummow mistakenly thought was before the Kimmell homicide) damaged Dr. Gummow's credibility. Second, Eaton claims that trial counsel's deletion of three particular slides from Dr. Gummow's thirty-slide PowerPoint presentation during her testimony devalued her testimony. Third, Eaton presents Dr. Gummow's post-trial criticisms that in her association with trial counsel several days before her testimony, and during her testimony there seemed to be confusion; meetings were not conducted in private areas; trial counsel was not organized and helpful; and trial counsel was irritable, shaky, and not in good health. Eaton argues that trial counsel's "overreliance on two ill-prepared doctors, mixed in with the family members who 'tanked,' gave the jury no coherent mitigation story, and so not a single mitigating factor was found by a single member of the jury."

[¶ 130] The State asserts that on the full record before us, Eaton has failed to show trial counsel's deficient performance in any respect, let alone prejudice. According to the State, the record shows that trial counsel's investigation included, among other things, revealing interviews with Eaton himself as well as with numerous family members and friends; acquisition of pertinent mental health records of both Eaton and his deceased mother; and mental health examinations of Eaton by two experienced, well-qualified mental health experts. The State asserts that, based on trial counsel's investigation, trial counsel presented significant mitigating evidence of Eaton's "life history" encompassing his childhood poverty and abuse, disadvantaged background, limited educational opportunities, and lifelong mental health problems, all of which was relevant to the jury's assessing his moral culpability. The State also points out that—aside from a few unilluminating school records, a former schoolmate's report that a young Eaton was a victim of school bullies' taunts and physical abuse, and a one-page document (Disposal of Client Record Form from the Lincoln County Mental Health Association) showing that Eaton sought counseling in 1986 shortly following similar documented counseling in the Community Hospital in Torrington, Wyoming, that same year—Eaton did not present any additional mitigating evidence at the remand evidentiary hearing or with his motion for a new trial as required by the applicable legal precedent. As for these few items of additional evidence, the State argues that they are cumulative of similar mitigating evidence that was presented at trial and they are of such minimal evidentiary value that, had they been considered by the jury, no reasonable probability exists that the jury would have reached a different verdict. Finally, the State also rejects Eaton's criticisms of trial counsel's preparation and examination of Dr. Ash and Dr. Gummow.

[¶ 131] As we noted earlier in this opinion, under our remand order the trial court held a five-day evidentiary hearing during which Eaton's appellate counsel and the prosecutor developed a record covering, among other issues, Eaton's contentions and criticisms of his trial counsel's performance. As previously noted, the trial court issued a 47-page decision letter in which it discussed the record developed during that hearing, considered the applicable legal precedent, and concluded that Eaton's trial counsel had not rendered ineffective assistance in repre-

sentation of Eaton. With respect to Eaton's contentions of ineffective assistance in investigation and presentation of mitigating evidence, the trial court's treatment of those contentions appears in pages 21–33 of its decision letter. We reiterate our standard of review: We do not disturb the trial court's findings of fact unless they are clearly erroneous or against the great weight of the evidence; we review *de novo* the trial court's conclusions of law, which in this instance

concern whether or not trial counsel's performance was deficient and, if it was, whether Eaton was prejudiced by that deficient performance. As we shall now explain, we hold that Eaton's trial counsel did not provide ineffective assistance in the investigation and presentation of mitigating evidence in the sentencing phase of the trial.

[¶ 132] We have reviewed Eaton's contentions and criticisms and the State's responses in the light of the legal standards [5] and ana-

5. In *Strickland,* the Court noted:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland,* 466 U.S. 668, 688–89, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also, *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); and *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("we long have referred [to these ABA Standards] as 'guides to determining what is reasonable' ").

We note that the new ABA Guidelines adopted in 2003 explain in detail the obligations of defense counsel to investigate mitigating evidence. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ¶ 10.7, at 80–83 (2003) describe defense counsel's obligation to investigate mitigating evidence for the trial's sentencing phase (omitting quotation marks and lengthy footnotes):

> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel sit idly by, thinking that investigation would be futile. Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.
>
> Because the sentencers in a capital case must consider in mitigation, anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant, penalty phase preparation requires extensive and generally unparalleled in-

vestigation into personal and family history. At least in the case of the client, this begins with the moment of conception [*i.e.,* undertaking representation of the capital defendant]. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors,

lytical model set forth in *Strickland, supra* (reviewing both the performance component and the prejudice component, the Court found neither deficient performance nor prejudice) and the line of United States Supreme Court decisions following that seminal decision, namely, in ascending order, *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (because the Court did not find deficient performance, it did not need to address prejudice); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (the Court found deficient performance and prejudice); *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (the Court found deficient performance and prejudice); and *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (the Court found deficient performance and prejudice). We have also taken note of two recent decisions of the Tenth Circuit Court of Appeals, namely, *Anderson v. Sirmons,* 476 F.3d 1131 (10th Cir.2007) (the court panel found deficient performance and prejudice); and *Smith v. Mullin,* 379 F.3d 919 (10th Cir.2004) (the court panel found deficient performance and prejudice). All of these decisions are helpful particularly because they precisely focus on the discrete issue of alleged ineffectiveness of counsel in investigating and presenting mitigating evidence in the sentencing phase of a capital trial. These decisions instruct:

- An ineffective assistance claim has a performance component and a prejudice component. The components are mixed questions of fact and law. A court does not have to approach the inquiry by addressing performance first and prejudice second. A court does not have to address both components if the appellant makes an insufficient showing on one. If a court determines it is easier to dispose

of the claim because sufficient prejudice is lacking, the court may do so.

- *The performance component*
 — to show that trial counsel's performance was deficient, the appellant must show that counsel made errors so serious that counsel was not functioning at an objective standard of reasonableness under prevailing professional norms, considering all the circumstances as of the time of counsel's conduct;
 — judicial scrutiny of trial counsel's performance must be highly deferential. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;
 — trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. A court must directly assess a particular decision not to investigate for reasonableness under all the circumstances, applying a heavy measure of deference to counsel's judgments.

- *The prejudice component*
 — a court shall not set aside the sentence if trial counsel's deficient performance had no effect on the sentence. The appellant must affirmatively show that counsel's deficient performance actually had an adverse effect on the defense;
 — when an appellant challenges a death sentence, the question is whether there is a reasonable probability—which is less than a preponderance of the evidence but sufficient to undermine confidence in the outcome—that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. In

teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and

children. A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

making this determination, the court must evaluate the totality of the available mitigating evidence—both that presented in the sentencing phase of the trial and that presented in the post-trial evidentiary hearing—in reweighing all the mitigating evidence against the aggravating evidence.

— the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding. A court must be concerned with whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown in the adversarial process.

[¶ 133] In order to provide context to trial counsel's presentation of "life history" mitigating evidence in the sentencing phase of the trial, we shall briefly recount the parties' opening statements and the prosecution's evidentiary submission which preceded trial counsel's evidentiary submission. Following that, we shall recount in some detail the "life history" mitigating evidence that trial counsel presented in the sentencing phase.

[¶ 134] In the prosecution's opening statement, the prosecutor stated that he would offer into evidence all of the guilt-phase evidence and would ask the jury to return the death sentence. He listed the statutory aggravating circumstances in the case: (1) The murder was especially atrocious or cruel, being unnecessarily torturous to the victim; (2) the murder was premeditated and committed purposely while Eaton was engaged in the crimes of kidnapping, robbery, and sexual assault; and (3) Eaton was previously convicted of a felony involving the use or threat of violence to the person. The prosecutor declared that all three aggravating circumstances would be proved beyond any reasonable doubt, and the jury would need to find only one of them before deciding whether the death penalty was appropriate. Turning to Eaton's mitigation case, the prosecutor said he expected it would center around evidence of Eaton's background and history of depression, but that such evidence, even if believed, could not overcome the State's strong aggravating circumstances.

[¶ 135] In defense counsel's opening statement, he said that Eaton accepted and respected the jury's verdict in the guilt phase. He then stated that Eaton's life had value and trial counsel would give the jury reasons to take the road to life for Eaton. He alerted the jury that he would review Eaton's life, presenting witnesses who knew him from his youngest days and witnesses who had observed and evaluated him concerning his present situation, and would show that Eaton's life had not been a pretty picture. Trial counsel stated that Eaton, unlike most persons in the courtroom, did not have a nuclear family, but had a father who beat him. Trial counsel said that Eaton never had a chance in his life, unlike the others in the courtroom. He told the jury that it alone had the decision whether Eaton would die of natural causes in a penitentiary cell or would be executed. Trial counsel then briefly reviewed the expected evidence of Eaton's troubled childhood: an alcoholic and selfish father who was a transient laborer and was good at abusing young Eaton; a poor family that moved many times; a mother who was severely abused and hospitalized with schizophrenia; a young Eaton who was forced to work long hours at the farm and who dropped out of school to work to support the family; a young Eaton who did not do well when he attended school and who had a low IQ; a 16–year-old Eaton who was diagnosed at a psychiatric hospital as disturbed and depressed. Trial counsel also reviewed briefly the evidence of Eaton's troubled adult life, including his failed marriage, his difficulty holding steady employment, his continuing depression, and his isolated and poor living conditions. Trial counsel also reviewed the evidence of Eaton's mental health evaluations by, and expert opinions of, neuropsychologist Dr. Linda Gummow and psychiatrist Dr. Kenneth Ash.

[¶ 136] Turning to the applicable statutory mitigating circumstances and reasons for life, trial counsel identified: (1) The murder was committed while Eaton was under the influence of an extreme mental or emotional disturbance; (2) Eaton acted under extreme duress; (3) the capacity of Eaton to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (4) any oth-

er fact or circumstance of Eaton's character or prior record or matter surrounding his offense which serves to mitigate his culpability. Concluding his opening remarks, trial counsel submitted that the only logical, right, fair, and ethical choice was for Eaton to serve the rest of his life in the state penitentiary.

[¶ 137] Before calling its first witness, the prosecution formally moved for the introduction into evidence of all of the guilt-phase testimony and exhibits previously introduced and received. Eaton's trial counsel added that that applied as well to all defense guilt-phase evidence. The district court judge ruled that all such evidence was received. The prosecution next examined in quick succession three witnesses to establish Eaton's previous conviction of aggravated assault and battery in Sweetwater County. Those witnesses were Shannon Breeden, the victim; Richard Haskell, from the sheriff's department; and Tony Howard, a prosecuting attorney. The prosecution rested.

*"Life History" Mitigating Evidence*

[¶ 138] We review Eaton's first line of criticisms of trial counsel's performance by first considering the "life history" mitigating evidence that trial counsel presented at the sentencing phase. Following that, we shall consider the additional "life history" mitigating evidence that Eaton presented at the remand evidentiary hearing and in his motion for a new trial. Having in mind the sentencing phase record, the remand evidentiary hearing record, and the motion for new trial record, we will then be in the best position to judge Eaton's contentions and the State's responses on this appellate issue.

[¶ 139] The sentencing phase record reveals that trial counsel presented "life history" mitigating evidence through two expert witnesses who had interviewed and evaluated Eaton before trial and who had reviewed a number of records and statements containing "life history" information, several family members of Eaton's, and several friends and acquaintances of Eaton's. Dr. Kenneth Ash, psychiatrist, described his expert qualifications and his general evaluation procedure, including a review of medical records; con-

versation with Eaton's trial counsel; meeting with Eaton to explore his life history and present circumstances; and personal observation of Eaton's thinking, moods, and behavior. Dr. Ash described that he met with Eaton in jail on four separate occasions for a total of about twelve and a half hours, during which he observed him as he asked questions about his life history and present circumstances. In considering Eaton's growth from childhood forward, Dr. Ash examined Eaton's available medical evaluation records including those from the Colorado Psychiatric Hospital when he was sixteen years old and from the hospital in Torrington, Wyoming, when Eaton was there in 1986. From these records of mental health evaluations, Dr. Ash noted a consistent finding of depression. Dr. Ash then explained the effect of depression on the brain and differentiated mild depression from Eaton's lifelong significant clinical depression which causes brain damage. Dr. Ash saw evidence of this clinical depression as he talked to Eaton. Dr. Ash related that Eaton told him about his failed marriage, family, and welding work, and his living in a bus in Moneta, Wyoming, in poverty and isolated from family and friends. Dr. Ash testified how Eaton's psychosocial and environmental problems related to his depression diagnosis. Dr. Ash identified the numerous stressors in Eaton's life. Dr. Ash also testified about Eaton's past significant problems in schooling and failure to get a general education certificate from a secondary school. Dr. Ash learned that Eaton had no access to health care. Dr. Ash evaluated Eaton as a person with major impairments in the areas of work, school, family relationships, judgment, thinking, and mood. Trial counsel examined Dr. Ash about his review of Eaton's 1986 Torrington hospital records which revealed his depression and suicidal ideation. Dr. Ash testified that Eaton's IQ was in the 80s to low 90s, in the low range of normal.

[¶ 140] Dr. Ash expressed these opinions about Eaton with supporting testimony:

1. A consistent finding of significant clinical depression, after considering his growth from childhood to manhood, the Colorado Psychiatric Hospital record when Eaton was sixteen years old, and the 1986

record at the Community Hospital at Torrington; and

2. Eaton committed the Kimmell homicide when under the influence of extreme emotional disturbance and extreme distress.

[¶ 141] Dr. Linda Gummow, neuropsychologist, testified about her expert qualifications, experience, and evaluation procedure. She spent two days with Eaton, estimating that twenty-five percent of that time was interview and the rest was test administration. She testified about her background evaluation of Eaton, which entailed getting as many documents as possible about his past life, such as medical records, educational records, psychiatric records, and police records. She testified that she also reviewed information obtained from persons in Eaton's life, including Eaton's sisters, Sharon Slagowski and Judy Mason, and Eaton's father, Merle. She testified about her preparation of a background chronology of Eaton's life using the various records and interview statements. She also had obtained and used the psychiatric records of Eaton's mother as part of the background chronology of Eaton's life. Trial counsel introduced into evidence, without objection, Dr. Gummow's background chronology of Eaton's life. In some detail, Dr. Gummow's testimony follows:

This chronology basically just gives some marker events in Mr. Eaton's life. The first line is his birth on February 10, 1945. He's the second oldest of eight children and the oldest son.

He was raised by his natural parents. His father was the primary support of the family, who—he did a number of occupations, but he basically had an eighth-grade education and did a lot of manual occupations: mining, ranching, farming. The family moved fairly frequently. There's some testimony indicating that the father drank heavily, regularly. There's some family information indicating that there was physical abuse in the family, the mother and Mr. Eaton; some testimony indicating that the abuse to Mr. Eaton was more significant, perhaps, than that to other siblings. And that fits with the research

which suggests that the oldest son sometimes takes the heaviest brunt.

. . . .

Mr. Eaton—this is his report, now—had a strong emotional attachment to his mother, who was reported to be a good mother, who cared for the family and did the best she could until she started to have mental health problems—and we don't know the exact onset, but sometime around 1961.

There's supposedly some fights between the parents.

Due to the frequent moves and Mr. Eaton's personality style, he had few friends. He was a slow developer. He seemed immature for his years. And he had very heavy responsibility as the oldest son, because his father sometimes couldn't find work locally and had to leave the—the home for extended periods of time; and during that time, he was basically responsible for whatever farm animals they had and so on.

There is some suggestion that—well, it's fairly well documented the family was economically struggling throughout most of their—most of his childhood, with difficulty providing basic medical services. Sometimes children did not get medical problems treated until they were quite severe or other people intervened.

This is Mr. Eaton's report. Mr. Eaton reported that he started running away in third grade. Documents suggest that he started running away sometime around fifth grade. This was reported to be due to fear of punishment, being struck by his father.

In 1960—he would be approximately 16 years old, 15 years old—he was identified as having poor attention. He was held back in school.

Now, this is where I'm not sure of these dates. The earliest hospitalization date I have is this—definite is 1962, when Mrs. Eaton was hospitalized in the Colorado State Hospital in Pueblo. There's an indirect reference in the evaluation that Mr. Eaton, when he was 16, stating that she had had a nervous breakdown previous to 1961. So somewhere in '60, '61, Mrs. Eaton started developing symptoms of what

was diagnosed consistently as schizophrenia.

He was identified as having some learning problems in the Greeley School District, and he was at some point held back. It's very confusing—his academic record is very confusing. We don't have many documents. We just have Meeker and Greeley, when he was 16. We don't have the earlier documents. We were unable to obtain them.

Q. (By Mr. Skaggs) Doctor, is that common in cases that have this kind of age?

A. They are common in older—older defendants. It's easier to get records now, with computers and so on. And, also, when the person moves frequently and there's a lot of schools, sometimes the school doesn't have a record if the student is only there for six months.

. . . .

He was diagnosed—this is his first known psychiatric diagnosis. He was diagnosed as being a depressed youngster, had been depressed for a long time, having serious emotional problems and being unable to relate.

This was the physician who noted that Mr. Eaton had difficulty relating to—to others, particularly adults; had very poor peer relationships. He had no friends. He was a fairly unappealing youngster who seemed to be immature.

He was treated at Colorado Psychopathic Hospital for—primarily for diagnosis, and then he was referred to several facilities outside of his family, including Lookout Mountain School for Boys and then the Buena Vista Correctional Center. It was in the Buena Vista Correctional Center that he learned to weld.

. . . .

So—and welding became his primary occupation throughout his life. He joined several unions.

And I've got the diagnosis stating '66 for the schizophrenia, but it was actually '62. I just didn't want to put it two places.

Q. Was she hospitalized more than once—

A. Yes.

Q. —according to the records?

A. Multiple—

Q. Okay.

A. —several times in one year.

And her hospitalization—her first hospitalization date and Mr. Eaton's hospitalization date are very close in time. And Mr. Eaton believed that he was responsible for his mother's mental health problems.

Q. Is that a self-reported thing?

A. That's his self report. There's no indication that anyone else blamed him, but he felt that he was responsible.

He lived and worked, after he was released from the correctional center, primarily as a welder. He contributed financially to his family, both as a child, as an adult, contributing a lot of his earnings. He was active in a church, helped build a church in 1972. He became a member of the Operating Engineers Union in approximately 1972.

Most important event occurred in his life and was in 1971, where he married Melody St. John. He was 26 years old at the time. I believe she was 18. And it was the first significant and long-term relationship that he had had. He had not had any long-term relationships before. He reported a few date-or-two-type relationships. They had three children, two sons and a daughter. And the marriage was not a happy one. His happiness with the marriage, according to his report, ended on his wedding night, when his wife said she wanted a divorce. There was a lot of acrimony and difficulty in the marriage, mutual accusations, and, I think, a considerable bitterness on both parties. They were separated, we know, at least once, in 1979, when Melody filed for a divorce; and then they then reconciled.

Early in the relationship, Mr. Eaton was the primary source of support. His work history is worth mentioning. He worked, like I said, primarily as a welder. His longest job was—according to his report, was about a year or year and a half. That was a long time for him. He changed jobs frequently. He had difficulty getting along with coworkers, got in altercations,

sometimes left for—for no apparent reason. Same work pattern that his father had, very short employments here and there.

So toward the end of the marriage, Mrs.—Melody became more the primary support of the family. She undertook more of the responsibility. She became very disenchanted with the conflict in the family and the instability of his work history. And she started basically supporting the family. He, at this point in time, was doing occasional welding jobs, as I understand it, and was also doing some sort of a junk business, going—trading materials, you know, salvaging and going to junk shows and things, so—kind of flea markets and so on.

Sometimes their living conditions were quite rough, sometimes living in a trailer without amenities.

And so she filed for divorce in 1986. She left him, and that was the end of the marriage. His wife left him, and he was hospitalized for depression at that time. He was hospitalized for a few days. He went to the hospital—he actually went to the police department. They were concerned about him. They took him to the community hospital, where they admitted him and diagnosed him with a depression and thought disorder.

. . . .

Sometime—and this is an approximate date. Sometime in 1986, Mr. Eaton lived on the property—is it Moneta?

Q. Right.

A. He—this property was given to him, I believe, by a family member. And he—his reason was that he needed to get away from people. So he started living out here. And he called it "to hide out." The property didn't have any water. It had no facilities. Mr. Eaton basically was given an old bus which he put on the property and lived in it.

And by multiple reports, his lifestyle was extremely marginal. His diet was poor. His uncle told me that he would always bring a sandwich whenever he visited Dale because he didn't want to eat in the kitchen. And Dale would always offer

him a meal. And Dale's meal consisted of taking a—pieces of frozen venison, which he hunted and caught, and throwing it into a skillet, which was indescribably dirty, and then eating that with his hands. And so Mr. Eaton's uncle told me that he always brought a sandwich so he could say, well, my wife would get mad if I didn't eat it.

So his lifestyle was very marginal, frequently described during this time frame and later as not—not having good hygiene. No evidence of that earlier; but later on, didn't bathe. Sometimes would go wash his car and get in the carwash with the car and bathe himself there; sometimes went to neighbors'. Had no water on the property, so he had to go to various places to get water.

So his behavior became bizarre and somewhat—and his grooming and hygiene were marginal during that phase, as well as his dietary habits.

Medication was recommended, I should mention, when he was in the community hospital, but he never followed up with mental health care afterward. They wanted him to, but he didn't do it.

This was another very significant date. That's why I put it on here. Dale's brother asphyxiated himself with carbon monoxide sometime in 1987. I don't know the exact date. Dale blamed himself for this, because he believed that if he had loaned his brother some money that he had asked for, that his brother wouldn't have committed suicide. Whether or not that's an accurate understanding, I don't know.

And then, of course, significant date here for our purposes is April 2, 1988, was when the body of Lisa Marie Kimmell was found in the North Platte River.

Shortly after Ms. Kimmell's death, his son, William, spent some time with him. And by interview, he indicated that Mr. Eaton was very unstable in the sense his lifestyle was unstable. I think they lived four or five different places in a year, and he was attending different schools during this period of time. He was also said to be very controlling and didn't want to live

with him and left, and they had no more contact after that.

· I should mention that I forgot to put it on—I mentioned in here, one of their children was removed from the home. And I'm not sure when that occurred, because I haven't seen the documents; but one of the sons was removed from the home.

Q. Now, whose home was that?

A. From Melody and Dale's home.

Q. Okay.

A. Okay. And Mr. Eaton had no stable, long-term relationships with any other woman after this time. His best—his strongest relationship was with a woman in Nevada that he visited periodically, might stay a few months. And that woman described Dale, again, as having very poor grooming and called him junkyard Dale, because apparently his—his car was—his van was a jumble.

I should mention, during this time period, Mr. Eaton at one point in time had put together a welding truck and equipment; and he used that to kind of be a freelance welder, doing jobs all over the place. During this time frame before Ms. Kimmell's death, he lost that welding truck. He—his credit rating went down. And he basically really never worked more than 90 days at a time anywhere after that. He seemed to express it to me 90 days was a long time. When I interviewed him, he couldn't even recall his major employers. We got—I got five or six names, but he was just from one job to another job to another job to another job. And he remembered the longer jobs, but not the many, many others that he had had.

He's had a lot of psychiatric treatment from 1997 on, at least the evaluation and medication. He was diagnosed with depressive disorder, some issues with cognitive compliance—that is, some of the people that examined him were concerned that he wasn't being completely truthful with them. He was diagnosed with multiple suicide ideation, lifetime depression, PTSD. There's one not on here that should be on here. It was an occasional—couple diagnoses of explosive disorder, dysthymia, depression, major depression,

anxiety, and post-traumatic stress disorder, which someone diagnosed based on his reported history of childhood abuse.

And then the last date here is in May—I mean April of 2003. He was transported to Natrona County jail to stand trial for the death of Ms. Kimmell.

[¶ 142] Dr. Gummow expressed these opinions about Eaton with supporting testimony:

1. There was a 95% probability that Eaton was responding honestly during her testing and evaluating for his psychiatric symptoms, and there was no malingering on Eaton's part.

2. At age 16, Eaton was diagnosed at the Colorado Psychiatric Hospital with depression, suicidal ideation, disturbed sleep disorder, low self-esteem, and inability to relate.

3. Eaton's depressive disorder is called depressive disorder NOS because of psychotic features and brain damage. It is of long-standing existence dating to his adolescence and was present in an exacerbated or severe form in 1988.

4. Eaton has had a long-standing learning disorder, with an IQ range from 76, which is borderline, to high 80s to 90s.

5. Eaton's depression is probably genetic and his family members' mental conditions bear this out; his major depressive disorder is considered to be a brain disease and it has been exacerbated by the social factors in his life, including his documented child abuse.

6. Eaton's academic skills in reading, math, and spelling "are far below average."

7. Eaton has moderate to severe brain damage.

8. Eaton's depression is linked to his behavior. Eaton never learned any coping styles to help him deal with the irrational feelings associated with his depression illness.

9. Eaton's significant lifelong psychiatric disorder caused extreme emotional disturbance and extreme duress at the time of the Kimmell homicide.

[¶ 143] Corroborating the "life history" mitigating evidence presented by Drs. Ash and Gummow, four family members of Eaton's testified on Eaton's behalf. Loren Ferrin, whose deceased older sister was Eaton's mother, testified that he had known Eaton since Eaton's birth. Through Mr. Ferrin, trial counsel introduced into evidence several photographs of Eaton and his family members taken in the mid–1950s when Eaton was ten to twelve years old. Mr. Ferrin testified that Eaton's mother had told him that Eaton's father, Merle, had kicked her and "broke her tailbone." Mr. Ferrin said he was going to confront Merle Eaton about the matter, but his sister (Eaton's mother) told him not to because Merle Eaton "would just come back and pick on her then." Mr. Ferrin testified that Eaton's father drank to excess, had several jobs, and moved the family from a half dozen to a dozen times. There were eight children in the family, but one died at birth. Mr. Ferrin stated that, although he had not seen Eaton hit by his father, Eaton did not have a good relationship with his father—Eaton was afraid of him. Mr. Ferrin said that Eaton, the oldest boy in the family, "wasn't treated good" and "had to do a lot that he shouldn't have had to do." Mr. Ferrin recounted how he and his late wife had tried to adopt the young Eaton because Eaton's father "was picking on him too much." Mr. Ferrin also said that later on Eaton's father was going to "adopt all of the kids out," but it did not happen. Mr. Ferrin described Eaton's father as selfish, testifying "When the rest of the family would be out starving to death sometimes, he would go down to the cafe and have big steaks." He recounted an incident when he and his late wife visited the Eaton family and "they didn't have anything to eat." Mr. Ferrin's father bought lunch meat so they could have dinner; but Eaton's father "figured he didn't get enough to eat, so he went down to the cafe and had a big steak dinner after that." Mr. Ferrin described another occasion when Eaton's mother was in the hospital and Mr. Ferrin was riding home with Eaton's father. Eaton's father had a box of candy and told Mr. Ferrin, "Let's eat it up before we get home ... [t]he kids will just eat it up." Mr. Ferrin mentioned a later time when Eaton had bought his father a welding truck so they could work together; Eaton's father bought new tires for the truck, charged the purchase to Eaton, and then left. Mr. Ferrin recalled that Eaton's parents argued all the time. Mr. Ferrin said that Eaton had a good relationship with his mother. Mr. Ferrin also testified that he was the person who had given Eaton the Moneta property where Eaton lived.

[¶ 144] Loren Ferrin's wife, Betty, testified that she had known Eaton since 1951. At the beginning of her testimony, she became emotional and stated, "I can't do this." The trial judge offered her a glass of water to calm her. She then testified that she liked Eaton and did not want him to die because "I don't think he was in his right mind when he did this."

[¶ 145] Marilu O'Malley, Eaton's aunt, testified that she has known Eaton since his birth. Eaton's mother was Ms. O'Malley's sister. Ms. O'Malley testified that she never saw Eaton's father hit Eaton's mother, "but he ridiculed her all the time." She said that Eaton's mother was a patient at a mental hospital for two or three years. Commenting on what Eaton's mother had to put up with from Eaton's father, Ms. O'Malley testified, "Well, the ridicule; and then he abused the children, and ... she couldn't stand up for them in any way. And that was back in the days when wives and children had no protection or no place to go when they were in trouble." She recounted a particular incident between Eaton and his father:

Well, I was there one time when the children were playing around. And when there's several children, there's bound to be a little noise. And Merle didn't—when he came home, he expected everything to be quiet. And the children were playing. And all of a sudden, he jumps out of his chair and grabs his belt up—you know, took it off his body, had a big wide belt with a buckle on it, and started beating on Dale Wayne. And Dale Wayne—I mean, he beat all of the kids to some extent, but I think Dale Wayne got the brunt of it. He seemed to be always the one that got first and most.

She added that she never saw Eaton's father hit Eaton's sisters, saying, "I don't think they were affected as much as Dale Wayne was, by a long shot." She had seen other occasions of Eaton's father abusing Eaton. She also testified:

> But I felt so sorry for him one time. I was a young wife with a little child, about a year and a half old. And I just felt so sorry for him that I wanted to get him away from that home for a while. So I asked if I could keep him. And as I recall—I don't remember the exact number of days, but it was, like, ten days or two weeks. He stayed with my husband and I. And my husband taught him how to fish, and they would go fishing. We would cook them. He had a great time with us. . . .
>
> And then I wanted to keep him longer, but his mother said that his dad had work for him to do.

Ms. O'Malley also remembered an occasion when she and her mother visited the Eaton family in Meeker, Colorado. Ms. O'Malley rode into town with Eaton's father and, as he had done with Mr. Ferrin, Eaton's father was eating from a box of candy and told her if he took it home the kids would eat it. At the time, the rest of the family did not have much food. Eaton's father did not like to eat the vegetable stew that Eaton's mother made for the family, so he would eat in town. Ms. O'Malley testified that Eaton had "always been very sweet to me." She stated that Eaton's mother expressed concern for her children all the time, but "didn't seem to dare show too much affection or stand up for the kids at all; but she loved them." When Eaton's mother had her mental breakdown, she could no longer care for her children. Eaton's father had a lot of different jobs, and the family moved around quite a bit—at least eight. Eaton's paternal grandmother "was not a very pleasant person to be around" and "was rather ornery to" Eaton's mother. Ms. O'Malley identified several photographs of Eaton as a young boy and of Eaton and his then-wife and two of his children. Ms. O'Malley testified that Eaton left home at the age of fourteen or fifteen because of his relationship with his father.

[¶ 146] Trial counsel also presented "life history" mitigating evidence from Eaton's sister, Sharon Slagowski, by way of Lynn Cohee, a Natrona County Deputy Sheriff. Through Deputy Cohee, trial counsel introduced into evidence excerpts of Ms. Slagowski's interview by Deputy Cohee. These excerpts contained evidence of Eaton's mental and physical abuse as a child and limited education. In these excerpts her testimony was as follows:

> SS: He just uh, as being older, I see that dad just kind of picked on him and he was, when he was growing up, he was mean to him and made him work when he was really young, you know and. . . . Uh, as I look at it now, he was child abused when he was little. . . . Getting hit around and the, not, not only the mental but the physical abuse.
>
> . . . .
>
> SS: Yeah, I remember when he used to hit him with a belt and uh, hit him with his fist and uh, I remember one time when but I don't remember how old I was he broke a beer bottle over his head. . . . You know, other than that, the, just that kind of physical abuse.
>
> LC: Ok. When he broke the beer bottle over his head, do you remember how Dale, how old Dale was then?
>
> SS: We lived in, down in [Riverton], so in Riverton, we had to be real young. . . . Probably, I was in school. Dale and I was both in school, so we had to be in the uh, oh man, I'm thinking early grade school.
>
> LC: Ok. Uh, how about any head injuries? Did that cause any head injuries?
>
> SS: I don't know. He was never taken to the doctor for it. . . . But he was hit around. It wasn't just on the, it wasn't on his butt, every time he got hit it was where ever dad decided to hit him. He just had a rough life.
>
> LC: How did he do in school, do you know?
>
> SS: Well, he never had a chance to be in school. We moved around a lot and that really effected [sic] him. And he never got to be a little boy, cuz he had to work so hard. And he was always up so early, uh,

you know milking cows … and doing the (inaudible) farm work and everything. He never got a chance to be a kid.

LC: Ok. Do you remember how far he—he did get to go in school?

SS: He had, he made it through, let's see, we went, we lived in Meeker and that's the last time he attended school that I know of. And let me see, I was in the, probably 7th or 8th grade is all the way he went.

[¶ 147] Trial counsel also presented "life history" mitigating evidence from four of Eaton's friends and acquaintances. Virginia Schifferns testified that she and her husband, Lodine, had known Eaton since 1972, and he had stayed with them a few times in the past. She stated that they liked Eaton and she could not believe that he would ever do anything violent. She said that she and her husband attend church regularly and she believes that people make mistakes. Lodine Schifferns testified that he met Eaton shortly before Eaton was married, they were good friends, and he still likes him. He added that he "just can't believe … anything like that could happen to him."

[¶ 148] Trial counsel presented testimony from Shirley and Floyd Widmer, owners of the store at Waltman. Mrs. Widmer testified that they are among the very few people who live in the Waltman–Moneta area. She testified that she has known Eaton for quite a few years as he used to eat at their store. She "has always gotten along real good with" Eaton. She testified that when Eaton's son, Billy, was quite young, Eaton and he would stop in the store. She said that Eaton never had a bad temper around her. Floyd Widmer testified that he has known Eaton for a lot of years, likes him, and always got along with him.

[¶ 149] In connection with our review of trial counsel's mitigation case in the sentencing phase of the trial, we have also considered trial counsel's closing argument to the jury. His dominant themes were the power of a single juror to vote for a life sentence, the existence by a preponderance of the evidence of both statutory and nonstatutory mitigating circumstances, Eaton's acceptance of responsibility for his crimes, and the jury's power to spare Eaton's life as a matter of mercy. Trial counsel emphasized that each juror must make a personal decision, and that one juror's vote can "stop this march into madness." He stressed that the only power Eaton had was through that juror who would choose life; an individual juror had the right to vote for life and was not answerable to anyone for that vote; and each juror was free to write on the verdict form any mitigating circumstance that particular juror believed existed. Trial counsel asserted that Dr. Ash's testimony and Dr. Gummow's testimony clearly proved that, at the time of the homicide and otherwise, Eaton suffered from extreme emotional or mental disturbance and duress and life-long depression, brain damage, and substantial mental impairment. Trial counsel recounted the uncontroverted evidence, from Dr. Gummow and Eaton's sister, Sharon Slagowski, and other witnesses, about Eaton's childhood abuse, uneven schooling, and hard work. He emphasized Eaton's very troubled life of poverty and extreme hopelessness. He stated that Eaton was remorseful for what he had done. Reviewing several of the jury instructions, trial counsel cautioned that the jury could consider only the three aggravating circumstances listed on the verdict form, but stressed that even if the jury found the existence of one or more of them, it could still vote for life. He also noted that even if the jury found no mitigating circumstances, it could still vote for life and it could vote for life solely on the basis of mercy or sympathy. In conclusion, trial counsel asked the jury to choose life.

▮ [¶ 150] With the above and foregoing sentencing phase "life history" mitigating evidence in mind, we now turn to the records of the remand evidentiary hearing and the motion for new trial based on newly discovered evidence to identify what additional "life history" mitigating evidence Eaton presented in those post-trial proceedings. At the remand hearing, Eaton presented a one-page Disposal of Client Record Form from the Lincoln County Mental Health Association, Kemmerer, Wyoming, pertaining to Eaton, and trial counsel's testimony that, after Eaton's trial, trial counsel had received a telephone call from a man who had known Eaton

when they were kids in Meeker, Colorado. According to this man, Eaton had suffered mental and physical abuse from schoolmates. In Eaton's motion for new trial, Eaton again presented the one-page Disposal of Record Form, an affidavit from Eaton's childhood friend from Meeker, who had called trial counsel after the trial had concluded, and several old school records pertaining to Eaton. The one-page Disposal of Record Form indicates that Eaton received service at the mental health facility in the period March 11, 1986, to July 7, 1986, which was after his discharge on March 7, 1986 from the Community Hospital in Torrington, Wyoming. The form indicates that the Lincoln County record was destroyed on May 29, 1996, well before Eaton was charged in the Kimmell homicide and, therefore, well before trial counsel entered his appearance in this case, which was in April 2003. The admitting and discharge diagnosis was similar to that obtained earlier in the Torrington facility, and the medication and dosage information was the same as obtained in the Torrington facility. The form listed the surnames of two therapists. In Eaton's appellate brief addressing the order denying his motion for new trial, Eaton informs the Court that one of the therapists had retired, moved out of state, and could not be located, and the other therapist had been contacted but did not recall Eaton. To the extent that this one-page disposal form is "life history" mitigating evidence, we find it is cumulative to similar evidence that trial counsel presented in the sentencing phase. We note also the underlying record referred to on the form was apparently destroyed before Eaton was charged and trial counsel entered the case, and we note the two therapists were not sources of information available to trial counsel. Trial counsel's failure to discover the one-page disposal form is not deficient performance.

[¶ 151] With respect to the "life history" mitigating evidence from the man in Meeker, Colorado, who knew Eaton when they were schoolmates, his affidavit contains information that he knew Eaton at the age of 12 or 13; Eaton was teased, ridiculed, and continually picked on by other children; a group of boys jumped him and rubbed Cana-

dian thistles over his groin area; other children threatened to beat him badly if he did not give them money he earned from mowing lawns; Eaton's family was poor; Eaton wore the same clothing all the time; and Eaton was "a good kid, and a hard worker." Eaton contends that trial counsel's investigation was deficient for failing to find witnesses like this childhood friend; that had the trial defense team gone to Meeker, Colorado, and interviewed townspeople, it would have uncovered similar "life history" mitigating evidence. Considering this new evidence in the light of the substantial "life history" mitigating evidence that trial counsel did find, develop, and present at the sentencing phase, we cannot say that trial counsel's failure to investigate townspeople in Meeker or the other towns where Eaton once lived constitutes deficient performance. Such widespread investigations "can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Rompilla*, 545 U.S. at 389, 125 S.Ct. at 2467.

[¶ 152] With respect to the old school records that Eaton presented in his motion for new trial, Eaton identifies them as follows:

- school records from Tulsa, Oklahoma, which indicated that Eaton attended Lowell Elementary School (4th grade) for thirty half days (fifteen full days) in the 1956–57 school year;

- a single document from a school district in Scottsbluff, Nebraska;

- a school record from an Ely, Nevada, school district which indicated that Eaton had attended school there in 1955–56 for thirty-five days of the first term and ninety-two days of the second term, was eleven years old when he completed third grade, and scored below the class median average on the Stanford Achievement test; and

- a school record from the Washakie County, Wyoming, school district that Eaton started second grade in 1954 and was dropped from school on March 24, 1955.

Eaton contends that these school records demonstrate the chaos and disorder that at-

tended Eaton's early education and are not cumulative of any of the trial evidence. We find, however, that trial counsel presented substantial evidence of that chaos and disorder that attended Eaton's education in the sentencing phase of the trial through evidence from Dr. Gummow and Eaton's sister, Sharon Slagowski. We do not find that trial counsel's failure to obtain the above-identified school records constituted deficient performance.

[¶ 153] Although we hold that trial counsel's performance was not deficient for failing to obtain the one-page Disposal of Record Form and interview therapists whose names were listed on the form (one could not be located by Eaton's new counsel and the one who was located did not remember Eaton), for failing to look for people in Meeker, Colorado, and for failing to obtain additional school records, we shall proceed as the *Strickland* court did and assume arguendo that, in these three instances, trial counsel was deficient. Under that assumption, we shall consider the prejudice component, applying those elements of that component which we listed at the outset of our review of the mitigation issue. The *Strickland* line of cases instructs that:

- attorney errors cannot be classified according to likelihood of causing prejudice;

- not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceedings;

- a court shall presume that the jury acted according to law;

- the assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision;

- a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support;

- some errors will have had a pervasive effect on the inferences to be drawn from the evidence, and some errors will have had an isolated, trivial effect;

- taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, the court must ask if the appellant has met the affirmative burden of showing that the decision reached would reasonably likely have been different absent the errors; and

- the ultimate focus of inquiry must be on the fundamental fairness of the proceeding and whether, despite the strong presumption of reliability, the verdict is unreliable because of a breakdown in the adversarial process.

[¶ 154] Applying the elements of the prejudice component and the above-listed instructions, we hold that Eaton has failed to carry his affirmative burden. The evidence that Eaton says his trial counsel should have found and offered at the sentencing phase of the trial would not have altered the sentencing profile presented to the jury. At most, this evidence was cumulative to the substantial evidence that was found and presented to the jury by trial counsel. We have considered the totality of the evidence—the mitigating evidence presented in the sentencing phase and the additional mitigating evidence submitted by Eaton in the post-trial proceedings and the evidence supporting the aggravating circumstances found by the jury. Upon that consideration, we hold that there is not a reasonable probability that, absent the errors, the jury, or even one juror, would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

[¶ 155] Having completed our discussion of the additional "life history" mitigating evidence that Eaton did present in the post-trial proceedings, we next discuss Eaton's complaint that trial counsel did not present more "life history" mitigating evidence from Eaton's family members and relatives, former employers and coworkers, and others. At the outset, it bears noting that at the remand evidentiary hearing, Eaton did not call any witnesses from any of these categories to present more "life history" mitigating evidence. However, testimony from Mr. Skaggs, lead trial counsel, who testified in person at the hearing, and his investigator,

Priscilla Moree, who testified by way of deposition which was submitted at the hearing, explained trial counsel's investigation and decisions concerning these potential sentencing phase witnesses. With respect to Eaton's father, Merle, Ms. Moree explained that she spent an. afternoon visiting with him, and that he was not forthcoming in his answers to her questions about his deceased wife and his children. She realized that he was not going to admit that he had mistreated Eaton as a child. Ms. Moree discussed with Mr. Skaggs the results of her visit with Eaton's father. Mr. Skaggs was also aware that Eaton's father had made a statement to the sheriff's investigator that Eaton had a normal childhood. Because Mr. Skaggs had evidence from other Eaton relatives that Eaton's father had abused Eaton and that his childhood was not normal, he decided against calling Eaton's father as a witness in order to avoid any contradictory evidence. We find that trial counsel's decision was a product of reasonable professional judgment, and Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 156] With respect to Eaton's younger sister, Judy Mason, Ms. Moree interviewed her and her husband at their home in Colorado. It is clear from Ms. Moree's report to trial counsel about that interview that Ms. Mason had the same information about the abusive, chaotic, and dysfunctional childhood of the Eaton children at the hands of their father, Merle, as Ms. Moree and trial counsel had found and had presented from those witnesses who testified in the sentencing phase. This same information included the father's physical abuse of young Eaton, the lack of medical care, the many family moves, and the children attending many different schools. As Ms. Moree's report shows, Ms. Mason also provided Ms. Moree and trial counsel with damaging information about Eaton, including Eaton's violent and abusive marriage to Melody Cline and their

having lived in squalor, Eaton's son, Eddie, had reported that Eaton had sexually molested and abused him, Eaton's bragging about stealing parts from vehicles in used car lots, Eaton's poor physical hygiene, and Eaton's explosive temper.

[¶ 157] Ms. Moree testified that, following this interview, Ms. Mason became uncooperative, would not return her telephone calls, and did not respond to letters seeking her cooperation. Ms. Moree testified that by the time of trial, she and Mr. Skaggs learned that Ms. Mason had made public statements denying there had been abuse in the family. Mr. Skaggs decided that Ms. Mason was not going to help her brother. Mr. Skaggs saw Ms. Mason at the trial, sitting with the Kimmell family. We note in Eaton's appellate brief that he inappropriately refers to several excerpts allegedly from a book written by Miss Kimmell's mother. The excerpts, purportedly information from Ms. Mason, concern stories about Eaton's deceased mother and a younger brother of Eaton's. Neither the book nor the excerpts were offered into evidence at either post-trial proceeding and are not evidence before this Court.[6] We shall not consider them.

[¶ 158] We find that trial counsel's decision not to call Ms. Mason as a witness in order to avoid her potentially damaging and contradictory testimony, especially in light of her unwillingness to cooperate with trial counsel and her apparent association with the Kimmell family at trial, was a product of reasonable professional judgment, and Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 159] With respect to Eaton's sister, Sharon Slagowski, Ms. Moree interviewed her and found that she, like Judy Mason, was initially cooperative but later became uncooperative and did not respond to telephone calls and letters seeking her help.

---

6. Eaton referenced the book in his motion for new trial. The district court declined to consider the book's contents, stating:

Now, I understand that the defense has referenced Ms. Kimmell's book. I have not read that book. I don't think it is appropriate evidence. I don't know where Ms. Kimmell got her information. It may be valid; it may not. But I don't think I can consider a cite from a book as much in this case.

Ms. Moree testified that Sharon Slagowski, who had been a dispatcher for the police department in Lyman, Wyoming, told her initially that she would like to be helpful but was concerned that her neighbors and friends not know about her relationship to Eaton because of her standing in the community. According to Mr. Skaggs, Sharon Slagowski would not confirm the parts of her statement to the sheriff's office that he wanted her to testify about in person. He believed that she did not want to testify. He decided to use, and he did use at trial, those excerpts from her statement to Sheriff's Deputy Lynn Cohee which were favorable. He said this decision avoided the risk that, if she testified in person, she would say that abuse never happened. We find that trial counsel's decision not to call Ms. Slagowski at trial, but to use the favorable excerpts from her interview statements, was a product of reasonable professional judgment, and Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 160] With respect to Eaton's other sister, Mary Achziger, Ms. Moree testified that Judy Mason told her that she wanted nothing to do with Eaton or his case and "Mary will not be good to talk to." Mr. Skaggs testified that they had read Mary Achziger's negative statement given to the sheriff's office and decided not to interview her. We have assessed trial counsel's decision not to try to locate and interview Ms. Achziger for reasonableness under these circumstances, applying a heavy measure of deference to trial counsel's judgment. Given Ms. Mason's statement that her sister wanted nothing to do with Eaton or his case and that "Mary will not be good to talk to" and considering trial counsel's knowledge that she had made a negative statement to the sheriff's office, we find that trial counsel made a reasonable decision that contact with this family member was unnecessary. Eaton has failed to overcome the strong presumption in trial counsel's favor. Trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 161] Ms. Moree had a telephone conversation with Eaton's brother, Richard, who is fifteen years younger than Eaton. He did not tell her much about Eaton, was "kind of vague," and said, "if that's what happened, my brother deserves whatever." Ms. Moree recalled that Richard and Eaton had been involved in some sort of an insurance scam at some time. She testified that when Richard returned her phone call, "he didn't really want anything to do with the case." Both Ms. Moree and Mr. Skaggs had read Richard's statement given to the sheriff's office which suggested that Richard suspected that Eaton was involved in another homicide. Mr. Skaggs decided not to use any part of that statement at trial because he feared that the prosecution's rebuttal would reveal that suspicion. Although trial counsel sent several letters to Eaton's siblings—Judy, Sharon, and Richard—explaining the importance of family mitigation evidence and asking for their cooperation in the case, Mr. Skaggs testified that they did not respond. We find that trial counsel's decision not to call Eaton's brother, Richard, as a witness in order to avoid potentially damaging testimony, especially in light of his unwillingness to cooperate with trial counsel and his expressed feeling about what Eaton deserved, was a product of reasonable professional judgment. Eaton has failed to overcome the strong presumption in trial counsel's favor.

[¶ 162] With respect to Eaton's former wife, Melody Cline, both Ms. Moree and Mr. Skaggs testified about their conversations with her. Ms. Moree testified that, "I spent many hours with her and I think she wanted Dale to live just so he could die a miserable death in his cell." Ms. Moree's impression was that, in Melody Cline's marriage to Eaton, she was abused by him and she was abusive to him in return. Mr. Skaggs testified that he learned from Ms. Cline that the marital relationship "was so terribly violent, so ugly, not only to her but to the rest of the kids, as well, that she would have contributed absolutely nothing to our mitigation phase and would have contributed a great amount to [the prosecution's] aggravation phase." According to Mr. Skaggs, she described beatings and sexual assaults by

Eaton; she described fearing for her life during these situations and right around the time of the Kimmell homicide. We find that trial counsel's decision not to call Eaton's former wife as a witness was a product of reasonable professional judgment. Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 163] Mr. Skaggs also testified that they could not find the Eatons' son, Eddie, to interview him because Ms. Cline would not tell them where he lived. On the subject of trial counsel's not interviewing Eaton's son Eddie, trial counsel knew that Ms. Moree's report of her interview of Judy Mason revealed that Judy Mason "says that Eddie reported being sexually molested/abused by [Eaton] and that was when the State stepped in and Melody [Eaton's former wife] gave up custody of Eddie to the State of Wyoming when he was 10 years old." Trial counsel's decision not to further pursue Eaton's son given these circumstances was reasonable, especially in light of the heavy measure of deference to be accorded trial counsel's judgment.

[¶ 164] Ms. Moree interviewed Eaton's son, Billy, in person twice in Cheyenne, Wyoming, where he was living with his mother. Ms. Moree testified that Billy did not offer anything that she thought would have been good mitigation for Eaton. She asked Mr. Skaggs to accompany her on her second visit with Billy so he could get a feeling about Billy. In that second visit, Billy described Eaton as being violent and throwing wrenches at his head. Mr. Skaggs testified that in deciding not to use Billy as a witness, "I used what I talked to him about. Billy could have added nothing. Billy didn't like his dad. Billy didn't love his dad. Well, he didn't care about his dad. Even the fun times with his dad were, you know, mixed with the times of violence. And, you know, Billy would have just not added anything. Billy wanted him killed, is the bottom line." We find that trial counsel's decision not to call Eaton's son Billy as a witness was a product of reasonable professional judgment. Eaton has failed to overcome the strong pre-

sumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 165] Ms. Moree had a telephone conversation with Eaton's daughter, Valitha, who was attending a culinary school in Denver, Colorado. Valitha told her she loved Eaton, that he had been a good father and had not abused her. She was just a young girl when she stayed briefly with Eaton at his place in Moneta. Ms. Moree asked Valitha if they could meet in Denver, but Valitha said she could not spare the time because that would harm her education. Ms. Moree testified that, "[w]hat she related to me was she could not come to the trial, she could not testify, and she was not interested in testifying." Ms. Moree told Mr. Skaggs about her conversation with Valitha. Mr. Skaggs testified that he was aware of the unsanitary living conditions at Eaton's Moneta place as described in a deposition given by Eaton's neighbor, Doris Buchta. He was concerned that Valitha would have had to describe those conditions which were inappropriate for a girl of her age when she stayed with Eaton. Mr. Skaggs also testified that he had reviewed a sheriff's office report of an interview with Valitha in which she indicated that there was a lot of domestic abuse in the home and that Eaton had not been in her life for some considerable period of time. Mr. Skaggs stated he did not think she would have been a productive witness. We find that trial counsel's decision not to call Eaton's daughter as a witness was a product of reasonable professional judgment. Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 166] Ms. Moree spoke on the telephone with another potential "life history" mitigation witness, Kerry Rose, who worked as a waitress in Nevada, had known Eaton, and had been contacted by the sheriff's office about Eaton and the charges against him. In Ms. Moree's written report to Mr. Skaggs informing him that Rose was willing to testify on Eaton's behalf, she said, among other things, that Rose and her family

had been totally shocked and devastated to hear about the charges against Eaton. Rose said Eaton was not that type with her, was never mean to her, and brought her breakfast in bed and flowers. Rose told her that Eaton had worked with her father in Utah and the family liked him. Rose said her father told her that Eaton had a fight with a coworker. Rose said she and Eaton had an argument about a woman who had baby-sat Rose's daughter and that Eaton had been jealous of the woman. Ms. Moree testified that she was aware that Rose had told the police that Eaton had lived in a pigsty, she had had sex with him but did not really like him, and that Eaton had given her jewelry. Mr. Skaggs testified that he and Ms. Moree had a long discussion about the pros and cons of bringing Rose to Wyoming for the trial and that he decided against it. Mr. Skaggs' considerations included: Rose had not been around Eaton for years; in Rose's mind, they were not particularly close; Eaton had given her a diamond ring and that a diamond ring was missing from Miss Kimmell's property. Mr. Skaggs decided, "it didn't seem like she would help the defense at all. That diamond ring could have been real problematical." We find that trial counsel's decision not to call this potential witness was a product of reasonable professional judgment, especially in light of potentially damaging information. Eaton has failed to overcome the strong presumption in trial counsel's favor.

[¶ 167] Both Ms. Moree and Mr. Skaggs spoke to Vince Horn, a federal public defender in Denver, Colorado, who had represented Eaton on a charge of felon in possession of a firearm. Mr. Horn provided his file to Ms. Moree. Mr. Skaggs learned from Mr. Horn and another close source that Eaton and Mr. Horn "didn't get along real well." Mr. Skaggs did not want to use Mr. Horn as a witness because, among other reasons, he did not want Eaton's lengthy criminal record before the jury; Eaton and Mr. Horn had not gotten along well; and Mr. Skaggs believed that the jury would view with distrust Mr. Horn's testimony about Eaton. We find that trial counsel's decision not to call Mr. Horn as a witness was a product of reasonable professional judgment. Eaton has failed to overcome the strong pre-

sumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 168] Ms. Moree interviewed by telephone Eaton's former friends, Joanne and Ed Walsh. Mr. Skaggs did not think they would be good witnesses because the friendship had soured over a borrowed item—"something came up in Mr. Eaton's possession that shouldn't have been there," and Mrs. Walsh indicated that she was afraid of Eaton. We find that trial counsel's decision not to call Mr. and Mrs. Walsh as witnesses was a product of reasonable professional judgment. Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 169] With respect to Eaton's employment history, Ms. Moree put together what she was able to find in various documents, but she characterized Eaton's employment history as sporadic as he did not stay in any one place for any length of time. She testified the records showed that Eaton had been fired from at least three jobs for assaulting coworkers. She also testified that for most of the past six or seven years Eaton had been incarcerated. Mr. Skaggs testified that it was difficult to obtain a thorough work history because Eaton frequently changed jobs, the jobs lasted a short time and ended somewhat disastrously, he was self-employed with his own welding truck, he had been fired several times for assaulting coworkers, and there was no work history for the seven years before the trial because Eaton had been incarcerated. We find that trial counsel's investigation and presentation of Eaton's employment history through several trial witnesses was a product of reasonable professional judgment that supported the limitations on investigation into that history. Eaton has failed to overcome the strong presumption that trial counsel's decision was within the wide range of professionally competent assistance.

[¶ 170] With respect to Eaton's medical history, Ms. Moree learned from Eaton's sister, Judy Mason, that Eaton and his

siblings were not taken to be seen by doctors and were not given inoculations during their childhood. According to Dr. Ash's interview with Eaton, Eaton had no access to medical care. Ms. Moree did obtain and provide to Drs. Ash and Gummow the Colorado mental health records of both Eaton and Eaton's mother, about which they testified in the sentencing phase of the trial. And, of course, we note that Eaton's 1986 Torrington hospital record and his Wyoming State Hospital records were in evidence during the testimony given by those two doctors. We find that trial counsel's investigation and presentation of Eaton's medical and mental health history was a product of reasonable professional judgment that supported the limitations on investigation into that history. Eaton has not overcome the strong presumption in trial counsel's favor.

[¶ 171] Ms. Moree and Mr. Skaggs had records pertaining to his incarceration at the Wyoming State Penitentiary, his federal incarceration, and his juvenile action in Colorado. Mr. Skaggs testified that Eaton's criminal record was "the biggest aggravator of all," mentioning Eaton's prior record in the Natrona County jail, his bad conduct in jail and threats to go after inmates, his prior record in Florence, Colorado, where a fellow inmate was killed, his record of escape from CAC and his possession of a gun when he was caught, and his "perfectly atrocious juvenile court history," which included stabbing a woman over a watermelon. Mr. Skaggs testified that he wanted to avoid any of that history coming before the jury. We find that trial counsel's decision to avoid as much as possible potentially damaging evidence of Eaton's criminal history was a product of reasonable professional judgment. Eaton has failed to overcome the strong presumption in trial counsel's favor.

[¶ 172] In our review of the record of the remand evidentiary hearing, we have also taken note that both Ms. Moree and Mr. Skaggs testified that they were not limited by financial considerations in their work on Eaton's case. Ms. Moree testified that Mr. Skaggs did not request that she keep her costs down because of the public defender's budget. Mr. Skaggs testified he was never denied resources. He stated that Mr. Ken Koski, the State Public Defender, "was very careful not to deny any resources."

[¶ 173] We now have a complete picture of the "life history" mitigating evidence that trial counsel and his investigator explored, developed, and presented in the sentencing phase of Eaton's trial; the additional but scant "life history" mitigating evidence that Eaton explored, developed, and presented at the remand evidentiary hearing and in his motion for a new trial based on newly discovered evidence; and the testimony of trial counsel and his investigator at the remand evidentiary hearing that informs us concerning trial counsel's decisions in the presentation of the "life history" mitigating evidence in the sentencing phase. We have analyzed this complete picture in the light of those legal standards and analytical model set forth in the *Strickland* line of cases earlier mentioned. We hold that, in light of all the circumstances and with application of a heavy measure of deference to trial counsel's judgments, trial counsel's decisions in the matters identified by Eaton were within the wide range of professionally competent assistance. Eaton has failed to show that trial counsel's performance was deficient.

[¶ 174] We begin our review of Eaton's second line of criticisms of trial counsel's performance by first considering Eaton's claim that trial counsel's performance in his preparation and presentation of mitigating evidence through his expert witness, Dr. Ash, was deficient. Eaton asserts that trial counsel's failure to alert Dr. Ash about certain notations in a journal kept by Doris Buchta, one of Eaton's neighbors near his Moneta property, which notations suggested that Eaton may not have been as socially isolated as Dr. Ash believed, exposed Dr. Ash to the prosecutor's damaging cross-examination. It is important to view this claim in the context of trial counsel's direct examination of Dr. Ash on the subject, the prosecution's cross-examination, trial counsel's redirect examination, and trial counsel's testimony at the remand hearing. In trial counsel's direct examination of Dr. Ash in the sentencing phase, Dr. Ash testified that

he had talked to Eaton about the way Eaton was living in March and April of 1988:

A. Mr. Eaton was living in the most abject of circumstances. He had lost his marriage, lost his family. He had lost his welding business. He had lost his job. He had lost his home, because he could not afford it. He had a home that would take 2– or $300 a month in Cheyenne. He lost that and was living in a—a bus by himself. He was isolated, essentially, from friends; and he was isolated from family. He was in poverty. He was able to manage to feed himself, essentially, by scavenging cans out of dumps and selling them for money for groceries.

On cross-examination, the prosecution and Dr. Ash had the following exchange:

Q. Now, Mr. Eaton, when he spoke to you, describes a fairly miserable life at the time of early 1988; fair statement?

A. Yes.

Q. Okay. Were you aware that he was, on a frequent basis, visiting his neighbors?

A. At the time in the spring?

Q. Yes.

A. No.

Q. Okay. For instance, did you know there was a little old lady across the way that kept a diary?

A. I was aware of the people across the way. I had thought that they were getting involved with each other after this happened.

Q. Okay. Well, let's talk about that, then; because Mr. Eaton basically told you he holed up and didn't leave unless he just had to?

A. Yes.

Q. That's not an overstatement, is it?

A. That is not an overstatement.

Q. Okay. And so things that happened in March would be relevant, wouldn't they, March of 1988?

A. Yes.

Q. Okay. And, for instance, he also reported that he had a very poor economic status; is that true?

A. That's correct.

Q. Okay. So if she has a note that Dale visited on March 8 and paid the taxes on an adjoining property, that would seem somewhat inconsistent with what he told you, wouldn't it?

A. How much were the taxes?

Q. Well, I mean, I guess that's inconsistent two ways. He was going out and seeing people, that would indicate, wouldn't it?

A. He—he had a hard time getting out seeing people, he said. That's correct.

Q. Okay. Were you aware there's another entry on March 16 that he had visited the Buchtas? Were you aware of that?

A. No.

Q. Were you aware that on March 22, he visited the Buchtas for two hours? Were you aware of that?

A. No.

Q. On March 24, were you aware that he had gone over and helped Mr. Buchta work on a car?

A. No.

Q. And this persisted after March 24, did it not, the depression, this period of horrible isolation?

A. In my opinion and from what I've been told, yes.

Q. Were you aware that he visited the Buchtas again on April 1?

A. No.

Q. Were you aware on April 11 that he wanted to visit, and he went over and visited them for six hours? Does that sound like he's keeping himself in isolation?

A. No, it does not.

Q. Finally—there's a lot of these, but I think this is a relevant time period. April 25, were you aware that he went over and visited the Buchtas, again, for chicken dinner?

A. No.

Q. So he's maybe not quite as isolated as he led you to believe?

A. There are more visits than I was aware of.

Q. Did they ever give you that to look at?

A. No.

During trial counsel's redirect examination of Dr. Ash on the subject, the following exchange occurred:

Q. Okay. Now, you heard questions from Mr. Blonigen which indicated that Dale would go across the road and visit with Doris Buchta—

A. Yes.

Q. —Buchta? You heard those questions?

A. Yes.

Q. Would the fact that he would go across the street and visit with Doris Buchta every couple of weeks—would that cause you to change your mind that he's socially isolated?

A. A visit every couple of weeks is actually more visits than I had in my mind that he was making. If that's all that he had contact with people during that time, that's still pretty isolated.

Q. Okay. Well, actually, he probably may have had contact with other people over in Waltman. Would that be inconsistent?

A. He—he gave a picture of—of being very isolated, very alone, and very depressed.

[¶ 175] At the remand evidentiary hearing, trial counsel explained that he had not given the Buchta journal to Dr. Ash because trial counsel believed it was not relevant "in terms of Dr. Ash's opinion that [Eaton] was living a life of social isolation out there." Trial counsel said that Mrs. Buchta's living three hundred yards across the highway did not mean Eaton was not in isolation. In trial counsel's opinion, the prosecution's cross-examination of Dr. Ash on the matter was not damaging. He said, "I think the jury understood that he was extremely isolated out there."

[¶ 176] In the district court's decision letter following the remand hearing, the court stated that the point could be argued either way, and that it was up to the jury to determine whether Eaton lived an isolated life and whether the fact was significant. In the court's opinion, the prosecution's cross-examination of Dr. Ash on the matter did not significantly impact Dr. Ash's opinion. After reviewing the full context of Eaton's claim, as well as the complete record of the sentencing phase of the trial, we do not find that trial counsel's not providing Dr. Ash with Mrs. Buchta's journal was deficient performance. Dr. Ash held his ground under the prosecution's cross-examination and testified that, even considering Mrs. Buchta's journal entries, "if that's all that he had contact with people during that time, that's still pretty isolated." We hold that Eaton has not established that, in light of this record, trial counsel's not providing Dr. Ash with Mrs. Buchta's journal was outside the wide range of professionally competent assistance.

[¶ 177] We continue our review of Eaton's second line of criticism of trial counsel's performance with consideration of his assertion that trial counsel's preparation and presentation of Dr. Gummow's testimony was deficient in three respects. First, Eaton claims that trial counsel's failure to provide Dr. Gummow with the correct date of the suicide death of Eaton's brother (which Dr. Gummow mistakenly thought was before the Kimmell homicide) exposed Dr. Gummow to the prosecution's "quite brutal" cross-examination. It is helpful to consider this claim in context. During trial counsel's direct examination of Dr. Gummow, she testified in narrative fashion with a chronology of Eaton's life. Among other information, she included, in her words, "another very significant date," which was the carbon monoxide asphyxiation of Eaton's brother "sometime in 1987. I don't know the exact date." She said that Eaton blamed himself for his brother's suicide because he had not loaned his brother some money. Midway through the prosecution's cross-examination of Dr. Gummow, there was this exchange:

[Mr. Blonigen]: Actually, from what he reported to you, the suicide of his brother wasn't having much impact on him at the time that he committed this crime, was it?

A. I never specifically discussed that with him. I don't know whether it was still bothering him or not.

Mr. Skaggs: Well, Your Honor—excuse me—actually, suicide of his brother I don't think happened until after—

Q. (By Mr. Blonigen): That's not what her chart says.

A. It was '87, is my understanding.

Mr. Skaggs: When was Torrington?

Mr. Blonigen: '86.

The Witness: '86.

Mr. Skaggs: Okay. So it happened afterward.

Mr. Blonigen: After Torrington, yes, but before the homicide.

Mr. Skaggs: Oh, okay. I missed where you were at.

Q. (By Mr. Blonigen): Did you consider the suicide of his brother a significant event in his life and in his mental state in 1988?

A. I have no way to evaluate that.

Q. Did you do anything to confirm whether that information was accurate?

A. Just—it was mentioned in reports. That's where I got the date from. I didn't get it from Mr. Eaton. Mr. Eaton didn't recall the date.

The prosecutor's cross-examination moved on to other matters, but then returned to the date of the brother's suicide toward the end when this exchange occurred:

Q. And one of the—you said, when you were standing up here with this time chart, that one of the most significant events in Dale's life before the homicide was the suicide of his brother Darrel; is that correct?

A. That was my statement, yes.

Q. And that was listed as occurring on January 1, 1987; is that correct?

A. That's an approximate date. I only had the year. So when I have something like 1/1/87, it means that I don't know the exact date; and I put the year.

Q. Well, both you and Dr. Ash talked about this being an event that was affecting him at the time of the homicide, as part of his depression; isn't that true?

A. No, I didn't testify to that.

Q. Well, Doctor, did you ever bother to get a death certificate?

A. No.

Q. I would like to show you 1003, a simple thing to check on, a very simple thing to check on.

A. Not for me. I'm not an investigator. I wouldn't even be able to get the authorization to do this.

Q. Doctor, what day did Mr. Eaton's brother commit suicide, from that document?

A. October 10, 1988.

Q. So well after the Kimmell homicide; isn't that true?

A. That's true.

Mr. Blonigen: Move for the introduction of 1003, Your Honor.

Mr. Skaggs: Well, I object to that, Your Honor.

Mr. Blonigen: Well, Your Honor, I'm sure he does, but it directly impeaches and it is a certified copy of a regularly kept public record.

The Court: It may be a certified copy, but the doctor has not testified that this suicide was a factor that she weighed in—to my knowledge, weighed in—

Mr. Blonigen: I—

The Court:—her diagnosis.

Mr. Blonigen: I disagree. On her direct testimony, she testified it was a very significant event.

Mr. Skaggs: I disagree with that, Your Honor.

The Court: Not relating to the homicide.

Mr. Blonigen: Well, are they saying his suicide is not related to the homicide in any way, or his state of mind?

Mr. Skaggs: That's exactly what we're saying.

The Witness: I have no evidence that it was directly related. I think I testified to that.

The Court: I'm going to not receive 1003.

The prosecutor then moved to strike the chronology exhibit, but the court denied the motion. In trial counsel's redirect examination, Dr. Gummow testified that the date of the brother's suicide had no relation to Eaton's mental condition at the time of the Kimmell homicide. She did not consider it and it was not mentioned to her, and she

thought she had gotten the date from a presentencing report.

[¶ 178] At the remand evidentiary hearing, called on direct examination by Eaton's new counsel, Dr. Gummow testified that the date of the brother's suicide was not significant to her sentencing phase testimony. Asked by Eaton's new counsel if she had felt "beat up" on the prosecutor's cross-examination on that subject, Dr. Gummow answered, "not particularly." In the district court's decision letter following the remand evidentiary hearing, the court found that trial counsel's failure to correct Dr. Gummow's chronology of Eaton's life with the correct date of the brother's suicide was not significant. After reviewing the full context of Eaton's claim, as well as the complete record of the exchange among Dr. Gummow, trial counsel, the prosecutor, and the trial court on the point, we do not find that trial counsel's performance was deficient. Dr. Gummow's sentencing phase testimony on the import of the brother's suicide was clear: The date of the brother's suicide had no relation to Eaton's mental condition at the time of the Kimmell homicide; she did not consider it.

[¶ 179] The next specific criticism that Eaton lodged against trial counsel in his presentation of Dr. Gummow's sentencing phase testimony is trial counsel's deletion of three slides from Dr. Gummow's thirty-slide PowerPoint presentation during that testimony. In his appellate brief, Eaton states that, at the remand evidentiary hearing, Dr. Gummow "expressed concern about the substance of slides deleted from her testimony and presentation to the jury, as those went to Mr. Eaton's 'pretty well-documented history of depression and fairly strong history of genetic loading for mental illness....'" At the remand evidentiary hearing, Dr. Gummow testified that the three slides would have helped the jury understand how depression can turn into rage, and rage can turn into violence. She felt this would have helped the jury to understand what Eaton had done. The first slide, Remand Exhibit AA, was a summary of the research on depression and serotonin and transmitters; the second slide, Remand Exhibit BB, was a survey of the literature about anger and depression among all people who suffer from that condition and the third slide, Remand Exhibit CC, captioned "Genetics Brain Disease and Violence Facts," concerned the genetic component of depression, anger, and aggression. According to Dr. Gummow, trial counsel met with her for three days before her trial testimony and decided to delete these three slides. At that meeting, she told him she thought it was important to make the link that depressed people can be aggressive; she said trial counsel's response was that he thought the prosecutor would not like them. At the remand evidentiary hearing, trial counsel testified that one of the reasons he pared down Dr. Gummow's testimony "in a couple of different slides before we even started" was that they would expose the defense to rebuttal on past misconduct. He added that it was a "terrific concern" not to get into areas where "people have negatives in their background." During the hearing, trial counsel indicated that he wanted to avoid as much as possible evidence that Eaton had a bad temper, was violent, and unable to be rehabilitated. We have closely examined Dr. Gummow's PowerPoint slide testimony in the sentencing phase and are satisfied that her testimony, even without the three slides, sufficiently covered Eaton's strong and well-documented long-standing history of depression and genetic loading for the mental illness which Dr. Gummow, as well as Dr. Ash, found in their evaluations of Eaton. She testified about the impact of depression on the brain and that depression is thought to be a genetic disorder and "it is an inherited disorder in part. Usually, most depressed people have multiple family members who either have psychiatric conditions or depressive disorders ... the major depressive disorder is considered to be a brain disease that impacts brain transmitters and brain communication." Moreover, she stated, "it's exacerbated or worsened by social factors." She stated that Eaton had most of these factors including "early onset, he has childhood abuse ... and he has family members with significant history." She commented that Eaton's mother was diagnosed from 1962 to 1966 with the severe illness of schizophrenic reaction, chronic undifferentiated, and she confirmed Eaton's own 1986 hospitalization for mental health issues. She

then testified on genetic research findings, including that individuals who have a predisposition to major depression are far more vulnerable to stressors. She then referred to the severe and significant psychiatric disorder of Eaton's mother, the reported display of explosive behavior of Eaton's father, Eaton's brother's suicide, and anger control issues of Eaton's brother. After testifying about many aspects of the brain, metabolism, antidepressant medication, Eaton's IQ and academic skills, through her slide presentation, Dr. Gummow stated her opinion that Eaton, who suffers from major depression, has moderate to severe brain damage and that depression is linked to his behavior. She then stated that a person with a milder form of depression is not going to lose control. Although some people have good family support that helps them develop techniques or coping styles to manage the difficult feelings associated with depression, she testified that Eaton did not have anyone to help him deal with the irrational feelings he had associated with his illness. She stated her opinion that Eaton's lifelong psychiatric disorder caused extreme emotional disturbance, inability to conform his conduct, and extreme duress in March and April 1988, the time of the Kimmell homicide. We note that during the prosecution's cross-examination, Dr. Gummow stated that, although her profession in the past had criticized linking certain mental illnesses and violent behavior, that linkage is not criticized nearly as much now with more objective methods. We also note that Dr. Gummow stated, in her remand evidentiary hearing testimony, that at Eaton's trial, she felt she had sufficient information to proceed with her evaluation and testimony in the case.

[¶ 180] Based upon our extensive review of Dr. Gummow's trial testimony, including her thirty-slide PowerPoint presentation, and the testimony at the remand evidentiary hearing from both Dr. Gummow and trial counsel, we conclude that Dr. Gummow's trial testimony about the linkage of depression, aggression, and genetic loading was ample; that trial counsel had made a reasonable decision to try to avoid to the extent possible evidence suggesting that Eaton had a bad temper, was violent, and unable to be reha-

bilitated. Under the circumstances, trial counsel found himself in a very difficult spot and, in our view, made a reasonable decision to delete the three slides in question. Consequently, we find no merit in Eaton's claim that trial counsel's performance in this regard was deficient.

[¶ 181] The final specific claim that Eaton aims at trial counsel in his preparation and presentation of Dr. Gummow's sentencing phase testimony arises from Dr. Gummow's post-trial criticisms that in her association with trial counsel several days before her testimony and during her testimony "there seemed to be confusion, meetings were not conducted in private areas, ... [trial counsel] was not behaving in the more organized, helpful fashion he had in the past ... [and was] irritable and shaky." This claim received attention during the remand evidentiary hearing, as both Dr. Gummow and trial counsel testified about the criticisms. Dr. Gummow testified that before the Eaton case, she and trial counsel had worked together on several other capital cases and she was working with him on another capital case at the time of the remand hearing. She said that trial counsel had first contacted her about the Eaton case weeks before May 20, 2003. Trial counsel entered the case in April 2003. We note that Eaton's trial was nine to ten months later. At trial counsel's request, she spoke to Dr. Ash, who was also working on the case, to get his views on Eaton's mental condition. We note from her trial testimony that she met with Eaton for two days to converse with and evaluate him through various tests she administered. At the remand evidentiary hearing, she testified about meeting and having telephone conversations with trial counsel as her work on the case progressed. She developed a chronology of Eaton's life based upon the "life history" materials and information provided by trial counsel. She spent several days in Casper before her testimony was presented at trial. She spent time with trial counsel during those days. On three or four occasions, they met at breakfast and discussed her testimony. It was on those occasions that she felt their meetings were not in private, and she felt uncomfortable, but she did not make

her concerns known to trial counsel. She also met with trial counsel and others on the defense team at the public defender's office, where they discussed her testimony. She described the tone of the meeting as uncomfortable in the sense that it was a "very tense situation," and trial counsel was irritable and "very snappish." From our previous discussion about trial counsel's deletion of three slides from Dr. Gummow's PowerPoint presentation, we know that three days before her testimony, she and trial counsel discussed that matter. Before her testimony, she and trial counsel had discussed her presentation in the courtroom with other members of the defense team, and court staff personnel were in and out on that occasion. She testified that she felt able to communicate with trial counsel, and he with her, about what her trial testimony would cover, but during particularly the second half of her testimony, she "began to wonder about that." In her remand hearing testimony, she elaborated on her observation of trial counsel's ill health during her trial testimony. She said that earlier trial counsel had mentioned to her that he had diabetes. She said that she had overheard him tell a court staff member that he was not feeling well and had passed out the night before. She said he was drinking lots of water. Under the prosecution's cross-examination, she stated that she had spent more than twenty hours preparing for the case and felt she had sufficient information to proceed with her evaluation and testimony in the case. Asked by the prosecutor why she did not share her concerns with trial counsel after the trial, she answered, "I like [trial counsel] and I—I think it was more I didn't want to hurt his feelings."

[¶ 182] Trial counsel testified about his working with Dr. Gummow in preparation for the trial and in the presentation of her testimony. Early on, he had traveled to Salt Lake City, Utah, to discuss with her matters relating to the case. He said he talked to her before trial several times in depth about her testimony. He referred to meeting with her in the public defender's office and at breakfast. Commenting on the condition of his health at trial, he said he had a cold and was ill to the point that he was somewhat grumpy, adding he is grumpy even when he

is not ill. Responding to Dr. Gummow's testimony that he told a court staff member that he had passed out, he testified "I went home and got some sleep. I use that term loosely, meaning I sleep well or pass out. I go to bed early and sleep all night, which I don't normally do." Concerning his diabetic condition, he said that at trial he was not having any trouble maintaining his blood glucose levels and was checking that regularly. He agreed that he was drinking a lot of water; he said:

> Well, my mother always said drink a lot of water if you have a cold. And [at] that particular point, I did have a cold. I was dehydrating to some extent with a cold, and so, yes, I was drinking ... I was drinking a lot of water. I drink a lot of water anyway.

He further testified that at no time did he feel that he was mentally and emotionally ill-prepared and confused.

[¶ 183] The trial court conducting the remand evidentiary hearing found that trial counsel's health was not an issue during trial; that his cold was relatively minor and had no impact on his ability to try the case. Eaton has made no showing that the trial court's finding of fact is clearly erroneous. Based upon our extensive review of Dr. Gummow's trial testimony and the testimony of trial counsel, we conclude that Eaton's final claim is without merit. We find no deficient performance in trial counsel's preparation and presentation of Dr. Gummow's trial testimony.

[¶ 184] To the extent that Eaton has in his appellate briefs raised any other claim asserting trial counsel's deficient performance in his representation of Eaton in the investigation, preparation, and presentation of mitigating evidence in the sentencing phase of his trial, we find no merit in any such assertions and hold that trial counsel's performance as Eaton's counsel was not deficient.

[¶ 185] In conclusion, Eaton has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in

trial counsel's assistance. Eaton's sentencing proceeding was not fundamentally unfair.

### (iii) Instructions.

[¶ 186] We apply the same standard of review here as we did in Part I of this opinion. ¶¶ 67–68, *supra*.

[¶ 187] Once again, we are faced with an argument that boils down to this: The defense team offered good penalty phase instructions, but they did not vigorously pursue the use of those instructions. Eaton contends that the instructions offered by the defense team were better than those given by the district court, but in an unreported instructions conference, the defense did not fight to get those instructions used. The defense made no objections to the instructions given. At the remand hearing, the district court would not take testimony on the matter of the unreported instructions conference (expert or otherwise), but an affidavit of an expert on the subject does appear in the record on appeal.[7] The essence of Eaton's position on this issue is that the instructions given did not set forth a comprehensible scheme for guiding the jurors' decisions. Moreover, it is claimed that the instructions were inconsistent and contradictory. Although Eaton makes mention of some specific instructions in this argument and compares offered instructions to given instructions to a limited extent, we will limit our review process to a consideration of whether or not any of the instructions given in the penalty phase were erroneous under the plain error standard.

■ [¶ 188] We have carefully examined all of the instructions given, and we find none to be erroneous, much less erroneous under the plain error standard. The central point that Eaton made in this segment of his brief is that the instructions could have been better and more favorable to him had his attorney fought more vigorously for those additional or different instructions. Instead, defense counsel made no objections whatso-

ever to the instructions given. Because none of the instructions given are erroneous, and because Eaton has not made a viable contention that an instruction not given was required, we conclude that no error occurred in the instructions to the jury during the penalty phase. Hence, counsel were not ineffective in this regard.

### (iv) Sentencing form inadequate.

■ [¶ 189] We have also carefully examined the sentencing form and find that it is not erroneous in any respect. The principal objection made here was that the sentencing form stated that mitigating circumstances had to be proved by a preponderance of the evidence, when the 1983 statute stated no burden of proof for mitigating evidence. Aggravators had to be proved beyond a reasonable doubt, whereas mitigators only had to be proved by a preponderance of the evidence, the lowest burden of proof known to the law. We think it was advantageous to Eaton to have a much lesser burden described by the sentencing form, and so we do not identify this as a disadvantage.

### D. *Hostility of Judge*

[¶ 190] We apply the same standard of review here as we did in Part I of this opinion. ¶ 78, *supra*. Much as we did in Part I, we have carefully examined the transcripts of the penalty phase of the proceedings in this case, and we perceive no evidence that the district court demonstrated any prejudice against Eaton.

### E. *Prosecutorial Misconduct*

[¶ 191] We apply the same standard of review here as we did in Part I, ¶ 103, *supra*. We add here:

> The general rule in Wyoming is that a failure to interpose a timely objection to improper argument is treated as a waiver, unless the prosecutor's misconduct is so flagrant as to constitute plain error, requiring reversal. *Armstrong v. State*, 826

---

7. This argument depends in part upon an affidavit of Michael J. Heher, an attorney admitted to practice in Colorado and Hawaii, who appears to be an expert in matters such as this. He concludes that defense counsel did not render reasonably competent assistance of counsel because they did not pursue some of their offered instructions. We have considered the affidavit, but do not find it particularly persuasive in light of the applicable standard of review.

P.2d 1106, 1115 (Wyo.1992). A plain error analysis requires the appellant to demonstrate the violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice. *Arevalo v. State*, 939 P.2d 228, 232 (Wyo.1997). We are reluctant to find plain error in closing arguments "lest the trial court becomes required to control argument because opposing counsel does not object." *James v. State*, 888 P.2d 200, 207 (Wyo.1994) (quoting *Taul v. State*, 862 P.2d 649, 659 (Wyo.1993)).

In analyzing claims of prosecutorial misconduct, we consider the prosecutor's argument in the context in which it was made and with regard to the evidence produced at trial. *Taul v. State*, 862 P.2d 649, 659 (Wyo.1993). Although counsel are allowed great latitude in the argument of cases, argument must be kept within the evidence. *Dice v. State*, 825 P.2d 379, 384 (Wyo.1992). Statements calculated to inflame, prejudice or mislead the jury are not permitted. *Taul*, 862 P.2d at 659.

*Helm v. State*, 1 P.3d 635, 639–40 (Wyo.2000) (quoting *Montoya v. State*, 971 P.2d 134, 136 (Wyo.1998)).

**(i) In closing argument.**

[¶ 192] We embark upon this discussion by taking note that no objections were made to any part of the closing argument. In Eaton's discussion of the closing argument made by the prosecutor, we are given brief passages of argument without there being a page number identified for our ready reference. Nonetheless, we have sought out these passages on our own and identified them in the course of analyzing this issue.

[¶ 193] Eaton contends that the prosecutor made "improper community outrage-type arguments and unduly prejudicial arguments." This contention is made without benefit of applicable authority. However, reference is made to the prosecutor saying that the "only" responsible verdict is death. Notably missing from the transcript is the word "only." Rather, the prosecutor says: " . . . [I]f we are to make a responsible, moral, reasonable judgment, as the judge

stated in his instructions, some murders must be recognized to be different than others; . . ." Eaton claims "[t]he DA blamed Mr. Eaton for placing the 'awesome burden' of determining the death penalty on the jury." However, the transcript reveals that the prosecutor commented on Eaton's conduct in committing the murder as the impetus for bringing to bear the death penalty and he emphasized that the decision to impose was "yours and yours alone." Eaton also asserts that this portion of the prosecutor's argument is plain error: "And your verdict will speak volumes as to what is to be said about this murder and what is the full measure of justice for what happened in this case to this young girl at the hands of Dale Eaton, because it is Dale Eaton's choices that bring us here—no one else's—his." We conclude this was not improper argument. *Sanchez v. State*, 2002 WY 31, ¶¶ 17–23, 41 P.3d 531, 535–36 (Wyo.2002).

[¶ 194] Eaton also objects to this excerpt from the closing argument; indeed it is the last paragraph of the State's closing argument:

Death is not an easy choice for you like it was for Mr. Eaton. But if justice is to have its full measure, we must at some time speak and speak as a group, as a jury, and **state** that this murder goes far beyond those; that it is the worst of the worst; and that defendant should be convicted and that he should face the ultimate punishment. [Emphasis added.]

Eaton apparently misconstrues the word "state" emphasized above as an invocation for the jury to speak on behalf of all of the State of Wyoming. In context, however, it is clear that he is asking the jury to "state" (i.e., speak, assert, declare) that this was a murder that warranted application of the death penalty.

[¶ 195] When all of these excerpts are viewed in context, it is evident that the prosecutor was not seeking a decision based upon matters outside the evidence. The prosecutor acknowledged that the choice between life and death would not be an easy task and by reminding the jury that, in order to make a just, responsible, and reasoned moral decision to impose a death sentence, that some

murders, those warranting the death penalty, are qualitatively different from others that do not warrant the ultimate sanction. We conclude that this line of argument was not error requiring reversal.

[¶ 196] Eaton also contends that the prosecutor urged the jury not to consider the mitigating evidence, a proposition contrary to the instructions given by the judge. The prosecutor referred to much of the mitigating evidence as an attempt to hide the enormity of Eaton's crime in "a veil of psychiatrists and tears." This was nothing more than a reminder to the jury to not allow intervening psychiatric and mercy witnesses to dull its memory about the aggravating circumstances proved by the State. The prosecutor's claim that the mitigating evidence was actually "aggravating" appears to be a comment on the details of the crime as presented in Dr. Ash's testimony. The prosecutor also characterized much of the mitigation as being "excuses," and in the context of this case, it was a fair argument for the prosecutor to characterize Eaton's evidence as, perhaps, "explaining" why the events happened, but that did not foreclose the State from contending that there may be only a very fine line between "explaining" and "excusing." This characterization is strengthened by the lack of a temporal connection between much of the mitigating evidence and the actual crime. There need not necessarily be a temporal connection, but the lack of that characteristic is a fair argument. The prosecutor's contention that three of the mitigators should be lumped together as only one was a comment on the close relationship between each of those mitigators and the evidence that supported them, and not an exhortation for the jury to ignore them or the instructions of the court.

[¶ 197] Eaton contends that the prosecutor attempted to insert "victim impact testimony" into his argument by saying that the State did not have "any pictures to show you of families and school boys, because we only have autopsy photos and missing person's reports." However, he fails to show that such argument itself constituted testimony or that it referred to any record testimony. Nor does he explain how such could

be said to amount to information about the personal qualities of the victim or the emotional effect of the death on her family, or information about her family's opinions and characterizations of the crime or the defendant. *Harlow,* ¶ 48, 70 P.3d 179 at 196. Most importantly, he fails to suggest how the challenged comment—in light of its brevity and the injunction in Instruction No. 12 to consider only the proven aggravators as capable of warranting a death sentence—might be said to be anything other than harmless. *Id.* at ¶¶ 49–57, 70 P.3d at 196–99.

[¶ 198] The prosecutor argued that "(p)erhaps he [Eaton] simply finds young women alongside the road a convenient target." Inmate Dax gave testimony from which it could be inferred that Eaton found a woman or women along the road, and Dr. Ash related that Eaton came upon Ms. Kimmell on the road into his property. Eaton also tries to spin this into an argument by the prosecution for the "future dangerousness" aggravator which was not a part of the case. However, we are unable to see that connection. The prosecutor is also scored for arguing that the mitigators must be directly connected with the crime in all cases (as opposed to having a connection with the crime **OR** the background of the criminal). That is not what the prosecutor appears to be suggesting. What he was doing was pointing out that the three mitigators in question, by their own language, all had a common feature: Eaton's mental or psychological state *at the time he murdered Ms. Kimmell.* Thus, he correctly noted that the mitigating facts to be proven—his extreme mental or emotional disturbance, that he was under duress, or his diminished capacity to appreciate the criminality of his conduct or to conform it to the law—had to be shown to have been operative at the time of the killing and, in that sense, connected to it. No plain error exists in this regard.

[¶ 199] Finally, Eaton contends that the prosecutor argued that Eaton attempted to "blame" the victim for the tragedies that befell her when there is no such evidence in the record. Once again, we view this as fair argument, given that Dr. Ash's

rendition of Eaton's story suggested that once he found Kimmell on his land and confronted her with a gun, that set in motion the inevitable conclusion that Eaton would have to kill her. In addition, inmate Dax testified that it was Ms. Kimmell's rebuff and her "high and mighty" attitude that set the tragic events in motion and caused Eaton to spin out of control. It is a fair argument that Eaton attempted to lessen his responsibility for the crime by blaming the victim for initiating the events that led to her own rape and murder.

[¶ 200] In sum, we find no plain error in the prosecutor's closing argument.

### (ii) During examination of witnesses.

[¶ 201] Eaton contends that the prosecutor's questioning of Dr. Ash with respect to Eaton's motivation to seek treatment with psychologists or psychiatrists was to reap secondary gain in "legal" situations. It is contended that this line of questioning implicated W.R.E. 404(b) and an attempt to bring prior bad acts to the jury's attention, as well as off-limits juvenile proceedings. We have scrutinized that cross-examination with care, and it cannot be said that prior bad acts were directly communicated to the jury, although it is possible that such a conclusion could be drawn. These circumstances wherein Eaton sought mental health services included juvenile proceedings and divorce, but also adult felony crimes. However, no crime or bad act was specified or identified and we decline to find plain error in these circumstances. In addition, the prosecutor did point out that some of the health care professionals suspected that Eaton was malingering and exaggerating his symptoms so as to improve his legal position. This appears to be an accurate reference to the evidence elicited from Dr. Ash and a proper method of testing the soundness of the underlying facts that supposedly supported Dr. Ash's testimony. We cannot point to it as an error requiring reversal of the penalty imposed.

[¶ 202] Eaton contends that the prosecutor acted improperly in his examination of Dr. Gummow as well. However, for the most part, this argument challenges only the prosecutor's right and duty to subject an expert's testimony to searching scrutiny in order to test her reliability as a witness, the soundness of her opinions and the information upon which they are based, as well as for any biases the witness may have. *Chrysler Corp. v. Todorovich,* 580 P.2d 1123, 1133 (Wyo.1978); *Pearson v. State,* 811 P.2d 704, 707 (Wyo.1991).

[¶ 203] As he began his cross-examination of Dr. Gummow, the prosecutor immediately began to challenge her testimony that Eaton suffered from organic brain damage that was caused by his severe, long-term depression. The prosecutor asked point blank and with no introduction: "Ma'am, I would like to begin first by talking about the brain damage issue. Based on your opinion and review, did Mr. Eaton suffer more or less brain damage than Ms. Kimmell suffered when she was killed?" In all honesty, we can only characterize this as a "cheap shot" and unprofessional conduct. Dr. Gummow simply answered that she did not know, and that would have been consistent with the scope of her testimony that she examined Eaton, but had not made an inquiry into Ms. Kimmell's condition. While it demonstrated poor judgment in a death penalty case (death is different), it is a matter that could have easily been corrected had an objection been made. The trial judge could also have stricken the question and advised the jury to ignore it entirely.

[¶ 204] It cannot be gainsaid that the prosecutor was vigorous and aggressive in his cross-examination of Dr. Gummow; however, we are unable to conclude that the prosecutor's cross-examination amounted to misconduct. The prosecutor's questions included the number and types of cases in which she testified for defendants in death penalty cases, the thrust of her testimony, and her compensation in such cases. This line of questioning of opposing expert witnesses is standard fare and is not prohibited. Moreover, at the remand hearing, when asked by Eaton's appellate counsel whether she felt "beat up" by the prosecutor's cross-examination on the subject of the date of the suicide death of Eaton's brother, Dr. Gum-

mow answered, "not particularly." We have carefully and closely reviewed the prosecutor's cross-examination of Dr. Gummow and are satisfied that Eaton's claim has no merit.

[¶ 205] Finally, Eaton contends that the prosecutor's persistent characterization of some of Eaton's mitigation witnesses as "mercy" witnesses amounted to misconduct. We disagree. In *McLaughlin v. State,* 780 P.2d 964, 969 (Wyo.1989), we held that a prosecutor's remarks about the appellant's expert witness, which the appellant claimed was an expression of the prosecutor's opinion that the expert witness was a "professional witness," was not misconduct. Similarly, we hold here that the prosecutor's characterization of some of Eaton's witnesses does not amount to misconduct.

### (iii) Destruction of evidence.

[¶ 206] Eaton contends that the prosecution's decision to allow the bus, which it was suggested had been the bus in which Eaton lived and held Ms. Kimmell captive, to be destroyed constitutes misconduct. There is nothing in the record to support this assertion and no authority is cited to suggest it is a viable issue in any event. We decline to consider it further. At trial, it was very clear that the defense did not think the bus was that which had belonged to Eaton.

### F. *Allowing Dr. Ash to Testify*

[¶ 207] Eaton contends that it was error for the district court to permit the defense to allow Dr. Ash to so comprehensively incriminate Eaton, without Eaton having first given his express written permission to waive doctor/patient privilege. In addition, he contends that the district court should have ensured that Eaton comprehended and knowingly and voluntarily relinquished his right not to incriminate himself. Dr. Ash performed his examination for the specific purposes of determining Eaton's competency, whether he had a not guilty by reason of mental illness defense, and to develop material that might serve to mitigate the sentence in this case. We will not set out the details of that testimony further here, but we will agree with Eaton's characterization of it as most assuredly being a substantial

factor in the jury's decision to impose the death penalty, although it is impossible to know whether or not the jury would have inferred facts equally condemnatory from all of the testimony elicited at trial.

[¶ 208] The State divides its response to this argument into three parts. First, Wyo. Stat. Ann. § 33–38–113 (LexisNexis 2007) is not applicable. Second, the State contends that the statute was not violated by the instant circumstances. Finally, the State argues that any error, if indeed such occurred, was harmless. The harmless error standard calls on the Court to determine whether the error resulted in prejudice to Eaton, and "whether the circumstances manifested inherent unfairness and injustice or conduct which offends the public sense of fair play." *Cooper v. State,* 2002 WY 78, ¶ 15, 46 P.3d 884, 890 (Wyo.2002).

[¶ 209] We set the statute out here for convenience of reference. Wyo. Stat. Ann. § 33–38–113 (LexisNexis 2007) provides:

**§ 33–38–113. Privileged communication.**

(a) In judicial proceedings, whether civil, criminal, or juvenile, in administrative proceedings, and in proceedings preliminary and ancillary thereto, a patient or client, or his guardian or personal representative, may refuse to disclose and may prevent the disclosure of confidential information, including information contained in administrative records, communicated to a person licensed or otherwise authorized to practice under this act, and their agents, for the purpose of diagnosis, evaluation or treatment of any mental or emotional condition or disorder. A person licensed or otherwise authorized to practice under this act shall not disclose any information communicated as described above in the absence of an express waiver of the privilege except in the following circumstances:

(i) Where abuse or harmful neglect of children, the elderly or disabled or incompetent individuals is known or reasonably suspected;

(ii) Where the validity of a will of a former patient or client is contested;

(iii) Where such information is necessary to defend against a malpractice action brought by the patient or client;

(iv) Where an immediate threat of physical violence against a readily identifiable victim is disclosed to the person licensed or otherwise authorized to practice under this act;

(v) In the context of civil commitment proceedings, where an immediate threat of self-inflicted damage is disclosed to the person licensed or otherwise authorized to practice under this act;

(vi) Where the patient or client alleges mental or emotional damages in civil litigation or otherwise places his mental or emotional state in issue in any judicial or administrative proceeding concerning child custody or visitation;

(vii) Where the patient or client is examined pursuant to court order; or

(viii) In the context of investigations and hearings brought by the patient or client and conducted by the board where violations of this act are at issue. Information that is deemed to be of sensitive nature shall be inspected by the board in camera and the board shall determine whether or not the information shall become a part of the record and subject to public disclosure.

Wyo. Stat. Ann. § 33–38–103(a)(i) (LexisNexis 2007) provides:

### § 33–38–103. Exemptions.

(a) Nothing in this act shall be construed to apply to the activities and services of:

(i) Qualified members of other legally recognized professions who are otherwise licensed or certified by this state, such as physicians, psychologists or registered nurses, from performing services consistent with the laws of this state, their training and the code of ethics of their professions, provided they do not represent themselves to be practicing the professions regulated under this act and do not represent themselves to be professional counselors, clinical social workers, marriage and family therapists or addiction therapists, or certified social workers, certified addictions practitioners or certified mental health workers;

Because Dr. Ash is exempt, this Court should not look at § 33–38–113 in deciding whether or not it was error to allow Dr. Ash to testify. It appears that the error here, if any, cannot be premised on the statute because of the exemption.

[¶ 210] However, that is certainly not the end of the discussion. We conclude that it is readily evident that Wyoming recognizes the application of the physician-patient privilege in criminal cases. *Frias v. State*, 722 P.2d 135, 140 (Wyo.1986). There was no objection here, and to some extent that answers the question per *Frias*. It is also evident that Eaton's argument goes somewhat beyond that. He claims that defense counsel and the trial court had a duty to inquire about waiver of the privilege and to ensure that Eaton was making an informed and voluntary decision. We cannot disagree that that should be the case, and the record should be clearer in this regard than it is. However, we do view the error, to the extent it is error, as harmless in these circumstances. In hindsight, defense counsel's use of Dr. Ash arguably turned out to be more damaging than it was helpful. Nonetheless, it may have been Eaton's last best hope.

### G. *Instructions Improper*

[¶ 211] We iterate the standard of review we applied in Part I of this opinion at ¶¶ 66–68.

[¶ 212] Although the district court, with no objection from defense counsel, declined to give an instruction that we recommended in our decision in *Olsen*, we find no error in that. In *Olsen* we said:

We also do not find that the jury was appropriately instructed on the definitions of "aggravating" and "mitigating." In Instruction No. 3, these terms are defined as:

An aggravating factor is a specified fact or circumstance which might indicate, or tend to indicate, that the defendant should be sentenced to death. A mitigating factor is any aspect of a defendant's character or background, or any circumstance of the offense which might

indicate or tend to indicate that the defendant should not be sentenced to death.

A more useful instruction would be:

An aggravating factor is a specified circumstance attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which does not justify or excuse the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

*See* California Jury Instructions, *supra*, at 517.

We hold that the jury instructions about mitigating circumstances do not correctly state the law mandated by § 6–2–102(d), and this failure is reversible error. Upon remand for resentencing, jury instructions should reflect the intended statutory process and clarify the jury's decision process in comparing the totality of aggravating and mitigating circumstances.

*Olsen,* ¶¶ 141–142, 67 P.3d at 588.

[¶ 213] The instructions given by the district court in the penalty phase of this case were adequate. We do not consider it error to give an instruction, or instructions, that are adequate, in place of one we may have recommended.

## H. *Record Incomplete*

[¶ 214] Eaton contends that the record is incomplete because the instructions conference was not reported as a part of the record on appeal. He also contends that it is incomplete because it is possible to discern in the context of the transcript of the proceedings that the court and counsel held conferences/discussions off the record. In addition, he contends that the district court erroneously limited the scope of the remand hearing to such an extent that the record on appeal is still incomplete with respect to the issues that the remand hearing was intended to shed light upon.

**(i) Instructions conference/other discussions.**

[¶ 215] In this regard, W.R.Cr.P. 55 provides:

(a) In the district court, the court reporter shall report all testimony and all proceedings held in open court including but not limited to voir dire, opening statements, motions and final arguments, as well as conferences with the presiding judge in open court and in chambers. Informal discussions, informal instruction conferences and pre-trial conferences shall be reported when requested by a party.

(b) In circuit court and municipal court, all testimony and all proceedings held in open court including but not limited to voir dire, opening statements, motions and final arguments, as well as conferences with the presiding judge in open court and in chambers, shall be recorded by electronic means. Informal discussions, informal instruction conferences and pretrial conferences shall be recorded when requested by a party. At their own expense, any party may have proceedings reported by a court reporter.

■ [¶ 216] In *Bearpaw* we discussed at length the need for a complete record so that this Court can meaningfully review the proceedings below. There is nothing in Eaton's brief to suggest that anything is missing from the record on appeal that prevents this Court from fully and faithfully performing its review function, even given that our review responsibilities are greater in the context of a death penalty case than it is in an ordinary criminal case. Wyo. Stat. Ann. § 6–2–103 (LexisNexis 2007); and see *Dobbs v. Zant,* 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993).

**(ii) Remand hearing too limited.**

■ [¶ 217] Eaton contends that the district court unnecessarily restricted the remand hearing. We are not persuaded by the contentions contained in the brief that the five days devoted to the issue of ineffective assistance of counsel were inadequate. Moreover, Eaton has not called to our attention any new, relevant, and/or material evi-

dence that should have been presented at the *Calene* hearing.

## I. *Error in Admission of Too Much Evidence About 1998 Conviction*

 [¶ 218] One of the aggravating factors brought forward by the State, which it asserted justified the imposition of the death penalty, was Eaton's 1998 conviction for aggravated assault and battery ("previously convicted of a felony involving the use or threat of violence to the person"). Eaton's contention is that it was reversible error for the district court to have allowed one of the victims of that crime, and the officer who investigated it, to testify in so much detail about its circumstances. Rather, only the fact of the conviction and that it was a "violent" crime as contemplated by the death penalty statute should have been called to the jury's attention. The core of this issue is that defense counsel were ineffective for not ensuring that the testimony about this crime was more limited. The district court ruled that the testimony at issue and some documentation of that crime was admissible in furtherance of Wyo. Stat. Ann. § 6–2–102(c) (LexisNexis 2007):

(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

We conclude that the district court did not err in this regard.

## CONCLUSION

[¶ 219] For the reasons set out above, we find no reversible error in the penalty phase and, therefore, we affirm the sentence of death which has been imposed.

## PART III: Motion for New Trial

[¶ 220] On June 2, 2006, Eaton filed a motion for new trial based on newly discovered evidence pursuant to W.R.Cr.P. 33.[8] By order entered on August 18, 2006, the district court denied that motion. Eaton filed his notice of appeal on August 30, 2006. We will affirm the district court's order.

## DISCUSSION

[¶ 221] By order entered on May 1, 2007, we consolidated Case No. 06–255 with Case No. 04–180. Thus, we also set out our disposition of that appeal here.

---

8. **Rule 33. New trial.**

(a) *In general.*—The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury, the court, on motion of a defendant for a new trial, may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment.

(b) *Any grounds except newly discovered evidence.*—A motion for a new trial based on any grounds, except newly discovered evidence, shall be made within 15 days after verdict or finding of guilty or within such further time as the court may fix during the 15 day period; but the time for filing the motion may not be extended to a day more than 30 days from the date the verdict or finding of guilty is returned. The motion shall be determined and a dispositive order entered within 15 days after the motion is filed and if not so entered shall be deemed denied, unless within that period the determination shall be continued by order of the court, but no continuance shall extend the time to a day more than 60 days from the date the verdict or finding of guilty is returned.

(c) *Newly discovered evidence.*—A motion for a new trial based on the grounds of newly discovered evidence may be made only before or within two years after final judgment but if an appeal is pending, the court may grant the motion only on remand of the case. A motion for new trial based on the ground of newly discovered evidence shall be heard and determined and a dispositive order entered within 30 days after the motion is filed unless, within that time, the determination is continued by order of the court, but no continuance shall extend the time to a day more than 60 days from the date that the original motion was filed. When disposition of a motion for new trial based on newly discovered evidence is made without hearing, the order shall include a statement of the reason for determination without hearing.

[¶ 222] In his motion for new trial, Eaton describes several pieces of new evidence that he asserts require a new trial in his case:

A motion for a new trial on the ground of newly discovered evidence is not favored by the courts and is viewed with great caution. *Hopkinson v. State*, 679 P.2d 1008, 1012 (Wyo.), cert. denied, 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984). In order to obtain a new trial on the basis of newly discovered evidence, an appellant must establish each of the following factors:

(1) That the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial.

*Opie v. State*, 422 P.2d 84, 85 (Wyo.1967). All four of these factors must be met for an appellant to be entitled to a new trial, and, if any one factor is not satisfied, there is no error in the denial of the new trial motion. *Grable* [*v. State*], 664 P.2d [531] at 535 [ (Wyo.1983) ]. Therefore, it is not essential that we address each and every factor if an appellant fails in his burden to satisfy even one of the four factors.

*Griswold v. State*, 2001 WY 14, ¶ 8, 17 P.3d 728, 731 (Wyo.2001); also see *United States v. Herrera*, 481 F.3d 1266, 1269–73 (10th Cir.2007) (evidence of incompetence resulting from diabetes may constitute new evidence where the condition was unknown at trial, but where it was known it is not).

[¶ 223] The first matter we will discuss is his contention that a new mental examination of Eaton reveals that he was not competent to stand trial. The district court made these findings with respect to Dr. William Logan's report:

As to the report of Dr. William Logan, indicating his belief that Mr. Eaton was incompetent to stand trial during the original trial, the Court finds that this is not newly discovered evidence. Based upon the Court's evaluation of Dr. Gummow's

testimony, trial testimony from Dr. Kenneth Ash and post-trial testimony from Mr. Eaton's trial counsel, who did not believe Mr. Eaton was incompetent to stand trial, the Court finds Dr. Logan's evidence is substantially outweighed by evidence concerning Mr. Eaton's competence at the time of trial. . . .

We agree with the district court's observations, but we add that the record on appeal demonstrates that the defense diligently pursued the possibilities of whether or not Eaton was competent prior to and during trial, as well as whether or not Eaton should have pursued a not guilty by reason of mental illness defense. Well qualified mental health experts concluded that he was competent. The offered evidence is, thus, cumulative only and represents an opinion that merely differs from those expressed by Dr. Ash, Dr. Gummow, and defense counsel themselves.

[¶ 224] The district court also considered the school bus that Eaton allegedly used as his home. Testing of swabs taken from the bus showed there was human blood in a drain. However, the sample was so small that nothing definitive could be determined from it. In this appeal, it is claimed that had the bus not been destroyed, additional samples could have been taken and that such evidence might have strengthened the defense team's assertion that Eaton killed Ms. Kimmell at the bus, and not at Government Bridge, as contended by the State. In turn, this would have helped to establish that the homicide was not premeditated, but rather a second-degree murder or a voluntary manslaughter. The district court made these findings about the bus:

As to any evidence concerning a bus that was inspected by the defense during trial, and also by the prosecution, the Court finds that there was no suppression of evidence by the State in this case. The Court specifically finds that there was no *Brady* violation and that no *Brady* material has been suppressed in this instance. The Court finds that there is no evidence presented which would indicate that the bus constitutes material evidence.

[¶ 225] In this instance, we also agree with the district court and would add that Eaton's position is premised on the most blatant sort of speculation. The defense was first to have knowledge of the bus. They concluded, after their inspection of it, that it was not likely the bus that Eaton had used as his home. Moreover, we deem it a leap over a giant chasm to speculate that, even if it could be established that the bus was Eaton's, the presence of blood in the drain would result in a different verdict at the guilt/innocence stage.

[¶ 226] Finally, it is contended that several pieces of evidence located by appellate counsel demonstrate further the inadequacy of the mitigation investigation:

(1) The mental health treatment that Eaton received in Kemmerer in 1986.

(2) The affidavit of Brian Conrado that Eaton appeared to be very poor and was perhaps abused at home, and definitely tormented, teased, and perhaps robbed by his peer group of school boys.

(3) School records, which demonstrated that Eaton was moved from school to school, that his education was often disrupted, that he completed very little school, and that his childhood was probably chaotic.

[¶ 227] We conclude that the material does not serve to justify reversal of the district court's order denying Eaton's motion for a new trial.

## CONCLUSION

[¶ 228] A constitutional death penalty sentencing scheme must ensure the availability of meaningful judicial review as a final safeguard that improves the reliability of the sentencing process. Throughout this opinion, we have applied the final safeguard as provided in Wyo. Stat. Ann. § 6-2-103(c)(d) and (e) (LexisNexis 2007):

§ 6-2-103. **Review of death sentences; notice from clerk of trial court; factors to be considered by supreme court; disposition of appeal.**

. . . .

(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

(d) With regard to the sentence, the court shall determine if:

(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6-2-102 and mitigating circumstances.

(iii) Repealed by Laws 1989, ch. 171, § 2.

(e) In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, may:

(i) Affirm the sentence of death;

(ii) Set the sentence aside and impose a sentence of life imprisonment without parole, or life imprisonment; or

(iii) Set the sentence aside and remand the case for resentencing.

See *Olsen,* ¶ 219, 67 P.3d at 610–11; and *Harlow,* ¶¶ 89–90, 70 P.3d at 206–07.

[¶ 229] In this case the Court is satisfied that the evidence supports the jury's findings with respect to aggravating and mitigating circumstances. In addition, it is our determination that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

[¶ 230] We affirm the judgment and sentence of the district court, as well as its order denying Eaton's motion for a new trial. The case is remanded to the district court for the purpose of vacating the suspension of the sentence of death and setting a specific date for the execution of that sentence.